## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL COMMUNITY REINVESTMENT COALITION, 740 15th Street NW Washington, DC 20005, | ) ) ) ) ) | |
| MONTANA FAIR HOUSING, 501 East Front Street, Suite 533 Butte, MT 59701, | ) ) ) ) | |
| TEXAS LOW INCOME HOUSING INFORMATION SERVICE, 1800 West Sixth Street Austin, TX 78703, | ) ) ) ) ) | |
| CITY OF TOLEDO, One Government Center 640 Jackson Street Toledo, OH 43604, | ) ) ) ) ) | |
| EMPIRE JUSTICE CENTER, One West Main Street, Suite 200 Rochester, NY 14614, | ) ) ) ) | |
| ASSOCIATION FOR NEIGHBORHOOD & HOUSING DEVELOPMENT, 50 Broad Street, Suite 1402 New York, NY 10004, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 20-2074 |
| v. | ) ) | |
| CONSUMER FINANCIAL PROTECTION BUREAU, 1700 G Street NW Washington, DC 20552, | ) ) ) ) ) | |
| Defendant. | ) ) | |

## COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF

1.      Plaintiffs National Community Reinvestment Coalition (NCRC), Montana Fair Housing (MFH), Texas Low Income Housing Information Service (TxLIHIS), City of Toledo, Empire Justice Center (EJC), and Association for Neighborhood and Housing Development (ANHD) bring this action under the Administrative Procedure Act (APA) to challenge a final rule issued by defendant Consumer Financial Protection Bureau (CFPB) that raises the loan-volume thresholds at which financial institutions are required to report data about closed-end mortgage loans and open-end lines of credit under the Home Mortgage Disclosure Act (HMDA). The challenged rule, entitled "Home Mortgage Disclosure (Regulation C)," was published on May 12, 2020, *see* 85 Fed. Reg. 28364 (the 2020 HMDA Rule), and raises the reporting thresholds set by a final rule with the same name that was published on October 28, 2015, *see* 80 Fed. Reg. 66127 (the 2015 HMDA Rule). As a result, thousands of lending institutions will become exempt from reporting HMDA data, undermining the effectiveness of HMDA in achieving its statutory purposes.

2.      In promulgating the 2020 HMDA Rule, the CFPB failed to provide a reasoned explanation for its changes in position, conducted a flawed analysis of the costs and benefits of the rule, did not meaningfully address factors it is required by statute to consider, failed to adequately consider comments submitted in opposition to the rule, and relied on considerations that have no sound basis in law. The CFPB's action, findings, and conclusions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, *see* 5 U.S.C. § 706(2)(A), and the 2020 HMDA Rule is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, *see id.* § 706(2)(C).

## JURISDICTION AND VENUE

3.      This Court has jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

4.      Venue is proper under 28 U.S.C. § 1391(e).

## PARTIES

5.      Plaintiff NCRC is an association of more than 600 community-based organizations that promote access to basic banking services, affordable housing, entrepreneurship, job creation, and vibrant communities for America's working families. Its members include community reinvestment organizations, community development corporations, local and state government agencies, faith-based institutions, community organizing and civil rights groups, minority and women-owned business associations, and social service providers. Among other things, NCRC works with community leaders, policymakers, and financial institutions to champion fairness and end discrimination in lending, housing, and business. NCRC engages in research, training, and advocacy on behalf of members; tests, monitors, and challenges discrimination in financial services and housing; and facilitates dialog between financial institutions and community networks to increase lending in neighborhoods that need it. NCRC has often used information reported to government agencies and made available to the public to promote fairness in lending and combat housing discrimination. For example, NCRC has relied on HMDA data in preparing reports such as "Best and Worst Lenders," "Income is No Shield Against Racial Differences in Lending," "Mortgages and Older Adults After COVID-19," and "Home Lending to LMI Borrowers and Communities by Banks Compared to Non-banks," and in assisting local agencies, cities, and organizations in holding lending institutions accountable for inequitable practices. NCRC submitted comments to the CFPB in opposition to the 2020 HMDA Rule. NCRC and its members intended to use HMDA data on closed-end mortgage loans and open-end lines of credit that would

have been submitted under the 2015 HMDA Rule but will not be submitted under the 2020 HMDA Rule to conduct research on issues related to fair lending, access to credit across different geographies and demographic groups, and the determination of which areas are in greatest need of public investment to ensure sufficient home lending.

6.      Plaintiff MFH is a nonprofit organization dedicated to the elimination of housing discrimination and the advancement of civil rights. The organization investigates alleged violations of fair housing and anti-discrimination laws and files complaints of discrimination in administrative and legal proceedings on behalf of its constituents, in the public interest, or as an organization. MFH became a member of NCRC in an effort to educate its staff about the use of HMDA data to identify discriminatory lending practices and areas in need of investment. MFH provides services throughout Montana.

7.      Plaintiff TxLIHIS works on initiatives to promote fair housing and to help low-income residents of Texas' urban communities to obtain or retain safe, affordable housing. TxLIHIS also is an aggressive monitor of public investments in housing, including government housing and community development programs. It serves as a public interest research organization, whose examination of racial inequality in rates of homeownership and levels of wealth is frequently based in part on data provided under HMDA. Among other uses, TxLIHIS uses HMDA data to track modern day redlining, investigating the number, amount, and providers of home mortgage loans on a census tract level for several major counties in Texas.

8.      Plaintiff City of Toledo is the municipal government representing the 272,779 residents of Toledo, a city in northwest Ohio. It manages numerous programs of public investment in housing through its Department of Neighborhoods, which allocates Community Development Block Grant, HOME Investment Partnerships Program, Emergency Solutions Grant, and

4

Neighborhood Stabilization Program funds within Toledo. The City uses HMDA data to assess which areas of Toledo are most in need of public investment to ensure adequate access to credit.

9.      Plaintiff EJC is a nonprofit organization that works to advance the interests of low-income residents of New York State through training and public education, civil legal aid and litigation, and policy analysis and advocacy. Its housing efforts include working to level the playing field for all New Yorkers by monitoring and influencing how banks and other financial institutions make investments in localities, using information disclosed under HMDA. The Greater Rochester Community Reinvestment Coalition (GRCRC), convened by EJC and its predecessor organization the Public Interest Law Office of Rochester, was launched in 1993 to generate and continue discussions about lending patterns in Rochester. EJC, its predecessor and the coalition have used HMDA data to analyze how well banks are meeting their Community Reinvestment Act (CRA) obligations, shared HMDA tables and analyses dozens of times with banks and state and federal regulators during CRA exams and mergers, and submitted dozens of data-driven comments to the appropriate state and federal regulators who have oversight of the banks. EJC submitted comments to the CFPB on behalf of GRCRC in opposition to the 2020 HMDA Rule. EJC used HMDA data to analyze the mortgage lending of Canandaigua National Bank & Trust during its 2018 CRA exam. The coalition letter can be found at https://empirejustice.org/wp-content/uploads/2018/10/CanandaiguaNB_CNB_CRA_Exam_-Comment_Letter_2018.pdf. EJC, its predecessor organization Public Interest Law Office of Rochester, and GRCRC have released over a dozen reports analyzing mortgage lending using HMDA data during the past 27 years. EJC's most recent reports using HMDA data are "The River Runs Dry II: The Persistent Mortgage Drought in Rochester's Communities of Color" (2015), http://empirejustice.org/wp-content/uploads/2018/01/river-runs-dry-ii-1.pdf, and "The Lingering Storm: Mortgage Lending

Disparities on Long Island" (2015), http://empirejustice.org/wp-content/uploads/2015/09/the-lingering-storm-mortgage.pdf. The robust publicly available data currently provided under HMDA and Regulation C allow EJC to identify strengths and weaknesses in mortgage lending patterns in the Rochester metropolitan statistical area and other parts of New York State and to generate discussions with banks and regulators about how to better serve low- and moderate-income communities and communities of color.

10.     Plaintiff ANHD is a coalition of community development and grassroots neighborhood-based groups across New York City that uses research, advocacy, capacity building, and grassroots organizing to support its over 80 member organizations. ANHD's nonprofit member organizations have built more than 123,000 units of affordable housing in New York City's most distressed neighborhoods and have shaped the housing and economic development policy landscape to better meet the needs of low- and moderate-income New Yorkers. HMDA data frequently forms the basis of research released by ANHD, including white papers, such as "Who is Lending and Who is Getting Loans?: Trends in 1-4 Family Lending in New York City," and "Why is Non-Bank Lending Highest in Communities of Color?," and ANHD's annual reports "How is Housing Treated in your Neighborhood: Housing Risk Chart," and "The State of Bank Reinvestment in New York City." ANHD submitted comments to the CFPB in opposition to the 2020 HMDA Rule, and in earlier comment periods to encourage the expansion of data collected, including to better capture multifamily lending data. ANHD routinely uses HMDA data when analyzing affordable housing trends by neighborhood in New York City, the records of individual lenders, and related regulatory comments. ANHD and its member organizations intended to use data that would be released under the 2015 HMDA Rule but will not be submitted under the 2020

HMDA Rule to conduct research into unfair lending practices and access to credit throughout New York City.

11.      Defendant CFPB is an agency of the United States. The CFPB issued the 2020 HMDA Rule.

## FACTS

### Statutory and Regulatory Background

12.      Congress enacted HMDA, 12 U.S.C. §§ 2801–2810, in 1975, in response to widely shared concern about "redlining" and inadequate access to credit in certain urban areas, particularly urban areas inhabited predominantly by people of color. As a sunshine statute, HMDA seeks to hold lending institutions publicly accountable for making loans responsibly to traditionally underserved populations. HMDA requires certain financial institutions to collect, record, and report specified information about their mortgage lending activity. HMDA's main purpose is to provide the public with loan data to assess whether financial institutions are meeting the housing needs of their communities, to inform public-sector investment decisions, to identify discriminatory lending patterns, and to enforce anti-discrimination statutes.

13.      HMDA originally required depository institutions to compile information about home mortgage lending itemized by census tract or ZIP code and make it available for inspection or copying at institutions' home and branch offices. 12 U.S.C. § 2803(a) (1976). Amendments to the Act expanded these requirements, providing public access to HMDA data at centralized depositories and mandating the itemization of loan data according to demographic characteristics such as borrower race, age, and gender. *See* Pub. L. No. 101-73, § 1211(a)(3), 103 Stat. 183, 524 (1989) (codified at 12 U.S.C. § 2803(b)(4)); Pub. L. No. 96-399, § 340(a)(3), 94 Stat. 1614, 1658 (1980) (codified at 12 U.S.C. § 2803(f)).

14.     The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act) amended HMDA and made several changes to the process of issuing implementing regulations for HMDA. The Dodd-Frank Act expanded the scope of information relating to mortgage applications and loans that institutions must report under HMDA and transferred rulemaking authority for HMDA from the Board of Governors of the Federal Reserve System to the CFPB. Additionally, the Act directed the CFPB to consider several specified factors whenever prescribing a rule, including, among others, the "potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule" and "the impact on consumers in rural areas." 12 U.S.C. § 5512(b)(2)(A).

15.     Prior to enactment of the Dodd-Frank Act, the Board of Governors of the Federal Reserve System implemented HMDA through what is known as Regulation C, 12 C.F.R. pt. 1003. At that time, Regulation C required reporting of 22 data points.

16.     In 2015, the CFPB revised Regulation C to implement the Dodd-Frank Act's amendments to HMDA. The 2015 rule raised to 48 the number of data points that lending institutions must report. The 2015 rule also required some financial institutions to report data on certain dwelling-secured, open-end lines of credit, such as home-equity lines of credit. *See* 12 C.F.R. § 1003.2(e).

17.     The 2015 rule established institutional coverage thresholds based on loan volume that limited the definition of "financial institution" to include only those institutions that originated at least 25 closed-end mortgage loans or 100 open-end lines of credit in each of the two preceding calendar years. 80 Fed. Reg. at 66309. In the rulemaking, the CFPB determined that thresholds higher than 25 closed-end mortgage loans would have a negative impact on the availability of data

about patterns and trends at the local level that is essential to achieving HMDA's purposes. *Id.* at 66147. The CFPB concluded that setting higher thresholds would result in a loss of data that would substantially impede the ability of the public and public officials to understand access to credit in their communities. *Id.* at 66148.

18.     In 2017, the CFPB issued a rule that temporarily increased the open-end threshold to 500 for calendar years 2018 and 2019. *See* 82 Fed. Reg. 43088, 43088 (Sept. 13, 2017).

19.     The Economic Growth, Regulatory Relief, and Consumer Protection Act (EGRRCPA), enacted in 2018, amended HMDA by adding partial exemptions from HMDA's reporting requirements for certain insured depository institutions and insured credit unions. Under EGRRCPA, insured depository institutions and insured credit unions that have Community Reinvestment Act ratings above a certain threshold are exempt from reporting a subset of the data points for closed-end mortgage loans if they originated fewer than 500 such loans in each of the two preceding calendar years, and they are exempt from reporting a subset of the data points for open-end lines of credit if they originated fewer than 500 such lines of credit in each of the two preceding calendar years. 12 U.S.C. § 2803(i)(1)–(3).

### *Use of HMDA Data*

20.     HMDA data is essential to efforts to hold lenders accountable for redlining, fair lending violations, and other inequitable lending practices. For example, the 1988 "Color of Money" series in the *Atlanta Journal-Constitution* relied on HMDA data to uncover substantial inequality in lending between middle-class neighborhoods that were predominantly white compared to those that were largely African American. *See* Bill Dedman, *How study of home loans in metro Atlanta was carried out*, Atlanta J.-Const. (May 1, 1988), https://www.ajc.com/news/how-study-home-loans-metro-atlanta-was-carried-out/pEAmVocmeFZvKfdIalOtcO/.  That

series won a Pulitzer Prize for Investigative Reporting and led to enforcement action by the Department of Justice against a prominent Atlanta lender under federal lending discrimination laws. The public and comprehensive nature of HMDA data reporting has continued to drive accountability. The 2018 "Kept Out" exposé authored by journalists Emmanuel Martinez and Aaron Glantz for the investigative reporting news outlet *Reveal* used HMDA data to reveal ongoing redlining in mortgage lending in 61 American cities, which triggered widespread local, state, and federal action in response. *See* Aaron Glantz & Emmanuel Martinez, *For people of color, banks are shutting the door to homeownership*, Reveal (Feb. 15, 2018), https://www.revealnews.org/article/for-people-of-color-banks-are-shutting-the-door-to-homeownership/. HMDA data has driven many more redlining actions brought by private parties as well as federal and state agencies. Many such actions could not have been brought without the use of HMDA data to identify discriminatory lending patterns.

21.     Public officials use HMDA data to shape decisions about community investment. Lowell, Massachusetts; Albuquerque, New Mexico; Antioch, California; and Flint, Michigan are among the many jurisdictions that have used HMDA data to identify neighborhoods in need of public investment. *See* 80 Fed. Reg. at 66147–48. Private parties also use HMDA data to advocate for community investment.

22.     Lenders employ HMDA data to self-police their lending practices. This data can inform internal compliance and fair lending programs and allows lenders to compare their own lending to peer institutions. The public nature of this data also motivates improved compliance with fair lending laws, even in the absence of public enforcement, private supervisory examinations, or private litigation activity, due to the reputational harm that would follow the disclosure of data showing that a lender uses inequitable lending practices.

10

23.     Following enactment of the 1989 HMDA amendments that added new demographic data points to HMDA reporting, lending to low- and moderate-income neighborhoods and people of color surged, particularly among African American and Hispanic borrowers. *See* Robert E. Litan et al., U.S. Dep't of the Treasury, *The Community Reinvestment Act After Financial Modernization: A Baseline Report* ES-4–ES-8 (2000); Eugene A. Ludwig, Comptroller of the Currency, Remarks Before the National Urban League (Aug. 5, 1997), https://www.occ.treas.gov/news-issuances/news-releases/1997/nr-occ-1997-78.html.

***The Proposed Rule***

24.     On May 2, 2019, the CFPB issued a notice of proposed rulemaking relating to Regulation C's coverage thresholds and EGRRCPA's partial exemptions and requested public comment. The CFPB proposed to raise the reporting threshold of 25 closed-end mortgage loans to 50 or 100. It further proposed to extend until January 1, 2022, the temporary coverage threshold of 500 for reporting data about open-end lines of credit, and to set the permanent coverage threshold at 200 after that. 84 Fed. Reg. 20972, 20972 (May 13, 2019).

25.     The comment period for the May 2019 proposal closed on June 12, 2019. The CFPB received more than 300 comments during the initial comment period.

26.     In response to comments expressing concern that HMDA data covering 2018—the first batch of such data collected under the 2015 HMDA Rule—would not be available until after the comment period, the CFPB issued a notice on August 2, 2019 reopening the comment period until October 15, 2019 with respect to the permanent coverage thresholds for closed-end mortgage loans and open-end lines of credit, and the appropriate effective date for the former. 84 Fed. Reg. 37804, 38805–06 (Aug. 2, 2019).

27.    The CFPB did not reopen the comment period with respect to the proposed two-year extension of the temporary coverage threshold for open-end lines of credit and issued a final rule finalizing that proposal in October 2019. *See* 84 Fed. Reg. 57946, 57946 (Oct. 29, 2019).

28.    In total, the CFPB received more than 700 comments.

### 2020 HMDA Rule

29.    On May 12, 2020, the CFPB published the 2020 HMDA Rule. The rule raises the HMDA reporting threshold to 100 or more closed-end mortgages per year for each of the preceding two years, effective July 1, 2020, and raises the reporting threshold for open-end lines of credit to 200 or more per year for each of the preceding two years, beginning on January 1, 2022. 85 Fed. Reg. at 28364.

30.    The CFPB estimated that about 4,860 financial institutions were required to report closed-end mortgage loans prior to the effective date of the 2020 HMDA Rule, of which about 3,250 were partially exempt under EGRRCPA and thus not required to report a subset of data points required by Regulation C. Institutions that are partially exempt under EGRRCPA need not report otherwise mandatory data points about the loan, including the property address, difference between the interest rate and the average prime offer rate for comparable transactions, credit score relied upon, ratio of the applicant or borrower's monthly debt to monthly income, reason for denial in cases of denied applications, and value of the property securing the covered loan, among many others.

31.    Under the current temporary threshold of 500 open-end lines of credit, the CFPB estimates that approximately 333 financial institutions are required to report data about such transactions under HMDA. The CFPB estimates that if the threshold were to adjust to 100, the number of open-end reporters would be about 1,014, of which about 595 are partially exempt under

EGRRCPA and thus are not required to report a subset of data points currently required by Regulation C. This partial exemption covers the same, substantial list of data points as does the partial exemption for closed-end mortgage loans.

32.     The increased reporting thresholds in the 2020 HMDA Rule undermine the purposes and effectiveness of HMDA by allowing circumvention and evasion of the fair lending and anti-discrimination laws to go undetected. Large numbers of lending institutions are no longer required to report HMDA data and a significant proportion of loan volume is now exempt. For instance, the increased closed-end mortgage reporting threshold exempts about 40 percent of depository institutions that were previously required to report, on top of the institutions already exempted by the annual threshold of 25 closed-end mortgages set in the 2015 HMDA Rule. The 2020 HMDA Rule will cause approximately five percent of rural census tracts to lose at least 20 percent of the HMDA data that was previously reported, in addition to the data that was already exempted from reporting under the 2015 HMDA Rule.

33.     The CFPB asserts that by raising the thresholds and excluding from coverage institutions that would otherwise be required to report, the 2020 HMDA Rule somehow effectuates the purposes of HMDA by reducing the burden of reporting. In fact, the 2020 HMDA Rule undermines the purposes and effectiveness of HMDA by reducing the amount of information available to assess whether financial institutions are meeting the housing needs of their communities.

34.     The 2020 HMDA Rule reduces the availability of data that the public and public officials have used to uncover and address redlining and other fair lending and fair housing violations and makes identifying such practices more difficult. The loss of information will be felt most acutely in distressed urban areas, rural areas, tribal areas, communities of color, and

neighborhoods that have a high number of immigrants. Raising the reporting thresholds will compromise enforcement work against unfair and deceptive lending because there will be less data publicly available to monitor such activity.

35.     The CFPB attempts to justify the 2020 HMDA Rule based on its claim that the benefit of allowing lower-volume financial institutions to avoid the expense of complying with HMDA reporting requirements outweighs the cost of losing the data that such institutions would report. The CFPB's cost/benefit analysis is deeply flawed and does not justify the 2020 HMDA Rule.

36.     In issuing the 2020 HMDA Rule, the CFPB overstates the benefits of the rule by relying on presumptions about benefits that are unexplained or thinly justified. The CFPB asserts that added experience with the 2015 HMDA Rule has informed its higher projected costs of HMDA reporting, 85 Fed. Reg. at 28371, but fails to explain which factors drove its higher projections. It does not provide a reasoned explanation for why its cost estimates of HMDA compliance continue to be higher than those it cited in its 2015 HMDA Rule, even after EGRRCPA lowered compliance expenses. Elsewhere, the agency cites "anecdotal reports" from industry of high compliance costs as a basis for doubling its estimates of one-time costs to set up reporting of open-end lines of credit. *Id.* at 28400.

37.     Many of the purported industry cost savings the agency attributes to the rule are likely to be illusory. Among other shortcomings, the CFPB fails to discuss sufficiently how its projected cost savings from reduced HMDA reporting square with the fact that lending institutions must continue to collect much of the same data in order to comply with the Truth in Lending Act and Real Estate Settlement Procedures Act or to acquire loan insurance from the Federal Housing Administration.

14

38.     The CFPB's assertion that consumers will benefit from the new rule does not reflect reasoned decision-making. The CFPB favorably discusses comment suggesting that higher reporting thresholds will lower HMDA compliance costs and thereby lead smaller lending institutions to increase their home loan offerings. The agency fails to consider data reflecting the natural experiment that was created by the previous increase to the closed-end mortgage reporting threshold, in the 2015 HMDA Rule, which would show whether it would be reasonable to credit this asserted benefit. The CFPB's weighing of costs and benefits also appears to double count benefits, detailing the cost savings for lending institutions and then describing those savings as being "passed through" to consumers, without noting that such a pass through would decrease the benefit enjoyed by covered persons.

39.     Even as presented by the CFPB, the rule achieves minimal cost savings. The marginal burden of reporting data that is already collected is small, and any cost savings that result from excluding lower-volume lenders from HMDA reporting will be modest. The excluded institutions are required to maintain most of the data even if it is not reported, and 1,630 of the 1,700 lenders that will be newly exempted from reporting closed-end mortgage data under the 2020 HMDA Rule already qualify for partial reporting exemptions under EGRRCPA. 85 Fed. Reg. at 28393. In the absence of the 2020 HMDA Rule, many institutions that are partially exempt under EGRRCPA would only have to report data points that they have been required to report for decades.

40.     The cost savings described by the CFPB are even more insignificant when placed in context. For instance, the agency calculates that most relatively small, low-complexity "Tier 3" financial institutions will save $2,200 annually if exempted from reporting closed-end mortgage data, which must be considered in relation to the minimum $47 million in assets a depository

institution must hold to be required to report such data. 85 Fed. Reg. at 28394; 12 C.F.R. § 1003.2 (Supp. I 2020). Under the extraordinarily favorable assumption that newly exempt financial institutions would pass through every dollar of variable cost savings to consumers, the agency projects that customers of institutions that are partially exempt under EGRRCPA will see savings per loan application that range from less than one-third of one percent of the median total loan costs of a mortgage to less than one-tenth of one percent. When it issued the 2015 HMDA Rule, the CFPB estimated that the impact on small institutions from reporting closed-end mortgage loans would be approximately $1,900, which translates into approximately a $38 increase in per-application costs, representing approximately 1.3 percent ($38/$2,900) of net income per origination for small and mid-size banks. 80 Fed. Reg. at 66267. The CFPB determined at that time that compliance costs of this magnitude are "relatively small" and would not affect the competitive position of such lenders. *Id.*

41.    The 2020 HMDA Rule reduces substantially the data reported under HMDA and deprives the public of the information needed to achieve HMDA's purposes. In particular, the 2020 HMDA Rule has a substantial negative impact on the public's ability to identify discriminatory lending or areas in need of public sector investment. For these reasons, the agency previously rejected the same policy provisions it now adopts in the 2020 HMDA Rule. *See* 80 Fed. Reg. at 66147. Federal efforts to enforce fair lending and other anti-discrimination laws with respect to these now excluded lenders—particularly in response to redlining violations—will be prohibitively burdensome and costly if officials must separately and independently demand, compile, and inspect data of excluded institutions as well as their newly excluded peer institutions, all of which is currently publicly available. Non-federal actors such as state attorneys general and private plaintiffs may find their ability to enforce relevant laws with respect to these excluded

entities and even covered peer institutions stymied entirely because the principle method of identifying and enforcing redlining violations will be unavailable.

42.     The CFPB has described open-end lines of credit as disproportionately high cost and containing a number of costly terms and conditions. Publicly available information regarding the terms and conditions imposed on these types of loans is thus necessary to monitor this lending and to curb any increases in abuse. Yet, the CFPB loses sight of this particularly valuable use of HMDA data when considering the costs of the 2020 HMDA Rule's increased reporting thresholds.

43.     The reduced ability of public officials to identify areas in need of public investment will counteract any purported benefit that the CFPB expects will arise from expanded lending by small lenders and lenders in geographic areas with fewer compliance professionals. Public officials will have more difficulty determining whether low reported rates of lending in underserved areas are due to actual scarcity of credit or to the elimination of reporting requirements for financial institutions that are active in those areas.

44.     Scrupulous lending institutions may find it harder to compete against rivals who exploit the new thresholds in the 2020 HMDA Rule to increase lucrative discriminatory or predatory lending practices without fear of public scrutiny. Further, smaller institutions will lose the ability to assess their own lending patterns in comparison to peer institutions that will no longer report. Even covered institutions that are just above the new thresholds will lose access to data from peer institutions that are below the thresholds.

45.     Despite clear mandates from Congress to address the need for home mortgage lending in rural and other underserved communities, the CFPB failed to acknowledge or adequately address the geographic distribution of harm from the 2020 HMDA Rule. The decline in reported HMDA data will be concentrated in areas that are underserved by lenders, including

rural areas, communities of color, distressed urban areas, and low- and moderate-income census tracts. Commenters raised numerous specific examples of communities that face substantial data loss under the 2020 HMDA Rule. In some cases, these concerns received no response at all, such as comments identifying the impact of data loss in central-city counties in persistent poverty. In other cases, comments were merely met with a conclusory assertion that the agency had considered the comments, but no substantive response.

46.     The CFPB's treatment of important subsets of data, such as loans for multifamily homes, does not evince a process of reasoned decision-making. The decline in reported HMDA data regarding mortgages for multifamily homes is substantially greater than the decline for other types of closed-end mortgages, but the agency does not make a substantive argument why the remaining data about multifamily home loans is sufficient to effectuate HMDA's purposes. The agency stated in a cursory manner that reporting on multifamily loans and applications will decline by 13 percent, 85 Fed. Reg. at 28373, but it did not conduct an analysis of the geographic areas where this decline will occur. The loss of data regarding multifamily lending is likely to disproportionately impact underserved areas in need of such lending.

47.     The CFPB also ignored or insufficiently addressed factors it was required by law to consider. For example, the CFPB is required to consider "the potential reduction of access by consumers to consumer financial products or services resulting from" any rulemaking it undertakes. 12 U.S.C. § 5512(b)(2)(A)(i). Yet, in issuing the 2020 HMDA Rule, the CFPB failed to consider that the rule would reduce the incentive to promote lending to underserved communities that is created by public visibility into HMDA data, resulting in reduced access to consumer financial products or services in such communities.

48.     The CFPB's explanation of the 2020 HMDA Rule is further undermined by the presence of inconsistencies and errors that belie the exercise of reasoned decision-making. For instance, the agency relied on inconsistent estimates of cost savings to covered persons from the new closed-end mortgage reporting threshold, varying by a factor of nearly two. *Compare* 85 Fed. Reg. at 28374 (stating that "institutions that originate between 25 and 99 closed-end mortgage loans will save approximately $11.2 million per year, relative to the current threshold"), *and id.* at 28383 & n.139, *with id.* at 28392 tbl.2 (listing total annual savings of $6.4 million), *and id.* at 28396 & n.177 ("[T]he annual savings in the operational costs of firms newly excluded under the threshold of 100 closed-end loans will be about $6.4 million.").

49.     The CFPB did not explain or acknowledge its reversals in position regarding how much data must be reported under HMDA to achieve the statute's goals. For instance, in the 2015 HMDA Rule, the agency stated that losing 20 percent or more of reported data in 385 census tracts "would substantially impede the public's and public officials' ability to understand access to credit in their communities." 80 Fed. Reg. at 66148. In issuing the 2020 HMDA Rule, the agency reversed course without explanation, stating that even after 1,200 census tracts face data losses of that scale, reported HMDA data will still sufficiently "permit the public and public officials to identify patterns and trends at the local level." 85 Fed. Reg. at 28373. Furthermore, the agency disclaims its prior position that the aggregate data loss from raising the closed-end threshold above 25 "would substantially impede the public's and public officials' ability to understand access to credit in their communities" by referencing changes in projected compliance costs, 85 Fed. Reg. at 28368–69, but compliance costs are immaterial to whether data loss poses an impediment to public understanding.

50.     The CFPB did not respond to material issues raised in public comments, such as the impact of higher reporting thresholds on visibility into lending in predominantly African American communities or the increase to systemic financial risk posed by doubling the permanent reporting threshold for open-end lines of credit.

51.     The 2020 HMDA Rule undermines the statutory framework that Congress created to determine which institutions must report HMDA data. HMDA requires transparency regarding lending practices generally, and not only with respect to a subset of lenders with high loan volume. Nonetheless, the agency's projections suggest that the 2015 HMDA Rule and 2020 HMDA Rule have together, through regulatory exemptions, exempted the majority of depository institutions that otherwise would be required to report under the criteria set forth by Congress. And although Congress addressed concerns about costs of regulatory compliance in EGRRCPA, enacted after the 2015 HMDA Rule took effect, the partial exemptions to HMDA reporting that Congress created retain far more visibility into lending by smaller institutions than does the 2020 HMDA Rule. Moreover, the statutory framework retains greater reporting requirements for small institutions receiving poor ratings under the Community Reinvestment Act, a difference that this action by the CFPB erases, by regulation, with regard to institutions annually extending between 25 and 99 closed-end mortgage loans or between 100 and 199 open-end lines of credit.

52.     The CFPB has acted outside of its statutory authority in issuing the 2020 HMDA Rule. The Director of the CFPB purports to act pursuant to the agency's authority to issue regulations under HMDA, 12 U.S.C. § 2804(a), which, under certain conditions, permits her to provide for adjustments and exceptions to the agency's rules for particular classes of transactions. The exemption of a large number of lending institutions in the 2020 HMDA Rule is inconsistent with the text of the statutory authority upon which the agency relies. Furthermore, the

circumvention of more specific statutory provisions, which establish thresholds for complete exemptions from HMDA reporting and set criteria for partial exemptions, is an impermissible use of the agency's general rulemaking authority.

## CAUSE OF ACTION

1.      The APA empowers this Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

2.      The 2020 HMDA Rule is final agency action.

3.      The CFPB has failed to provide a reasoned explanation for reversing its position regarding the costs of reporting HMDA data and the amount of data necessary to adequately understand access to credit in many communities.

4.      The 2020 HMDA Rule is not a product of reasoned decision-making, lacks support in the record, and will undermine the ability to determine whether community housing needs are being met.

5.      The CFPB did not adequately consider factors that it is statutorily required to weigh when conducting rulemaking.

6.      The CFPB failed to respond adequately to comments submitted in response to the proposed rule that opposed raising the reporting thresholds.

7.      The regulatory provisions in the 2020 HMDA Rule are contrary to reporting requirements that Congress set forth in statute.

8.      Imposing the type and scale of exemptions contained in the 2020 HMDA Rule is outside the CFPB's statutory rulemaking authority.

9.      The 2020 HMDA Rule is arbitrary, capricious, or an abuse of discretion, and not in accordance with law, or is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in contravention of the APA.

**PRAYER FOR RELIEF**

Plaintiffs request that this Court:

A.      Declare that defendant's promulgation of the 2020 HMDA Rule raising reporting thresholds for closed-end mortgage loans and open-end lines of credit is arbitrary, capricious, an abuse of discretion, contrary to law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

B.      Vacate and set aside the 2020 HMDA Rule in its entirety;

C.      Order defendant to publish a notice within 30 days of the Court's order, notifying regulated parties that they are required to report data pursuant to the 2015 HMDA Rule at the next reporting deadline;

D.      Award plaintiffs their costs and reasonable attorney fees; and

E.      Grant all other appropriate relief.

Dated: July 30, 2020                              Respectfully submitted,

                                                  /s/ Michael T. Kirkpatrick
                                                  Michael T. Kirkpatrick (D.C. Bar No. 486293)
                                                  Allison Zieve (D.C. Bar No. 424786)
                                                  Public Citizen Litigation Group
                                                  1600 20th Street NW
                                                  Washington, DC 20009
                                                  (202) 588-1000
                                                  *Counsel for Plaintiffs*