**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIONAL COMMUNITY REINVESTMENT COALITION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 20-2074 (BAH) |
| CONSUMER FINANCIAL PROTECTION BUREAU, | ) ) ) | |
| Defendant. | ) ) ) | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiffs National Community Reinvestment Coalition, Montana Fair Housing, Texas Low Income Housing Information Service, City of Toledo, Empire Justice Center, and Association for Neighborhood and Housing Development hereby move for summary judgment on the ground that there is no genuine issue of disputed material fact and that they are entitled to judgment as a matter of law.

In support of this motion, plaintiffs submit the accompanying (1) memorandum, (2) declarations of Pam Bean, Catherine Crosby, Jonathan Feldman, Adam Pirtle, Jesse Van Tol, and Barika X Williams, and (3) a proposed order.

Dated: December 11, 2020

Respectfully submitted,
/s/ Adam R. Pulver
Adam R. Pulver (D.C. Bar No. 1020475)
Michael T. Kirkpatrick (D.C. Bar No. 486293)
Allison M. Zieve (D.C. Bar No. 42486)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL COMMUNITY REINVESTMENT COALITION, et al., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Civil Action No. 20-2074 (BAH) |
| CONSUMER FINANCIAL PROTECTION BUREAU, | ) ) ) |
| Defendant. | ) ) ) |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Adam R. Pulver (D.C. Bar No. 1020475)
Michael T. Kirkpatrick (D.C. Bar No. 486293)
Allison M. Zieve (D.C. Bar No. 42486)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

December 11, 2020

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 3

I.   The History of HMDA ........................................................................................... 3

II.  HMDA's Impact ..................................................................................................... 5

III. The 2015 Rule ........................................................................................................ 8

IV.  The 2017 Rule ..................................................................................................... 12

V.   The 2020 Rule ...................................................................................................... 13

VI.  The "Correction" ................................................................................................. 14

VII. Plaintiffs ............................................................................................................. 15

LEGAL STANDARD ....................................................................................................... 19

ARGUMENT .................................................................................................................. 19

I.   Plaintiffs have standing to challenge the 2020 HMDA Rule ................................ 19

II.  The CFPB's cost-benefit justification for the 2020 Rule is arbitrary, capricious, and contrary to law. ................................................................................................. 20

    A.  The CFPB's projection of benefits of the 2020 Rule was arbitrary and capricious. ...... 21

        1.  The CFPB relied on estimated savings for the new closed-end threshold that the agency has admitted are incorrect. .......................................................... 21

        2.  The CFPB failed to consider relevant factors in assessing the benefits of the Rule. 24

    B.  The CFPB's failure to consider and address meaningfully the harms associated with increasing coverage thresholds was arbitrary, capricious, and contrary to law. ............. 28

        1.  The CFPB's refusal to consider nonquantifiable harms to consumers and the public was arbitrary, capricious, and contrary to law. ........................................ 30

        2.  The CFPB failed to adequately consider the disproportionate impacts of the Rule. 33

III. The 2020 Rule is an arbitrary and capricious application of and exceeds the agency's statutory authority. ............................................................................................... 39

    A. The 2020 Rule fails to effectuate the purposes of HMDA. ............................................. 39

B. The CFPB's use of its "exception" authority relies on an unreasonable interpretation of the statute. ...................................................................................................40

C. The CFPB cannot rely on its general rulemaking authority to promulgate broad exemptions............................................................................................................44

CONCLUSION...................................................................................................................45

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*AFL-CIO v. FEC,*
    177 F. Supp. 2d 48 (D.D.C. 2001) .........................................................................41

*Air Alliance Houston v. EPA,*
    906 F.3d 1049 (D.C. Cir. 2018) ....................................................................27, 45

*Air Line Pilots Association v. FAA,*
    3 F.3d 449 (D.C. Cir. 1993) ...........................................................................35

*Alabama Power Co. v. Costle,*
    636 F.2d 323 (D.C. Cir. 1979) ........................................................................45

*American Bioscience, Inc. v. Thompson,*
    269 F.3d 1077 (D.C. Cir. 2001) ......................................................................19

*American College of Emergency Physicians v. Price,*
    264 F. Supp. 3d 89 (D.D.C. 2017) ..................................................................24

*American Equity Investment Life Insurance Co. v. SEC,*
    613 F.3d 166 (D.C. Cir. 2010) ........................................................................25

*American Society for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*
    659 F.3d 13 (D.C. Cir. 2011) .........................................................................20

*American Wild Horse Preservation Campaign v. Perdue,*
    873 F.3d 914 (D.C. Cir. 2017) ........................................................................24

*Amgen, Inc. v. Smith,*
    357 F.3d 103 (D.C. Cir. 2004) ........................................................................41

*Association of Private Sector Colleges & Universities v. Duncan,*
    681 F.3d 427 (D.C. Cir. 2012) ........................................................................24

*Bauer v. DeVos,*
    325 F. Supp. 3d 74 (D.D.C. 2018) .............................................................31–32

*Braeburn Inc. v. FDA,*
    389 F. Supp. 3d 1 (D.D.C. 2019) ....................................................................19

*Chamber of Commerce of U.S. v. SEC,*
    412 F.3d 133 (D.C. Cir. 2005) ........................................................................33

*Commissioner v. Clark*,
   489 U.S. 726 (1989)................................................................................41

*Consumers Union of U.S., Inc. v. Federal Reserve Board*,
   938 F.2d 266 (D.C. Cir. 1991)...........................................................43–44

*Council of Parent Attorneys & Advocates, Inc. v. DeVos*,
   365 F. Supp. 3d 28 (D.D.C. 2019) ..................................................27, 30

*Delaware Department of National Resources & Environmental Control v. EPA*,
   785 F.3d 1 (D.C. Cir. 2015) ...................................................................30

*District of Columbia v. U.S. Department of Agriculture*,
   No. 20-cv-00119 (BAH), 2020 WL 6123104 (D.D.C. Oct. 18, 2020) ...................20

*Environmental Defense Fund, Inc. v. EPA*,
   82 F.3d 451 (D.C. Cir. 1996) .................................................................45

*Ethyl Corp. v. EPA*,
   306 F.3d 1144 (D.C. Cir. 2002) .............................................................20

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)........................................................................20, 31

*FEC v. Akins*,
   524 U.S. 11 (1998)..........................................................................19, 20

*Financial Planning Association v. SEC*,
   482 F.3d 481 (D.C. Cir. 2007) ...............................................................40

*Friends of the Earth, Inc. v. U.S. Army Corps of Engineers*,
   109 F. Supp. 2d 30 (D.C. Cir. 2000).......................................................35

*Getty v. Federal Savings & Loan Insurance Corp.*,
   805 F.2d 1050 (D.C. Cir. 1986) .............................................................25

*Gresham v. Azar*,
   950 F.3d 93 (D.C. Cir. 2020) .................................................................38

*Hermes Consolidated, LLC v. EPA*,
   787 F.3d 568 (D.C. Cir. 2015) ...............................................................22

*MCI Telecommunications, Corp. v. AT&T*,
   512 U.S. 218 (1994)..............................................................................41

*Maryland People's Counsel v. FERC*,
  761 F.2d 768 (D.C. Cir. 1985) ....................................................................32

*Motor Vehicle Manufacturers Ass'n of U.S., Inc. v. State Farm Mutual Auto Insurance Co.*,
  463 U.S. 29 (1983) ....................................................................................22

*National Ass'n of Home Builders v. EPA*,
  682 F.3d 1032 (D.C. Cir. 2012) ...........................................................21, 22

*National Federation of Federal Employees. v. McDonald*,
  128 F. Supp. 3d 159 (D.D.C. 2015) ...........................................................41

*National Lifeline Association v. FCC*,
  921 F.3d 1102 (D.C. Cir. 2019) ................................................................36

*Nicopure Labs, LLC v. FDA*,
  266 F. Supp. 3d 360 (D.D.C. 2017) ...........................................................32

*North Carolina Wildlife Federation v. N.C. Department of Transportation*,
  677 F.3d 596 (4th Cir. 2012) ....................................................................22

*Northwest Immigrants Rights Project v. U.S. Citizenship & Immigration Servs.*,
  Civ. No. 19-3283 (RDM), 2020 WL 5995206 (D.D.C. Oct. 8, 2020)..................38

*NRDC v. Herrington*,
  768 F.2d 1355 (D.C. Cir. 1985) ................................................................33

*PPL Wallingford Energy LLC v. FERC*,
  419 F.3d 1194 (D.C. Cir. 2005) ................................................................24

*Public Citizen, Inc. v. Federal Aviation Administration*,
  988 F.2d 186 (D.C. Cir. 1993) ..................................................................30

*Public Citizen v. Federal Motor Carrier Safety Administration*,
  374 F.3d 1209 (D.C. Cir. 2004) ...........................................................37, 40

*Public Citizen v. FTC*,
  869 F.2d 1541 (D.C. Cir. 1989) ................................................................45

*Saint-Jean v. Emigrant Mortgage Co.*,
  337 F. Supp. 3d 186 (E.D.N.Y. 2018) ........................................................7

*Securities Industry & Financial Markets Ass'n v. CFTC*,
  67 F. Supp. 3d 373 (D.D.C. 2014) .............................................................33

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947)................................................................22

*Shays v. FEC*,
   414 F.3d 76 (D.C. Cir. 2005)................................................45

*U.S. Information Agency, Voice of America v. FLRA*,
   960 F.2d 165 (D.C. Cir. 1992)..............................................44

*United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service
   Workers International Union, AFL-CIO-CLC v. Mine Safety Health Administration*,
   925 F.3d 1279 (D.C. Cir. 2019).............................................27

*Waterkeeper Alliance v. EPA*,
   853 F.3d 527 (D.C. Cir. 2017)..............................................20

*Whitman v. American Trucking Ass'ns*,
   531 U.S. 457 (2001)............................................................40

**Statutes**

5 U.S.C. § 706(2) ................................................................3, 19

12 U.S.C. § 2801 ................................................................39

12 U.S.C. § 2801(a) ................................................................3, 30, 35

12 U.S.C. § 2801(b) ................................................................1, 4

12 U.S.C. § 2802................................................................4

12 U.S.C. § 2803................................................................3

12 U.S.C. § 2803(a) ................................................................4, 20

12 U.S.C. § 2803(b) ................................................................4

12 U.S.C. § 2803(f) ................................................................4

12 U.S.C. § 2803(i) ................................................................5, 42

12 U.S.C. § 2804(a) ................................................................39, 41

12 U.S.C. § 2808(a) ................................................................42

12 U.S.C. § 5512(b)(1) ................................................................39, 44

12 U.S.C. § 5512(b)(2)(A) ....................................................................................5, 32, 37

12 U.S.C. § 5512(b)(3) ...............................................................................................5, 44,

15 U.S.C. § 1604(a) ...............................................................................................................44

Pub. L. No. 96-399, 94 Stat. 1614 (1980) .............................................................................4

Pub. L. No. 100-242, 101 Stat. 1815 (1987) ........................................................................4

Pub. L. No. 101-73, 103 Stat. 183 (1989) .............................................................................4

Pub. L. No. 111-203, 124 Stat. 1376 (2010) ........................................................................4

Pub. L. No. 115-174, 132 Stat. 1296 (2018) ....................................................................5, 42

**Regulations and Federal Register Notices**

12 C.F.R. part 203 ..................................................................................................................4

12 C.F.R. part 1003 ...............................................................................................................8

12 C.F.R. § 27.3(a)(2) ..........................................................................................................25

12 C.F.R. § 1002.13 .............................................................................................................25

12 C.F.R. § 1003.1(b)(1) .....................................................................................................30

12 C.F.R. § 1003.2 (2011) .....................................................................................................9

12 C.F.R. § 1003.2(e) ............................................................................................................9

12 C.F.R. § 1003.2(g) ..........................................................................................................12

CFPB, Final Rule, Home Mortgage Disclosure (Regulation C), 85 Fed. Reg. 28,364 (May 12, 2020) .......................................................................................................... *passim*

CFPB, Final rule, Home Mortgage Disclosure (Regulation C) Adjustment to Asset-Size Exemption Threshold, 84 Fed. Reg. 69993 (Dec. 20, 2019) .............................................26, 42

CFPB, Final rule, Home Mortgage Disclosure (Regulation C), 82 Fed. Reg. 43088 (Sept. 13, 2017) ......................................................................................................................12

CFPB, Final rule; official interpretations; Home Mortgage Disclosure (Regulation C), 80 Fed. Reg. 66128 (Oct. 28, 2015) ............................................................................ *passim*

CFPB, Notice, Home Mortgage Disclosure (Regulation C); Correction of Supplementary
     Information, 85 Fed. Reg. 69119 (Nov. 2, 2020) ......................................2–3, 14, 15, 22, 23

CFPB, Notice, Home Mortgage Disclosure (Regulation C); Reopening of Comment Period, 84
     Fed. Reg. 37804 (Aug. 2, 2019).................................................................................13

CFPB, Proposed rule, Home Mortgage Disclosure (Regulation C), 84 Fed. Reg. 20972 (May 13,
     2019) ...........................................................................................................................13

**Legislative Materials**

House of Representatives Conference Report 101-222 (1989) .......................................................4

Senate Report No. 94-187 (1975) ................................................................................................3

**Miscellaneous**

Executive Order 12866, Regulatory Planning and Review, 58 Fed. Reg. 51735, § 1 (Sept. 30,
     1993) ...........................................................................................................................33

Bill Dedman, *How study of home loans in metro Atlanta was carried out*, Atlanta J.-Const. (May
     1, 1988), https://www.ajc.com/news/how-study-home-loans-metro-atlanta-was-carried-
     out/pEAmVocmeFZvKfdIalOtcO/ .............................................................................6

Aaron Glantz & Emmanuel Martinez, *For people of color, banks are shutting the door to
     homeownership*, Reveal (Feb. 15, 2018), https://www.revealnews.org/article/for-people-of-
     color-banks-are-shutting-the-door-to-homeownership/..............................................6

Adam Levitin, "New HMDA Regs Require Banks to Collect Lots of Data … That They Already
     Have," Credit Slips, June 23, 2017, https://www.creditslips.org/creditslips/2017/06/new-
     hmda-regs-require-banks-to-collect-data-they-already-have.html ...........................25

Robert E. Litan, *et al.*, Dep't of the Treasury, *The Community Reinvestment Act After Financial
     Modernization: A Baseline Report* (2000)..................................................................8

Eugene A. Ludwig, Comptroller of the Currency, Remarks Before the National Urban League
     (Aug. 5, 1997), https://www.occ.treas.gov/news-issuances/news-releases/1997/nr-occ-1997-
     78.html)........................................................................................................................7

Richard D. Marsico, Looking Back and Looking Ahead as the Home Mortgage Disclosure Act
     Turns Thirty-Five: The Role of Public Disclosure of Lending Data in A Time of Financial
     Crisis, 29 Rev. Banking & Fin. L. 205 (2009).........................................................3

## INTRODUCTION

In 1975, Congress enacted the Home Mortgage Disclosure Act (HMDA) as a measure to combat redlining and other lending practices that perpetuate segregation and inequality. HMDA works by providing the public "with sufficient information to determine whether depository institutions are filling their obligations to serve the housing needs of the communities and neighborhoods in which they are located and to assist public officials in their determination of the distribution of public sector investments in a manner designed to improve the private investment environment." 12 U.S.C. § 2801(b). Although the Act has been amended since then, its purpose remains the same: providing the public and policymakers with data about mortgage applications and loans to allow them to hold lending institutions accountable for inequitable practices, determine areas that are in need of public investment, and develop strategies to promote greater access to credit and housing. Plaintiffs in this action, National Community Reinvestment Coalition (NCRC), Montana Fair Housing (MFH), Texas Low Income Housing Information Service (TxLIHIS), City of Toledo, Empire Justice Center (EJC), and Association for Neighborhood and Housing Development (ANHD), use publicly disclosed HMDA data to do just that.

In this Administrative Procedure Act (APA) action, Plaintiffs challenge a 2020 rule issued by the Consumer Financial Protection Bureau (CFPB) that exempts thousands of lending institutions from HMDA's reporting requirements. Specifically, the rule raises the loan-volume thresholds for reporting, thereby exempting approximately 47% of financial institutions that would otherwise be required to report on mortgage loans and 39.5% of institutions that would be required to report on lines of credit from statutory requirements to report data about the loans they make. CFPB, Final Rule, Home Mortgage Disclosure (Regulation C), 85 Fed. Reg. 28364 (May 12, 2020)

(2020 Rule). By excluding such large swaths of the regulated industries, the Rule undermines the purposes and effectiveness of HMDA.

In addition, the 2020 Rule reverses a 2015 rule in which the CFPB explicitly stated that the adoption of increased thresholds like those it set in 2020 "would substantially impede the public's and public officials' ability to understand access to credit in their communities." CFPB, Final rule; official interpretations; Home Mortgage Disclosure (Regulation C), 80 Fed. Reg. 66128, 66148 (Oct. 28, 2015) (2015 Rule). Although in the 2020 Rule the agency rejected its earlier conclusion, nothing in the rule or record supports, or meaningfully explains, the CFPB's reversal. The agency's sole justification—that the burdens on regulated institutions that come from reporting data as required by statute exceeds the benefits of that data—does not reflect reasoned decisionmaking. The CFPB's contemporaneous discussion of the costs and benefits of reporting is filled with inconsistent and unreasoned statements that overstate the costs of HMDA reporting to financial institutions and understate the value of HMDA data to organizations and public entities like Plaintiffs, as well as to others. Indeed, the agency explicitly refused even to consider the harms that the 2020 Rule would cause to the ability to monitor and eliminate discriminatory lending practices, and to identify and target underserved communities, on the ground that it could not "quantify" these harms. The CFPB's refusal to consider these harms is arbitrary in light of HMDA's goals and is directly contrary to Congress's statutory command that the CFPB meaningfully consider the effects of its rules on consumers.

As to what the agency *did* consider, the CFPB has already issued a "correction" indicating that some of the cost-savings estimates on which it relied in its contemporaneous justification of the 2020 Rule overstated the cost savings of the changes to the closed-end threshold by 75%— responding to a flaw pointed out in Plaintiffs' complaint. *See* CFPB, Home Mortgage Disclosure

(Regulation C); Correction of Supplementary Information, 85 Fed. Reg. 69119 (Nov. 2, 2020) (Correction Notice). Such a post hoc "correction" cannot save a rule justified by concededly incorrect data, and the agency's initial reliance on such a flawed estimate alone warrants vacatur and remand of the impacted portions of the Rule. Even beyond this error, the CFPB's treatment of costs to industry was inadequate to meet the reasoned decisionmaking requirements of the APA. The little discussion of costs in which the agency did engage, focusing on the number of loans that would remain covered, failed to consider the disproportionate impact of the Rule on the underserved communities that HMDA was enacted to benefit. Finally, exempting nearly half of regulated institutions—including thousands of institutions that Congress determined should be only *partially* exempted in 2018—was an unreasonable invocation of the CFPB's limited authority to promulgate "exceptions" to statutory requirements.

Because the 2020 Rule is arbitrary, capricious, and contrary to law, and in excess of the CFPB's statutory authority, the Court should set it aside. *See* 5 U.S.C. § 706(2)(A), (C).

## BACKGROUND

### I.     The History of HMDA

Congress enacted HMDA in response to widely shared concerns about "redlining" and inadequate access to credit in certain urban areas, particularly urban areas inhabited predominantly by people of color. *See* 12 U.S.C. § 2801(a); S. Rep. No. 94-187, at 1–9 (1975). Unlike other statutes that target discriminatory behavior in the housing and lending markets by creating direct enforcement mechanisms, "HMDA relies on the power of public disclosure of lending data." Richard D. Marsico, *Looking Back and Looking Ahead as the Home Mortgage Disclosure Act Turns Thirty-Five: The Role of Public Disclosure of Lending Data in A Time of Financial Crisis*, 29 Rev. Banking & Fin. L. 205, 205 (2009). By requiring institutions to make certain disclosures,

as set out in 12 U.S.C. § 2803, Congress sought to provide the public with data that would enable it to assess whether financial institutions were meeting the housing needs of their communities, to inform public-sector investment decisions, and to assist in identifying discriminatory lending practices and enforcing antidiscrimination laws. *See* 12 U.S.C. § 2801(b); H.R. Conf. Rep. 101-222, at 459 (1989) (conference report for 1989 amendments).

As initially enacted, HMDA required depository institutions to compile information about home mortgage lending, itemized by census tract or zip code, and to make it available for inspection or copying at institutions' home and branch offices. 12 U.S.C. § 2803(a) (1976). Subsequent amendments to the Act expanded these requirements to other lenders, provided public access to HMDA data at centralized depositories, and mandated the itemization of loan data according to demographic characteristics such as borrower race, age, and gender. *See* Pub. L. No. 101-73, § 1211(a)(3), 103 Stat. 183 (1989), *codified at* 12 U.S.C. § 2803(b)(4); Pub. L. No. 100-242, § 565(a)(1), 101 Stat. 1815 (1987), *codified as amended at* 12 U.S.C. § 2802; Pub. L. No. 96-399, § 340(a)(3), 94 Stat. 1614 (1980), *codified at* 12 U.S.C. § 2803(f).

For the first thirty-five years of its existence, HMDA was implemented by the Board of Governors of the Federal Reserve System. Through what is referred to as Regulation C, that agency set forth financial institutions' reporting and disclosure requirements in greater detail. *See* 12 C.F.R. part 203.

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank Act), Pub. L. No. 111-203, made several changes to HMDA relevant here. First, it transferred responsibility for implementing HMDA, including rulemaking authority, to the CFPB. *See* Pub. L. No. 111-203, 124 Stat. 1376, § 1094(1), (4) (2010). Second, it required covered entities to disclose new data points, and it authorized the CFPB to require institutions to compile and report

additional data. *Id.* § 1094(3)(A), *codified at* 12 U.S.C. 2803(b). In addition, as to the CFPB's authority, the Dodd-Frank Act provided standards for the CFPB to follow in exercising its rulemaking authority when prescribing a rule, including, among others, the "potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule" and "the impact on consumers in rural areas." 12 U.S.C. § 5512(b)(2)(A). The Act also specified that the CFPB could exempt any class of persons or entities from any statutory or regulatory provision as "necessary or appropriate" to carry out statutory purposes or objectives, so long as the agency considered three specific factors: (1) the total assets of the class to be excluded, (2) the volume of consumer financial transactions the class engages in, and (3) the extent to which otherwise applicable legal provisions provide consumers with adequate protections. 12 U.S.C. § 5512(b)(3).

In 2018, Congress enacted the Economic Growth, Regulatory Relief, and Consumer Protection Act (EGRRCPA), to "provide tailored regulatory relief" to financial institutions. Pub. L. No. 115-174, 132 Stat. 1296 (2018). EGRRCPA amended HMDA to exempt certain insured depository institutions and insured credit unions from some, but not all, of HMDA's reporting requirements. *Id.* § 104 (codified at 12 U.S.C. § 2803(i)(1)–(3)).

## II.  HMDA's Impact

"HMDA data are the primary source of information for regulators, researchers, economists, industry, and advocates analyzing the mortgage market both for HMDA's purposes and for general market monitoring." 2015 Rule, 80 Fed. Reg. at 66130. "HMDA [has] substantially improved the public's ability to determine whether financial institutions were serving the needs of their communities." *Id.* As has been recognized by federal, state, and local governments,

community organizations, journalists, and others, HMDA data has been useful in uncovering and addressing redlining, fair lending violations, and other inequitable lending practices.

For example, one early use of HMDA data was the 1988 "Color of Money" series in the *Atlanta Journal-Constitution*, which used HMDA data to uncover substantial inequality in lending between middle-class neighborhoods that were predominantly white compared to those that were largely African American. AR1716 (linking to Bill Dedman, *How study of home loans in metro Atlanta was carried out*, Atlanta J.-Const. (May 1, 1988), https://www.ajc.com/news/how-study-home-loans-metro-atlanta-was-carried-out/pEAmVocmeFZvKfdIalOtcO/). That series led the Department of Justice to take enforcement action against a prominent Atlanta lender for violating federal lending discrimination laws. *Id.* More recently, HMDA data formed the basis for a 2018 exposé by the investigative reporting news outlet *Reveal* on ongoing redlining in mortgage lending in sixty-one American cities. That exposé triggered local, state, and federal action. *See* NCRC Comments II, AR3755 at 4 (discussing Aaron Glantz & Emmanuel Martinez, *For people of color, banks are shutting the door to homeownership*, Reveal (Feb. 15, 2018), https://www.revealnews.org/article/for-people-of-color-banks-are-shutting-the-door-to-homeownership/); *see also* ANHD Comments II, AR3791 at 2.[1]

Private parties and federal and state agencies have used HMDA data to identify discriminatory lending patterns, leading to actions to redress redlining and other unlawful practices. For example, legal services providers brought a lawsuit against Emigrant Savings Bank

---

[1] As noted below, the comment period for the 2020 Rule was closed and subsequently reopened, leading many commenters, including plaintiffs NCRC and ANHD, to submit comments twice. As produced by the CFPB, comments and other materials in the administrative record were each assigned an "AR" number, but individual pages were not marked with "AR" page numbers. Plaintiffs provide the "AR" number for the documents cited and the internal page number for each document.

in New York based on HMDA data that documented a pattern and practice of targeting people and communities of color in issuing certain predatory loans. *See* NCRC Comments II, AR3755 at 6. That case led to a jury finding that Emigrant Savings Bank had violated the Equal Credit Opportunity Act, the Fair Housing Act, and the New York City Human Rights Law. *Id.*; *see also Saint-Jean v. Emigrant Mortg. Co.*, 337 F. Supp. 3d 186 (E.D.N.Y. 2018). And as set out in detail by the New York Attorney General in her comments on the 2020 Rule, her office has repeatedly used HMDA data to identify discriminatory lending practices, resulting in successful enforcement actions. *See* N.Y. Att'y Gen. Comments II, AR3733 at 2.

In addition to their value as a tool for identifying discriminatory practices, HMDA data are used by community organizations to determine what programs may best serve the financial and housing needs of communities, and to determine potential lender partners for community development. *See, e.g.*, Woodstock Inst. Comments, AR2666 at 2; NeighborWorks Am. Comments, AR2828 at 1. Public officials use HMDA data to shape decisions about community investment. *See, e.g.*, Woodstock Inst. Comments, AR2666 at 2. Among the many jurisdictions that have used HMDA data to identify neighborhoods in need of public investment are Lowell, Massachusetts; Albuquerque, New Mexico; Antioch, California; and Flint, Michigan. *See* 2015 Rule, 80 Fed. Reg. at 66147–48.

Additionally, lenders employ HMDA data to self-police their lending practices. *See, e.g.*, MidFirst Bank Comments, AR2888 at 2–3; NCRC Comments II, AR3755 at 7; Met. Milwaukee Fair Hous. Council Comments, AR2645 at 1. The data can inform internal compliance and fair lending programs, and enable lenders to compare their own lending to peer institutions. *See id*. The public nature of this data also motivates improved compliance with fair lending laws, even in the absence of public enforcement, private supervisory examinations, or private litigation activity,

due to the reputational harm that would follow the disclosure of data showing that a lender uses inequitable lending practices. *See* NCRC Comments II, AR 3755 at 3; *see also* GRCRC Comments II, AR3654 at 3; Nat'l Consumer Law Ctr. Comments, AR2854 at 2.

As a result of these and other uses, HMDA data reporting has led to a significant increase in lending to low- and moderate-income neighborhoods and people of color, particularly among African American and Hispanic borrowers. *See, e.g.*, NCRC Comments II, AR3755 at 3 (citing Robert E. Litan, *et al*., Dep't of the Treasury, *The Community Reinvestment Act After Financial Modernization: A Baseline Report*, ES-4–ES-8 (2000); Eugene A. Ludwig, Comptroller of the Currency, Remarks Before the National Urban League (Aug. 5, 1997), https://www.occ.treas.gov/news-issuances/news-releases/1997/nr-occ-1997-78.html)).

## III.   The 2015 Rule

In 2015, the CFPB issued a final rule implementing the Dodd-Frank Act's amendments to HMDA and updating Regulation C (now codified at 12 C.F.R. part 1003), the relevant parts of which were effective on January 1, 2018. *See* 2015 Rule, 80 Fed. Reg. 66128. The 2015 Rule was premised on the notion that, "[d]espite its extensive benefits, serious inadequacies exist in the information currently collected under Regulation C." *Id.* at 66259.

The financial crisis of the early 2000s had made "apparent that communities throughout the nation lacked sufficient information to understand the magnitude of the risk to which they were exposed" and "to create effective and responsive relief programs." *Id.* at 66130. Accordingly, the 2015 Rule included changes to what data needed to be reported, for which loans such data needed to be reported, and to which institutions needed to collect and report data. The 2015 Rule added additional data points that lending institutions must report, including eleven mandated by Congress in Dodd-Frank. *Id.* at 66128, 66175. And it expanded the types of loans that were subject to

reporting by requiring some financial institutions to report data on both traditional closed-end loans and certain dwelling-secured, open-end lines of credit, such as home-equity lines of credit. *Id.* at 66143–44 (discussing 12 C.F.R. § 1003.2(e)).

Most relevant here, the 2015 Rule also made changes to the definition of "financial institution," which is used to determine which entities are required to collect and report HMDA data. Under previous versions of Regulation C, the relevant factors differed for depository and nondepository institutions. *See* 12 C.F.R. § 1003.2 (2011). Depository institutions that made home purchase loans were required to report HMDA data if their assets exceeded the statutory annually adjusted asset threshold. *Id.* Nondepository mortgage-lending institutions were required to report if (1) either 10% of their loan-origination volume derived from originated home purchase loans or their originated home purchase loans equaled at least $25 million, and (2) their assets exceeded an asset threshold that was *not* annually adjusted or they had originated at least 100 home purchase loans in the prior year. *Id.* In the 2015 Rule, the agency recognized that "Regulation C's current transactional coverage criteria omit a large proportion of dwelling-secured loan products, including large segments of the home-equity line of credit market." 80 Fed. Reg. at 66259. The Rule therefore established uniform loan-volume thresholds for depository and nondepository institutions, requiring "an institution that originated at least 25 closed-end mortgage loans or at least 100 open-end lines of credit in each of the two preceding calendar years to report HMDA data, provided that the institution meets all of the other criteria for institutional coverage." 2015 Rule, 80 Fed. Reg. at 66146 (discussing §1003.2(2)(g)). This change had the effect of increasing the number of nondepository institutions required to report, while eliminating reporting requirements for many low-volume depository institutions. *Id.* As to the former, the CFPB concluded that the revised threshold would "improve the availability of data concerning the

practices of nondepository institutions," making "the public and public officials … better able to protect consumers because historically, some riskier lending practices, such as those that led to the financial crisis, have emerged from the nondepository market sector." *Id.*; *see also* 80 Fed. Reg. at 66152 (explaining that the change reflected the agency's belief that "it is important to increase visibility into the practices of nondepository institutions"). As to depository institutions, the agency found that the 25 closed-end/100 open-end threshold struck an appropriate balance between reducing burden on institutions and "preserv[ing] sufficient data for analyzing mortgage lending at the national, local, and institutional levels." *Id.* at 66146.

As to closed-end mortgage loans, the agency acknowledged comments "urg[ing] the Bureau to adopt a much higher loan-volume threshold that would exempt more depository institutions from reporting." 80 Fed. Reg. at 66147. The agency explained, however, that such a threshold would be inappropriate because it "would have a material negative impact on the availability of data about patterns and trends at the local level." *Id.* Discussing in detail how vital such data was to serving HMDA's goals, the CFPB recognized that "[p]ublic officials, community advocates, and researchers rely on HMDA data to analyze access to credit at the neighborhood level and to target programs to assist underserved communities and consumers." *Id.* While "a 25-closed-end mortgage loan-volume threshold would impact the robustness of the data that would remain available only in a relatively small number of markets," the agency explained, a higher threshold would have a much greater impact: If the threshold were raised to 100, "the number of census tracts that would lose 20 percent of reported data would increase from about 45 tracts to about 385 tracts, almost eight times more than the number with a threshold set at 25 closed-end mortgage loans." *Id.* at 66148. For lower- and middle-income tracts, the number of tracts that would lose 20% of reported data would go from 20 to 145. *Id.* The CFPB concluded that this loss

of data "would substantially impede the public's and public officials' ability to understand access to credit in their communities." *Id.* at 66148; *see also id.* at 66275 (noting that "excluding some nondepository institutions with fewer than 100 loans may weaken the understanding of markets needed for prioritization and redlining analyses" and that "[t]he addition of nondepository institutions with between 25 and 99 closed-end mortgage loan originations will provide an improved understanding of the mortgage markets where these financial institutions operate, thereby enhancing efforts to assess whether these institutions, and financial institutions overall, are serving the housing needs of their communities"); *id.* at 66279–81 (explaining in detail how "[h]igher thresholds would further reduce burden but would produce data losses that would undermine the benefits provided by HMDA data").

The CFPB also explained that the 100-loan threshold it adopted for open-end lines of credit appropriately balanced costs and benefits, as it would "avoid imposing the burden of establishing open-end reporting on many small institutions with low open-end lending volumes," while "improv[ing] the availability of data concerning open-end dwelling-secured lending by collecting data from a sufficient array of institutions and about a sufficient array of transactions." *Id.* at 66149–50; *see also id.* at 66281 (stating that "a threshold of 100 open-end lines of credit reduces burden on financial institutions while preserving important coverage and visibility into the market for dwelling-secured lines of credit"). The CFPB estimated that nearly 90% of all open-end line of credit originations would be reported under the 100-loan threshold, which would "improve the public and public officials' ability to monitor and understand all sources of dwelling-secured lending and the risks posed to consumers and communities by those loans." *Id.* at 66150. The agency acknowledged that, as a result, "financial institutions may incur significant costs as a result of open-end line of credit reporting," but nonetheless "believe[d] that the benefits of reporting

justify the burdens." *Id.* at 66158. It explained "that home-equity lines of credit have become increasingly important to the housing market and that requiring such lending to be reported under Regulation C would help to understand how financial institutions are meeting the housing needs of communities." *Id.* at 66157. This data was particularly important given the well-documented roll that home-equity lines of credit and home equity loans played in the financial crisis between 2000 and 2008. *Id.* at 66282.

## IV.    The 2017 Rule

In July 2017, in response to "anecdotal evidence regarding one-time and ongoing costs and new data indicating that more institutions would have reporting responsibilities under the 100-loan open-end threshold than estimated in the 2015 HMDA Final Rule," the CFPB sought comment on (1) "whether to increase the open-end threshold temporarily"; (2) "if so, whether to raise the threshold to 500 or to a larger or smaller number"; and (3) for "what time period to increase the open-end threshold, should it do so." CFPB, Final rule, Home Mortgage Disclosure (Regulation C), 82 Fed. Reg. 43088, 43094 (Sept. 13, 2017) (2017 Rule). Later that year, after receiving and reviewing comments, the agency decided to temporarily increase the open-end threshold from 100 to 500, until January 1, 2020. *Id.* at 43095 (discussing amendments to 12 C.F.R. § 1003.2(g)). The agency acknowledged that the change would "decrease visibility into the open-end line of credit market," but it stated that a temporary increase would be appropriate "while the Bureau further studies the issue." *Id.*

The 2017 Rule did not alter the reporting thresholds for closed-end mortgages. The agency stated that it found no reason to revisit the determinations that it made in 2015 of the costs and benefits of the 25-loan threshold. *See id.* at 43095–96.

12

## V.      The 2020 Rule

On May 2, 2019, the CFPB issued a notice of proposed rulemaking relating to Regulation C's coverage thresholds. *See* CFPB, Proposed rule, Home Mortgage Disclosure (Regulation C), 84 Fed. Reg. 20972 (May 13, 2019) (2019 NPRM). In the 2019 NPRM, the agency proposed to extend the temporary increase of the open-end loan coverage threshold to 500 until January 1, 2022, and to set the permanent coverage threshold at 200 after that. It also proposed to increase the threshold for *closed*-end mortgages to either 50 or 100, effective January 1, 2020. *Id.* at 20972. The sole reason provided for these changes was to reduce the burden on financial institutions. *See id.* at 20976–77, 20984.

The comment period initially closed on June 12, 2019, but was later reopened and extended to October 15, 2019, with respect to the permanent coverage thresholds for closed-end mortgage loans and open-end lines of credit, and the appropriate effective date for the former. *See* CFPB, Notice, Home Mortgage Disclosure (Regulation C); Reopening of Comment Period, 84 Fed. Reg. 37804, 38805–06 (Aug. 2, 2019). The agency received more than 700 comments in response to the NPRM, 2020 Rule, 85 Fed. Reg. at 28367, including comments opposing increases in the coverage threshold from a range of research and advocacy organizations dedicated to fair lending, access to credit, and eradicating housing discrimination, as well as state and local governments. *See, e.g.*, NCRC Comments II, AR3755 (on behalf of 210 national and local organizations and local governments); ANHD Comments II, AR3791; N.Y. Att'y Gen. Comments II, AR3733; GRCRC Comments II, AR3654; Cal. Reinvestment Coal. Comments II, AR3631; Consumer Fed'n of Am. Comments, AR3036; NCRC Comments I, AR2970 (on behalf of 148 national and local organizations and local governments); N.Y. Att'y Gen. Comments I, AR2962; Cal. Reinvestment Coal. Comments I, AR2897; St. Louis Equal Hous. & Opportunity Council

13

Comments, AR2857; ANHD Comments I, AR2846; Fifth Ave. Comm. Comments, AR2836; NeighborWorks Am. Comments, AR2828; Woodstock Inst. Comments, AR2666; GRCRC Comments I, AR2588; Asian Ams. for Equality Comments, AR2387. Financial institutions took varied positions on the proposed rule. *Compare* MidFirst Bank Comments, AR2888 (arguing threshold increases were "not in the best interest of the regulated community"), *with* Farmers Trust & Sav. Bank Comments, AR2332 (requesting CFPB set higher threshold for closed-end reporting), *and* Int'l Bancshares Corp. Comments, AR2679 (supporting proposed threshold for closed-end reporting and requesting higher threshold for open-end reporting).

On May 12, 2020, the CFPB published the 2020 Rule challenged here. The rule raises the HMDA reporting threshold from 25 to 100 or more closed-end mortgages per year for each of the preceding two years, effective July 1, 2020, and raises the reporting threshold for open-end lines of credit from 100 to 200 or more per year for each of the preceding two years, beginning on January 1, 2022. *See* 2020 Rule, 85 Fed. Reg. at 28364. As discussed in further detail below, the CFPB justified both changes by asserting that, "on balance," the associated reductions in costs to institutions associated with reporting HMDA data outweighed the loss of data that such institutions would otherwise report. *See id.* at 28371 (closed-end threshold); *id.* at 28379 (open-end threshold).

## VI.  The "Correction"

Plaintiffs filed this action on July 30, 2020. Three months later, the CFPB published a "correction" of the 2020 Rule in the Federal Register. *See* CFPB, Home Mortgage Disclosure (Regulation C); Correction of Supplementary Information, 85 Fed. Reg. 69119 (Nov. 2, 2020) (Correction Notice). In this document, the CFPB acknowledged that the estimates of cost savings resulting from the increased closed-end threshold that it relied on in the 2020 Rule's Section-by-Section analysis, where it explained why the agency was adopting changes, were radically off.

14

Whereas the agency had stated that raising the threshold from 25 to 100 would save newly-exempted institutions approximately $11.2 million per year, the agency now conceded that the savings would be much lower—only $6.4 million per year across the entire industry. *Id.* at 69119. The agency retroactively "corrected" this error by substituting the lower number, without revisiting any of the discussion of cost savings that the agency had used to justify its earlier action. *Id.*

## VII.    Plaintiffs

Plaintiffs are five organizations and one city that use HMDA data in their research, education, and advocacy to promote access to credit, and thus to housing opportunities, in minority communities.

Plaintiff NCRC is an association of more than 600 community-based organizations that promote access to basic banking services, affordable housing, entrepreneurship, job creation, and vibrant communities for America's working families. Van Tol Decl. ¶ 2. Its members include community reinvestment organizations, community development corporations, local and state government agencies, faith-based institutions, community organizing and civil rights groups, minority and women-owned business associations, and social service providers. *Id.* Among other things, NCRC works with community leaders, policymakers, and financial institutions to champion fairness and end discrimination in lending, housing, and business. *Id*. ¶ 3. NCRC engages in research, training, and advocacy on behalf of members; tests, monitors, and challenges discrimination in financial services and housing; and facilitates dialogue between financial institutions and community networks to increase lending in neighborhoods that need it. *Id.* ¶ 4. NCRC uses HMDA data and makes it available to the public to promote fairness in lending and combat housing discrimination. *Id.* ¶ 5. For example, NCRC has relied on HMDA data in preparing reports such as "Best and Worst Lenders," "Income is No Shield Against Racial Differences in

Lending," "Mortgages and Older Adults After COVID-19," and "Home Lending to LMI Borrowers and Communities by Banks Compared to Non-banks," and assisting local agencies, cities, and organizations in holding lending institutions accountable for inequitable practices. *Id*. NCRC submitted comments to the CFPB in opposition to the 2020 HMDA Rule. NCRC Comments I, AR2970; NCRC Comments II, AR3755. NCRC and its members intended to use HMDA data on closed-end mortgage loans and open-end lines of credit that would have been submitted under the 2015 HMDA Rule but will not be submitted under the 2020 HMDA Rule to conduct research on issues related to fair lending, access to credit across different geographies and demographic groups, and the determination of which areas are in greatest need of public investment to ensure sufficient home lending. Van Tol Decl. ⁋ 7.

Plaintiff MFH is a nonprofit organization dedicated to the elimination of housing discrimination and the advancement of civil rights. Bean Decl. ⁋ 2. The organization investigates alleged violations of fair housing and anti-discrimination laws and files complaints of discrimination in administrative and legal proceedings on behalf of its constituents, in the public interest, or as an organization. *Id*. MFH provides services throughout Montana. *Id*. ⁋ 3. MFH, an NCRC member, joined NCRC to enhance its capacity to use HMDA data to identify discriminatory lending practices and areas in need of investment. *Id.* ⁋ 4. HMDA data that would have been submitted under the 2015 HMDA Rule but will not be submitted under the 2020 HMDA Rule is of particular interest to MFH, because many lenders in rural areas of Montana are likely to be below the reporting thresholds in the 2020 Rule. *Id.* ⁋ 5.

Plaintiff TxLIHIS works on initiatives to promote fair housing and to help low-income residents of Texas' urban communities to obtain or retain safe, affordable housing. Pirtle Decl. ⁋ 2. TxLIHIS also is an aggressive monitor of public investments in housing, including government

housing and community development programs. *Id.* ¶ 3. It serves as a public interest research organization, whose examination of racial inequality in rates of homeownership and levels of wealth is frequently based in part on data provided under HMDA. *Id.* Among other uses, TxLIHIS uses HMDA data to track modern day redlining, investigating the number, amount, and providers of home mortgage loans on a census tract level for several major counties in Texas. *Id.* ¶ 4. TxLIHIS intended to use HMDA data on closed-end mortgage loans that would have been submitted under the 2015 HMDA Rule but will not be submitted under the 2020 HMDA Rule to promote fair housing in Texas. *Id.* ¶ 5.

Plaintiff City of Toledo is the municipal government representing the 272,779 residents of Toledo, a city in northwest Ohio. Crosby Decl. ¶ 2. It manages numerous programs of public investment in housing through its Department of Neighborhoods, which allocates Community Development Block Grant, HOME Investment Partnerships Program, Emergency Solutions Grant, and Neighborhood Stabilization Program funds within Toledo. *Id.* The City uses HMDA data to assess which areas of Toledo are most in need of public investment to ensure adequate access to credit. *Id.* ¶ 3.

Plaintiff EJC is a nonprofit organization that works to advance the interests of low-income residents of New York State through training and public education, civil legal aid and litigation, and policy analysis and advocacy. Feldman Decl. ¶ 2. Its housing efforts include working to level the playing field for all New Yorkers by monitoring and influencing how banks and other financial institutions make investments in localities, using information disclosed under HMDA. *Id.* The Greater Rochester Community Reinvestment Coalition (GRCRC), convened by EJC and its predecessor organization, the Public Interest Law Office of Rochester, was launched in 1993 to generate and continue discussions about lending patterns in Rochester. GRCRC Comments II,

AR3654 at 1. EJC, its predecessor, and the coalition have used HMDA data to analyze how well banks are meeting their Community Reinvestment Act (CRA) obligations, shared HMDA tables and analyses dozens of times with banks and state and federal regulators during CRA exams and mergers, and submitted dozens of data-driven comments to the appropriate state and federal regulators who have oversight of the banks. GRCRC Comments II, AR3654 at 1. EJC submitted comments to the CFPB on behalf of GRCRC in opposition to the 2020 HMDA Rule. GRCRC Comments I, AR2588; GRCRC Comments II, AR3654. EJC used HMDA data to analyze the mortgage lending of Canandaigua National Bank & Trust during its 2018 Community Reinvestment Act examination. Feldman Decl. ¶ 5. EJC, its predecessor organization Public Interest Law Office of Rochester, and GRCRC have released over a dozen reports analyzing mortgage lending using HMDA data during the past twenty-seven years. GRCRC Comments II, AR3654 at 1. The robust publicly available data currently provided under HMDA and Regulation C allow EJC to identify strengths and weaknesses in mortgage lending patterns in the Rochester metropolitan statistical area and other parts of New York State and to generate discussions with banks and regulators about how to better serve low- and moderate-income communities and communities of color. GRCRC Comments II, AR3654 at 1. EJC intended to use HMDA data on closed-end mortgage loans that would have been submitted under the 2015 HMDA Rule but will not be submitted under the 2020 HMDA Rule to further its fair housing work. Feldman Decl. ¶ 8.

Plaintiff ANHD is a coalition of community development and grassroots neighborhood-based groups across New York City that uses research, advocacy, and grassroots organizing to support its members. Williams Decl. ¶ 2. ANHD's nonprofit member organizations have built more than 123,000 units of affordable housing in New York City's most distressed neighborhoods and have shaped the housing and economic development policy landscape to better meet the needs

18

of low- and moderate-income New Yorkers. *Id.* ⁋ 3. HMDA data frequently forms the basis of research released by ANHD. *Id.* ⁋ 4 (listing several papers); *see also* ANHD Comment II, AR3791 at 2–3. ANHD submitted comments to the CFPB in opposition to the 2020 HMDA Rule. ANHD Comment I, AR2846; ANHD Comment II, AR3791. ANHD and its member organizations intended to use data that would be released under the 2015 HMDA Rule but will not be submitted under the 2020 HMDA Rule to conduct research into unfair lending practices and access to credit throughout New York City. Williams Decl. ⁋ 7.

## LEGAL STANDARD

Under the APA, this Court "shall hold unlawful and set aside agency action" that is "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). "In APA cases involving cross-motions for summary judgment, 'the district judge sits as an appellate tribunal. The "entire case" on review is a question of law.'" *Braeburn Inc. v. FDA*, 389 F. Supp. 3d 1, 15 (D.D.C. 2019) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).

## ARGUMENT

### I.      Plaintiffs have standing to challenge the 2020 HMDA Rule.

As a preliminary matter, Plaintiffs have standing to challenge the 2020 HMDA Rule, which has caused them an informational injury that is redressable by the relief sought. "[A] plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998). To meet its burden in demonstrating such an injury, a plaintiff must "assert 'a view of the law under which the defendant (or an entity it regulates) is obligated to disclose certain information that the plaintiff has a right to

obtain.'" *Waterkeeper All. v. EPA*, 853 F.3d 527, 533 (D.C. Cir. 2017) (quoting *Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 22–23 (D.C. Cir. 2011)). "For the purpose of standing," where a plaintiff claims that an agency has unlawfully adopted an exemption that "reduces the information that must be publicly disclosed" pursuant to a statute, and, as a result, "no longer ha[s] a statutory right to access it," "that's injury enough." *Id.*

As detailed in their concurrently filed declarations, Plaintiffs use data disclosed pursuant to HMDA, 12 U.S.C. § 2803(a), in furtherance of their organizational objectives to promote fairness in and access to lending, to combat housing discrimination, and to shape decisions about community investment. By unlawfully exempting institutions that would otherwise be required to report HMDA data, the 2020 Rule deprives Plaintiffs of data to which they are entitled by statute and that they would obtain and use. "[T]here 'is no reason to doubt their claim that the information would help them.'" *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002) (quoting *Akins*, 524 U.S. at 21). Accordingly, Plaintiffs have standing to challenge the 2020 Rule.

## II.   The CFPB's cost-benefit justification for the 2020 Rule is arbitrary, capricious, and contrary to law.

CFPB justifies the increased thresholds in 2020 Rule on the basis that exempting more institutions from the disclosures mandated by statute would reduce the burden on those institutions, and that this reduction in burden outweighs the harms caused by depriving the public of the information that would otherwise be disclosed. This justification is a 180-degree reversal of the agency's conclusion in the 2015 Rule. Although an agency may change its position over time, here, the CFPB failed to provide contemporaneous, reasonable grounds for doing so, as required by the APA. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *District of Columbia v. U.S. Dep't of Agric.*, No. 20-cv-00119 (BAH), 2020 WL 6123104, at *18 (D.D.C. Oct. 18, 2020). Accordingly, its decision was arbitrary and capricious.

In addition, where an agency justifies a rule based on a cost-benefit analysis, as the CFPB did here, "a serious flaw undermining that analysis can render the rule unreasonable." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012). The analysis in the 2020 Rule contains several such serious flaws, both on the "cost" and "benefit" sides of the ledger. To begin with, the agency's projections as to the benefits of increasing the coverage thresholds were wildly overstated. Indeed, the agency has *acknowledged* that it relied on an erroneous projected cost savings in setting the closed-end threshold. Moreover, the agency's discussion of benefits does not reflect meaningful consideration of several relevant factors, as highlighted by the comments.

The agency's assessment of the costs that would be inflicted by the 2020 Rule was also egregiously flawed. The agency barely discussed the loss of data that would result from the Rule, making only a few cursory statements and failing to respond to the detailed discussion of resulting harms identified by commenters. The agency's approach is particularly glaring because it is statutorily required to consider the impacts of its actions on consumer access to credit, and the specific impact on consumers in rural communities. And what the agency *did* say directly contradicted its statements in the 2015 Rule—a contradiction that the agency failed to acknowledge or explain.

**A. The CFPB's projection of benefits of the 2020 Rule was arbitrary and capricious.**

**1. The CFPB relied on estimated savings for the new closed-end threshold that the agency has admitted are incorrect.**

In the 2020 Rule, the CFPB relied on a massive error that requires vacatur and remand of the Rule as to the closed-end threshold. Explaining its decision to adopt a 100-loan threshold for closed-end mortgage loans for both depository and non-depository institutions, the CFPB stated that increasing the threshold for closed-end mortgage loans from 25 to 100 would save non-covered institutions "approximately $11.2 million per year." *See* 85 Fed. Reg. at 28374. Based on

that estimate, the CFPB stated that "the cost reduction from increasing the threshold from 25 to 100 closed-end mortgage loans is significant" and will "provid[e] meaningful cost savings to institutions." *Id.* (discussing depository institutions); *see id.* at 28383 (utilizing same estimate for non-depository institutions and concluding cost savings for financial institutions would be "meaningful"). It was this "significant reduction in burden" that the agency concluded "justified" a loss of valuable HMDA data, finding the 100-loan threshold "strikes the right balance between the burden of collecting and reporting and the benefit of HMDA data." *Id.* at 28374 (depository institutions); *see id.* at 28383–84 (same analysis for non-depository institutions).

In their complaint in this case, Plaintiffs pointed out that the $11.2 million dollar figure that the CFPB used to justify the 2020 Rule was inconsistent with figures mentioned in other sections of the Rule. *See* ECF 1 at ¶ 48. The CFPB later conceded that it erred in projecting this "significant reduction in burden"—and materially so. *See* Correction Notice, 85 Fed. Reg. at 69119. The correct number for savings, the CFPB now says, is actually $6.4 million. The figure used by the CFPB to justify the 2020 Rule was thus inflated *by 175%. Id.*

The agency's error was a "serious flaw undermining [its] analysis." *Nat'l Ass'n of Home Builders*, 682 F.3d at 1040, and the *post hoc*, mid-litigation "correction" cannot save it. The "acknowledgment made during litigation does not change the fact that the [rulemaking] itself relied on" incorrect data. *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 603–04 (4th Cir. 2012) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 50 (1983), and *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

In light of the conceded error, the Court can uphold the 2020 Rule only if it can "conclude with sufficient certainty that the agency would have made the same decision absent its errors." *Hermes Consol., LLC v. EPA*, 787 F.3d 568, 579 (D.C. Cir. 2015). Given that "the conceded errors

significantly alter important figures" in the agency's justification for raising the closed-loan threshold, *id.*, however, it is hardly "certain" that the agency would have come to the same conclusion. Notably, in the 2020 Rule itself, CFPB explained it was necessary to revisit the 2015 open-end threshold on the grounds that that the 2015 Rule had been based on an estimate of 749 covered institutions, and the agency's revised estimate was "significantly higher"—1,014 covered institutions, a difference of 35%. 85 Fed. Reg. at 28378. The error here was just as "significant." In its Correction Notice, the CFPB noted that the correct, substantially lower estimate of cost savings were printed at two places in the separate section 1022(b) analysis at the end of the Rule's preamble. 85 Fed. Reg. at 69119 (citing 85 Fed. Reg. 23892 & 23896, and referring to section 1022(b) of the Dodd-Frank Act, which requires the CFPB to consider the potential benefits and costs of a regulation to consumers and covered persons). Notably, however, the CFPB did *not* disclaim that it had relied on the incorrect $11.2 million figure in its contemporaneous justification of the Rule. Although the Correction Notice notes that the 2020 Rule describes the section 1022(b) analysis as more "comprehensive" than the Section-by-Section analysis, 85 Fed. Reg. at 69119, it is clear in context that the word was used to indicate that the section 1022(b) analysis addressed all aspects of the Rule and gave more detail about the figures. *See, e.g.*, 85 Fed. Reg. at 28371 n.58 ("For estimates that are comprehensive of depository and nondepository institutions, see part VII.E.2 below."). The section 1022(b) analysis nowhere suggested that it superseded the Section-by-Section analysis or acknowledged any inconsistency. Indeed, one of the two places where the $6.4 million figure was listed was a summary table ("Table 2") that CFPB stated was "not intended to capture all details and nuances that are provided both in the rest of the analysis and in the section-by-section discussion above"—the discussion that used the incorrect $11.2 million figure. 85 Fed. Reg. at 28392.

To allow an agency, when confronted during litigation with errors and inconsistencies made in a rulemaking, to jettison its errors without explanation would be an affront to the requirement of reasoned decisionmaking. As the D.C. Circuit has explained, "there is no 'oops' exception to the duty of federal agencies to engage in reasoned decisionmaking." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 924 (D.C. Cir. 2017) (finding agency action arbitrary and capricious where agency "trie[d] to shrug off" a mistake "as some sort of inconsequential and passing 'administrative error'"). When it issued the 2020 Rule, CFPB justified its actions based on $11.2 million in annual savings—but it now acknowledges that the record does not support a figure remotely close to that. On this basis alone, the Court should vacate and remand the revised closed-end threshold.

### 2. The CFPB failed to consider relevant factors in assessing the benefits of the Rule.

#### a. Closed-End Threshold

Whether using the estimates actually relied on in the Rule or the CFPB's "corrected" figures, the agency's conclusory assertion that the changes to the closed-end threshold will yield "meaningful cost savings to institutions," 2020 Rule, 85 Fed. Reg. at 28374, is irrational. Commenters raised three major points that called into question how meaningful the savings would be, and the CFPB failed to respond adequately to any of them. Because the agency failed to respond to these substantive points, the Rule does not meet the APA's reasoned decisionmaking standard. *See Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 442, 449 (D.C. Cir. 2012); *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005); *Am. Coll. of Emergency Physicians v. Price*, 264 F. Supp. 3d 89, 95 (D.D.C. 2017).

First, although they will not be required to report it pursuant to HMDA, the newly-excluded institutions will still be required to maintain most HMDA data to comply with other statutory and

regulatory requirements, including the Truth in Lending Act (TILA) and Real Estate Settlement Procedures Act (RESPA), or to acquire loan insurance from the Federal Housing Administration. *See* NCRC Comments II, AR3755 at 11; N.Y. Att'y Gen. Comments II, AR3733 at 6; *see also* 12 C.F.R. § 27.3(a)(2) (requiring national banks that receive more than fifty applications to collect home loan data whether or not they are HMDA reporters); 12 C.F.R. § 1002.13 (imposing information collection obligations on mortgage lenders under Regulation B without regard to HMDA coverage). As a result, "the burden [of HMDA reporting] is really de minimis. … It's not going to make-or-break a small financial institution." Adam Levitin, "New HMDA Regs Require Banks to Collect Lots of Data … That They Already Have," Credit Slips, June 23, 2017, https://www.creditslips.org/creditslips/2017/06/new-hmda-regs-require-banks-to-collect-data-they-already-have.html, *cited in* NCRC Comments II, AR3755 at 11. *Cf. Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 178 (D.C. Cir. 2010) (finding SEC competition analysis arbitrary and capricious where it failed to consider existing disclosures required under state law).

The CFPB's sole acknowledgment of this point was to state that it "recognized that much of the information required for HMDA reporting is information that financial institutions would need to collect, retain, and secure as part of their lending process, even if they were not subject to HMDA reporting." 2020 Rule, 85 Fed. Reg. at 28391. "Recognizing" the point is not a response, however. *Cf. Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986) ("Stating that a factor was considered … is not a substitute for considering it."). Importantly, the CFPB does not state that it took the point into account in estimating cost savings, much less indicate that or how it adjusted its projections of savings to account for it.

Second, 1,630 of the 1,700 lenders that are newly exempt from reporting closed-end mortgage data under the 2020 HMDA Rule already qualify for partial reporting exemptions under

the 2018 EGRRCPA. *See* 2020 Rule, 85 Fed. Reg. at 28393. In the absence of the 2020 HMDA Rule, many institutions that are partially exempt under EGRRCPA would have to report only those data that they have been required to report for decades. *See* NCRC Comments II, AR3755 at 11. The CFPB's sole response was to "recognize[] that the estimated ongoing costs savings associated with increasing the threshold from 25 to 100 closed-end loans are less than they would have been absent the relief provided by the EGRRCPA," and to reiterate that the savings are still "meaningful." 2020 Rule, 85 Fed. Reg. at 28374. Again, the CFPB gave no indication how or that it took this point into account when analyzing the benefits of the Rule.

Third, the agency's reliance on aggregate figures, completely divorced from context, obscures that the *per institution* costs, even as estimated by the CFPB, are not significant. In the Final Rule, the agency did not consider how the $6.4 million in estimated savings would be spread across the 1,700 affected institutions, which is obviously a relevant factor. For example, a cost savings of $2,000 per year is less "meaningful" to a large national institution, even if it issues only a small number of closed-end loans, than it is for a smaller entity.

This concern about the "meaningfulness" of per-institution costs is highlighted by statements in the agency's section 1022(b) analysis of the potential benefits and costs to consumers and covered persons. There, CFPB calculates that most relatively small, low-complexity "Tier 3" financial institutions will save only $2,200 annually if exempted from reporting closed-end mortgage data. 85 Fed. Reg. at 28394. For a depository institution to be covered under HMDA *at all*, though, it must have a minimum $47 million in assets. *See* CFPB, Final Rule, Home Mortgage Disclosure (Regulation C) Adjustment to Asset-Size Exemption Threshold, 84 Fed. Reg. 69993 (Dec. 20, 2019) (setting 2020 threshold). For such an institution, it is not as obvious as the CFPB's conclusory assertion would suggest that a savings of $2,200 annually would be "meaningful."

Indeed, prior statements of the CFPB suggest it would not be meaningful. In the 2015 HMDA Rule, the agency concluded that the impact of reporting for Tier 3 institutions would be approximately $1,900, and determined that compliance costs of this magnitude are "relatively small" and would not affect the competitive position of such lenders. 80 Fed. Reg. at 66267. Given inflation and the total size of the institutions involved, there is a glaring inconsistency between the 2015 statement that a $1,900 annual compliance cost is "relatively small" and a 2020 statement that avoiding a $2,200 annual compliance cost would produce "meaningful savings." The 2020 Rule makes no attempt to harmonize these two conclusions. It is thus arbitrary and capricious. *See, e.g.*, *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO-CLC v. Mine Safety Health Admin.*, 925 F.3d 1279, 1284–85 (D.C. Cir. 2019); *Air All. Houston v. EPA*, 906 F.3d 1049, 1066 (D.C. Cir. 2018); *Council of Parent Att'ys & Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28, 51 (D.D.C. 2019).

### b. Open-End Threshold

Whereas, for the increase in the closed-end threshold, the CFPB's benefit assessment focused on ongoing annual operational costs, for the increase in the open-end threshold, the CFPB relied on the reduction of both one-time and ongoing costs. *See* 2020 Rule, 85 Fed. Reg. at 28379–80. For both kinds of costs, one of the "developments" that the CFPB cited in justifying doubling the open-end line of credit threshold was the increase between 2013 and 2018 from 749 to 1,014 in the number of institutions that were issuing more than 100 open-end lines of credit. 2020 Rule, 85 Fed. Reg. at 28378. The CFPB did not explain the relevance of this increase, except to state that it would lead to an increased aggregate cost. Yet the number of reporting institutions has no bearing on the cost *per institution*. And to the extent that total cost increased industry wide, there would be a corresponding increase in total benefit—something the agency did *not* consider. As

plaintiff NCRC explained in its comment, the agency had recently concluded that open-end lending "continues to be a riskier form of lending than closed-end mortgage lending," with features that increase the risk of abusive lending and defaults. NCRC Comments II, AR3755 at 10 (citing CFPB, Introducing New and Revised Data Points in HMDA: Initial Observations from New and Revised Data Points in 2018 HMDA, Aug. 2019, pp. 33–37, https://files.consumerfinance.gov/f/documents/cfpb_new-revised-data-points-in-hmda_report.pdf). The fact that more institutions are engaging in a higher volume of lending activity that the agency previously acknowledged was particularly high-risk and predatory is not a rational reason to require less reporting.

As to ongoing costs, the agency demonstrated the same inadequate reasoning regarding the impact of the EGRRCPA as it did in analyzing the closed-end threshold, even though 378 of the 401 open-end reporters newly exempted under the 2020 Rule were partially exempt under EGRRCPA. *See* 2020 Rule, 85 Fed. Reg. at 28380, 23899. The CFPB failed even to acknowledge that depository institutions will still be required to collect data due to other legal requirements. The agency also failed to consider the relationship between the costs and institution size and total operating budget, which, as explained above, is necessary to determine whether the costs impose a "meaningful" burden.

Given these failures in assessing the burdens to industry of the existing rule, the CFPB's conclusion that the lowered thresholds reflected a proper balance between burden and benefit was unreasonable.

**B. The CFPB's failure to consider and address meaningfully the harms associated with increasing coverage thresholds was arbitrary, capricious, and contrary to law.**

Like the benefit side of the CFPB's "balance" justification for the increased thresholds, the agency's assessment of the cost side of the ledger was likewise deficient. The CFPB merely

calculated how many institutions and loans would no longer be subject to reporting, and summarily concluded that these numbers were not significant enough to merit reporting. This conclusory explanation does not comport with the agency's obligations under the APA and section 1022(b)(2)(A) of the Dodd-Frank Act—particularly in light of the agency's prior statement that equivalent data losses *were* significant. *See, e.g.*, 2015 Rule, 80 Fed. Reg. at 66280, 66299–300; *see also* NCRC Comments II, AR3755 at 5–7; N.Y. Att'y Gen. Comment II, AR3733 at 3–5.

The CFPB's discussion of costs was limited to the "effect on market coverage" resulting from increasing the coverage thresholds. The agency estimated that 1,940 depository institutions that would be required to report HMDA data under the existing 25 closed-end mortgage loan threshold—more than 47% of the total—would no longer have to do so under the new 100 loan threshold. 2020 Rule, 85 Fed. Reg. at 28371. The CFPB recognized that this change would "reduce market coverage compared to the current threshold of 25." *Id.* at 28372. It dismissed the import of this reduction, however, on the ground that 96% of loans would still be reported, without addressing the impact of the loss of reporting by 47% of the institutions. *Id.* at 28372. It stated only that "the small amount of HMDA data obtained from lower-volume depository institutions does not justify the costs imposed on those institutions to comply with HMDA data reporting requirements." *Id.* For non-depository institutions, the agency estimated that 60 out of 740 institutions would no longer need to report, with a negligible impact on the percentage of loans subject to reporting. *Id.* at 28382. The agency summarily dismissed the loss of coverage for these institutions on the same grounds as it did depository institutions. *Id.* at 28383.

For the open-end threshold, the agency's explanation was equally conclusory. It acknowledged that increasing the threshold would lead to a loss of coverage of 401 of the 1,014 institutions required to report under existing law—a 39.5% reduction. *Id.* at 28378. Whereas

existing law would mandate reporting of 89% of originated loans by volume, the new threshold would lead to reporting of only 84% of originated loans. *Id.* at 28378–79. Again, the CFPB dismissed the concerns about the reduction in reporting, stating that the benefits of "cost savings" "justify the limited decrease in the data reported about open-end lending that will result from this threshold increase." *Id.* at 28379. It added, without citation, that data from smaller institutions "would be of lesser utility in furthering HMDA's purposes." *Id.*

The agency's cursory conclusions that the reductions of market coverage were not meaningful, and thus did not justify the burdens of reporting under the statute, were insufficient to meet its obligation to demonstrate "what major issues of policy were ventilated … and why the agency reacted to them as it did." *Del. Dep't of Nat. Resources & Env't Control v. EPA*, 785 F.3d 1, 15 (D.C. Cir. 2015) (quoting *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (ellipsis in original)). Additionally, a rule is "arbitrary and capricious [where the agency] failed to consider all the relevant factors when considering the cost of the regulation." *Council of Parent Att'ys*, 365 F. Supp. 3d at 53–54. As explained below, the CFPB failed to meet these standards given (1) its refusal to even consider "nonquantifiable" harms that would result from the loss of coverage and (2) its failure to consider and address the disproportionate impacts of data loss.

### 1. The CFPB's refusal to consider nonquantifiable harms to consumers and the public was arbitrary, capricious, and contrary to law.

The CFPB has explained that the purpose of HMDA is "to provide the public with loan data that can be used: (i) To help determine whether financial institutions are serving the housing needs of their communities; (ii) To assist public officials in distributing public-sector investment so as to attract private investment to areas where it is needed; and (iii) To assist in identifying possible discriminatory lending patterns and enforcing antidiscrimination statutes." 12 C.F.R. § 1003.1(b)(1); *see also* 12 U.S.C. § 2801(a). As commenters explained in detail, increasing the

reporting thresholds harms each of these three goals. *See, e.g.*, NCRC Comments II, AR3755 at 5 (discussing likely impact of lack of deterrent effect on predatory and discriminatory practices); *id.* at 6–7 (explaining that Community Reinvestment Act and fair lending enforcement monitoring will be less accurate and rigorous); *id.* at 7–8 (noting threshold increase would compromise ability to assess whether credit and housing needs are being met); *id.* at 10 (explaining impacts with respect to open-end threshold including a likely "repeat of risky practices in vulnerable neighborhoods" and "thwart[ing]" of enforcement agencies); Woodstock Inst. Comment, AR2666 at 3 (threshold increase "would substantially weaken" organization's "ability to do representative and accurate data analyses and noting deterrent effect of data); N.Y. Att'y Gen. Comment II, AR3733 at 3–5 (explaining that resulting lack of data would inhibit enforcement activity and lead to increase in predatory lending).

Despite these comments, the CFPB did not consider any of these harms in adopting the 2020 Rule. Although it acknowledged that the decrease in data "may lead to adverse outcomes for some consumers," 2020 Rule, 85 Fed. Reg. at 28397, it refused to consider these adverse outcomes in its analysis on the ground that it "lacks sufficient data to quantify these costs," *id.* at 28398 (addressing closed-end loans). *See also id.* at 28402 (refusing to analyze costs to consumers of change in open-end threshold on same grounds). The CFPB's refusal to address these harms solely because it lacked quantifiable data is arbitrary and capricious under the APA, and contrary to the CFPB's obligations under Dodd-Frank section 1022(b).

To start, an agency cannot properly repeal a rule without acknowledging the benefits the agency cited in adopting that rule. *Cf. Fox*, 556 U.S. at 515 (holding that an agency must provide a "detailed justification" where "a new policy rests upon factual findings that contradict those which underlay its prior policy"); *Bauer v. DeVos*, 325 F. Supp. 3d 74, 108, 108 n.13 (D.D.C.

2018) (holding that an agency stay of a rule that failed to consider the impact of the loss of benefits cited in issuing the rule was arbitrary and capricious). That is what the CFPB did here. In the 2015 Rule, as discussed above, *supra* at 10–11, the agency found "that the benefit of enhanced transparency will be substantial," and discussed in detail how expanding the scope of reporting benefitted consumers. 2015 Rule, 80 Fed. Reg. at 66262–63. It did so while acknowledging that, "[a]s a sunshine rule regarding data reporting and disclosure, most of the benefits of the enhanced rule on consumers will be realized indirectly," and that it was unable to quantify and monetize these benefits. *Id.* at 66262. Nonetheless, the agency did not *discount* those benefits. Rather, it provided a "qualitative consideration" of the benefits of the rule "based on general economic principles, together with the limited data available." *Id.* In the 2020 Rule, the agency failed to acknowledge, much less explain, its about-face.

Even aside from the failure to acknowledge the change, for the agency to dismiss the benefits was arbitrary and capricious. As the D.C. Circuit has explained, under the APA's reasoned decisionmaking standard, "[e]ven unquantified factors … cannot be dismissed without further inquiry where their impact is both evident and massively significant." *Md. People's Counsel v. FERC*, 761 F.2d 768, 776 (D.C. Cir. 1985); *see also Nicopure Labs, LLC v. FDA*, 266 F. Supp. 3d 360, 406 (D.D.C. 2017) (noting that the APA "does not require that [] benefits be quantified in any particular way when compared to the costs"), *aff'd*, 944 F.3d 267 (D.C. Cir. 2019). Here, there is no indication that the CFPB considered the harms to the statutory goals.

Moreover, the CFPB, when undertaking rulemaking, is required by statute to consider "the potential benefits and costs to consumers" and "the potential reduction of access by consumers to consumer financial products or services." 12 U.S.C. § 5512(b)(2)(A)(i). The terms "costs" and "benefits" do not mean only "quantifiable" costs and benefits. *Cf.* Executive Order 12866,

32

Regulatory Planning and Review, 58 Fed. Reg. 51735, § 1 (Sept. 30, 1993) ("Costs and benefits shall be understood to include both quantifiable measures (to the fullest extent that these can be usefully estimated) and qualitative measures of costs and benefits that are difficult to quantify, but nevertheless essential to consider"). Thus, that increases in unremedied discrimination and decreased access to credit, for example, may be difficult to quantify "does not excuse the [CFPB] from its statutory obligation to determine as best it can the economic implications of the rule it has proposed." *Chamber of Com. of U.S. v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005); *see also Secs. Indus. & Fin. Markets Ass'n v. CFTC*, 67 F. Supp. 3d 373, 432 (D.D.C. 2014) (absence of reliable data on costs and benefits does not eliminate agency's duty to assess implications of rule).

The CFPB's refusal to consider the harms associated with decreased access to data is analogous to the agency's refusal to do so in *NRDC v. Herrington*, 768 F.2d 1355, 1400 (D.C. Cir. 1985). There, the Department of Energy refused to consider statutory factors in evaluating whether a standard was "economically justified" because it lacked a quantitative model for doing so. *Id.* The D.C. Circuit found this explanation unreasonable, explaining that "Congress did not suggest that if DOE thinks it cannot quantify the factors precisely enough, it may refuse to make reasonable estimates of those factors, and on that ground refuse to perform the statutorily prescribed weighing." *Id.* So too here, Congress did not suggest that the CFPB could refuse to consider known impacts on consumers simply because it cannot quantify those impacts. Because the CFPB failed to consider the costs to consumers, including the potential reduction of access to financial products, the 2020 Rule is arbitrary, capricious, and contrary to law.

> **2.  The CFPB failed to adequately consider the disproportionate impacts of the Rule.**

As noted above, the only "cost" in terms of data loss that the CFPB considered in adopting the Rule was the loss of market coverage, which it summarily concluded was insignificant. This

conclusion was not adequately reasoned because the agency addressed only *how much* data was lost at the aggregate level, without sufficiently analyzing *which* data would be lost. Both are necessary to fully see the loss of data from the 2020 Rule.

First, simply stating that reductions in 39.5% (open-end) and 47% (closed-end) of the number of institutions covered is "insignificant" does not make it so. These percentages are substantial under any metric. The CFPB's assertion that these reductions are insignificant because the total percentage of loans issued by these institutions may be small mistakenly assumes that the characteristics of lenders of all sizes are the same, or, that for some reason, that data from smaller institutions is "of lesser utility in furthering HMDA's purposes." 2020 Rule, 85 Fed. Reg. at 28379. But in 2015, the CFPB explained why this is not so: Smaller institutions "serve a somewhat different group of consumers that are more disadvantaged, [and therefore] the loss of those records will impose a cost on this group of consumers as less information may be available to the government, community groups, and researchers to serve their unique needs." 2015 Rule, 80 Fed. Reg. at 66276. And in commenting on the 2019 NPRM, the New York Attorney General explained that this concern remains, as the depository institutions that would be excluded disproportionately serve underserved populations. *See* N.Y. Att'y Gen. Comments II, AR3733 at 2–3. She also noted that the Rule would disproportionately exclude local credit unions, likely resulting in a complete lack of useful HMDA data for that entire class of institutions. *Id.* at 3. Indeed, in comments, credit unions acknowledged that increasing the closed-end threshold to 100 would exempt 750 credit unions that would otherwise be required to comply with HMDA reporting requirements—a substantial segment of the industry. *See* Credit Union Nat'l Ass'n Comments II, AR3697 at 2. These institutions disproportionately serve low- and moderate-income homeowners, and "HMDA data on their mortgage lending activity is important to policy makers to ensure that these credit

unions continue to serve their communities." N.Y. Att'y Gen. Comments II, AR3733 at 3; *see also* Pittsburgh Cmty. Reinvestment Grp. Comments, AR3781 at 2 (discussing particular importance of data from small banks and credit unions). The CFPB failed to consider at all the impact of losing coverage of such a large portion of this class of financial institutions, or the unique value of data from small institutions more generally, and thus acted arbitrarily and capriciously.

Furthermore, the CFPB's assertion that losses of 4% to 5% were insignificant, without any further discussion, was insufficient to show the agency meaningfully contended with an important aspect of the problem. *See Air Line Pilots Ass'n v. FAA*, 3 F.3d 449, 455 (D.C. Cir. 1993) (agency was "required to provide a reasoned explanation on the record for its conclusion" that diminished value was insignificant); *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 38–39 (D.D.C. 2000) (conclusory statements, unaccompanied by analysis, that impacts are "not expected to be significant" was arbitrary and capricious). As commenters explained, the loss of data from smaller institutions disproportionately impacts areas that are underserved by lenders, including rural areas, communities of color, distressed urban areas, and low- and moderate-income census tracts—the very communities that HMDA and the Dodd-Frank Act were designed to protect. *See* 12 U.S.C. 2801(a) ("The Congress finds that some depository institutions have sometimes *contributed to the decline of certain geographic areas* by their failure pursuant to their chartering responsibilities to provide adequate home financing to qualified applicants on reasonable terms and conditions." (emphasis added)). The CFPB's response to these comments and its failure to consider the disproportionate impacts of the loss of market coverage were particularly insufficient in light of the statutory goals.

The CFPB acknowledged that "any loan-volume threshold will affect individual markets differently, depending on the extent to which smaller creditors service individual markets and the

market share of those creditors," but simply dismissed these concerns by stating, without explanation, that the reduced threshold for closed-end loans would "permit the public and public officials to identify patterns and trends at the local level." 2020 Rule, 85 Fed. Reg. at 28383. This conclusion is not supported by the record and is contrary to the CFPB's previous statements. In 2020, the CFPB acknowledged that the increased closed-end threshold would mean that 1,200 census tracts would face a "decrease of at least 20 percent of reportable HMDA data on closed-end mortgage loans." 85 Fed. Reg. at 28373. But in 2015, the CFPB rejected a closed-end threshold of 100 because it "would have a material negative impact on the availability of data about patterns and trends at the local level," concluding that a loss of 20% of reportable data in 385 census tracts "would substantially impede the public's and public officials' ability to understand access to credit in their communities." 80 Fed. Reg. at 66147–48. Given the CFPB's conclusion in 2015 that such a loss would have a "material" effect, the conclusion that a loss of the same degree for more than three times as many tracts would *not* have a material effect is unreasonable—particularly where the agency neither acknowledged nor explained the reversal. *See Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1112 (D.C. Cir. 2019) (vacating order where agency failed to acknowledge or explain departure from previous findings as to benefit to consumers).

The CFPB also stated that the Rule would retain "substantial visibility into rural and low-to-moderate income tracts." 2020 Rule, 85 Fed. Reg. at 28373. This vague assertion does not meaningfully grapple with comments on the impacts in these tracts or the fact that, even under the CFPB's own analysis, rural and low-to-moderate income (LMI) tracts will be disproportionately impacted by the Rule. The CFPB predicted that, nationwide, the 100 closed-end mortgage threshold will lead to a greater than 20% loss of data reduction in less than 2% of census tracts. *Id*. at 28373. Rural areas will see a substantially greater loss, though, as 5% of tracts will lose at least

20% of the HMDA data. *Id.* LMI tracts are also disproportionately affected, with 3% of tracts losing at least 20% of data. *Id*. at 28373. The disproportionate impact in these areas is particularly problematic since "[t]he impacted rural and lower-income areas are already underserved, underrepresented and underreported." NeighborWorks Am. Comment, AR2828 at 3; *see also* NCRC Comments II, AR3755 at 8 ("Rural areas generally have less access to banks and credit so disproportionately reducing the robustness of HMDA data in rural counties frustrates HMDA's statutory purpose to ascertain if credit needs are being met."). A 3% or 5%loss in a smaller pool has greater consequences for statistical analysis than one in a larger pool. *See, e.g.*, NCRC Comments II, AR3755 at 8.

The agency's sole discussion of the disproportionate impact in rural and LMI tracts was to "recognize … that rural and low-to-moderate income census tracts will lose proportionately more data as the threshold increases than other areas," and state that "the Bureau currently lacks sufficient data to quantify the impact of this decrease in data." 85 Fed. Reg. at 28403. This response is insufficient for the same reasons as the agency's refusal to consider nonquantifiable data more generally, as discussed above. This refusal is particularly problematic for rural areas, given that Congress has *explicitly* directed the CFPB to consider the impact of its rules "on consumers in rural areas." 12 U.S.C. § 5512(b)(2)(A)(ii). "A statutorily mandated factor, by definition, is an important aspect of any issue before an administrative agency, as it is for Congress in the first instance to define the appropriate scope of an agency's mission." *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004). The CFPB's refusal to meaningfully consider a disproportionate impact on rural areas is thus both arbitrary and contrary to law.

The CFPB also failed to adequately address the disproportionate impact of the closed-end threshold on the multi-family market. The agency acknowledged that 13% of multifamily loan

applications and originations by depository and non-depository institutions would no longer be reported under the increased threshold. *See* 2020 Final Rule, 85 Fed. Reg. at 28373, 28383. Under any rational analysis, this data loss is substantial. The agency's only discussion of it, however, was to say that "the limited decreases in the amount of data are justified by the benefits of relieving smaller-volume institutions of the burdens of HMDA reporting," *id.* at 28372, and that a "significant number" of loans would still remain covered, *id.* at 28383. Yet a 13% loss of data is not a "limited decrease," but a substantial loss. Such a cursory dismissal of the disproportionate impact on multifamily housing is insufficient in light of the detailed concerns raised by commenters. The agency failed to consider, for example, that the disproportionate impact on the multifamily market itself has disproportionate effects, including in particular geographic areas and on particular racial and ethnic groups. *See, e.g.*, N.Y. Att'y Gen. Comments II, AR3733 at 4 (noting that multifamily buildings house the majority of New York City residents and explaining usefulness of data reported under 2015 Rule that would no longer be reported); ANHD Comments II, AR3791 at 3 (explaining increased importance of multifamily data in New York City). An agency must do more than "note the concerns of others and dismiss those concerns in a handful of conclusory sentences." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020); *see also Nw. Immigrants Rights Project v. U.S. Citizenship & Immigration Servs.*, Civ. No. 19-3283 (RDM), 2020 WL 5995206, at *28 (D.D.C. Oct. 8, 2020). In its discussion of the multifamily housing market, the CFPB did even less.

The closed-end threshold also has significant disproportionate impacts in other geographic areas, for example, central city areas in persistent poverty, outlying counties, and counties in the Midwest and Southwest. NCRC Comments II at 8–9. The CFPB failed to address these impacts.

Because the CFPB failed to address the impact of data losses on particular markets and communities in a reasoned manner, the 2020 Rule is arbitrary and capricious.

**III.     The 2020 Rule is an arbitrary and capricious application of and exceeds the agency's statutory authority.**

As authority for the Rule, the CFPB primarily relied on HMDA section 305(a), 12 U.S.C. § 2804(a). *See* 2020 Rule, 85 Fed. Reg. at 28367. That provision states that the CFPB may prescribe "adjustments and exceptions for any class of transactions, as in the judgment of the Bureau are necessary and proper to effectuate the purposes of this chapter [HMDA], and prevent circumvention or evasion thereof, or to facilitate compliance therewith." 12 U.S.C. § 2804(a). In relying on this statutory provision, the agency failed even to attempt to demonstrate how the 2020 Rule effectuates HMDA's purposes, or how excluding 40% of covered institutions is an "exception" for a "class of transactions." To the extent that the CFPB also cited its general rulemaking authority, 12 U.S.C. § 5512(b)(1), that broad source of authority cannot serve as a basis for a rule that eviscerates the statute.

**A.  The 2020 Rule fails to effectuate the purposes of HMDA.**

Nowhere in the 2020 Rule does the CFPB discuss how increasing the coverage thresholds effectuates the "purposes" of HMDA, prevents circumvention or evasion, or facilitates compliance, as would be necessary to validly invoke section 305(a). HMDA has an explicitly defined statutory purpose: "to provide citizens and public officials … with sufficient information to enable them to determine whether depository institutions are filling their obligations to serve the housing needs of the communities and neighborhoods in which they are located and to assist public officials in their determination of the distribution of public sector investments in a manner designed to improve the private investment environment." 12 U.S.C. § 2801. But as discussed above, the CFPB refused to analyze the impact of the Rule on the "purposes" of HMDA, on the

ground that any impact on those purposes were not quantifiable. Because the CFPB failed to demonstrate that it considered a statutory factor, its reliance on section 305(a) was arbitrary and capricious. *See, e.g.*, *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d at 1216.

**B. The CFPB's use of its "exception" authority relies on an unreasonable interpretation of the statute.**

The CFPB's exclusion of approximately 39.5% of institutions that would otherwise be required to report open-end loan data, and 47% of institutions that would otherwise be required to report closed-end loan data—based solely on the costs to those institutions—exceeds the "exception" authority granted by HMDA section 305(a).

Section 305(a) allows the CFPB to make "adjustments and exceptions for any class of transactions." 12 U.S.C. § 2804(a). But this exception authority is not limitless, as confirmed by HMDA's "text, structure, and the overall statutory scheme, as well as the problem Congress sought to solve," *Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 487 (D.C. Cir. 2007), all of which indicate that Congress did *not* intend to grant the CFPB authority to broadly exempt all otherwise-covered financial institutions from HMDA's reporting requirement based solely on number of loans provided.

Congress allowed the CFPB to make "exceptions" for "class[es] of transactions." Nothing in this text indicates that Congress intended to grant the CFPB authority to completely exempt approximately 40% of otherwise covered financial institutions from HMDA's reporting requirement. Such an interpretation would be inconsistent with the normal meaning of the term "exception." It also runs counter to the maxim that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Courts repeatedly refuse to endorse interpretations of statutory exceptions that would swallow the

statutory requirement. *See, e.g.*, *Nat'l Fed'n of Fed. Emps. v. McDonald*, 128 F. Supp. 3d 159, 172 (D.D.C. 2015); *AFL-CIO v. FEC*, 177 F. Supp. 2d 48, 60 (D.D.C. 2001); *see also Comm'r v. Clark*, 489 U.S. 726, 739 (1989) ("Given that Congress has enacted a general rule…, we should not eviscerate that legislative judgment through an expansive reading of a somewhat ambiguous exception."). To allow agencies to use such exception authorities to make a "severe restructuring of the statutory scheme" would be unreasonable. *Amgen, Inc. v. Smith*, 357 F.3d 103, 117 (D.C. Cir. 2004). In *Amgen*, for example, the D.C. Circuit agreed that a statute authorizing the Department of Health and Human Services to make "adjustments" to the amount of payments set by the Medicare Act did not authorize the agency to "make drastic adjustments" that would undermine the mandatory nature of those payments under the statute. *Id.*; *cf. MCI Telecomms., Corp. v. AT&T*, 512 U.S. 218, 228 (1994) (holding that "modify" means "moderate change," and thus authority to modify did not provide agency authority to completely eliminate tariff filing for 40% of the relevant industry).

Here, the CFPB has relied on its "exception" authority to undermine the statutory scheme, by making "drastic" exclusions from statutory coverage. As the CFPB acknowledged, the thresholds it adopted will exempt more than 47% of the depository institutions that had to report closed-end data and 39.5% of the institutions that had to report open-end data under the existing regimes—in addition to the institutions that are excluded from coverage based on statutory or other exemptions. This reduction goes far beyond an "exception." Allowing the CFPB to issue such broad exceptions under section 305(a) would also require an unreasonable interpretation of the phrase "necessary and proper to effectuate the purposes of" the HMDA. 12 U.S.C. § 2804(a).

The Rule also does not except a "class of transactions," as allowed by the statute, but rather a class of *institutions*. Other parts of HMDA explicitly delineate the circumstances in which

*institutions* (as opposed to *transactions*) are exempt from HMDA, and the CFPB's invocation of its section 305(a) authority to create additional institutional thresholds conflicts with these more specific statutory provisions. Importantly, HMDA includes a statutory asset threshold for depository institutions, updated annually and currently set at $47 million. 12 U.S.C. § 2808(a); Adjustment to Asset-Size Exemption, 84 Fed. Reg. at 69993. The CFPB may only exempt non-depository institutions if it shows they are "comparable within their respective industries" to depository institutions with $10 million or less in assets. 12 U.S.C. § 2808(a). The agency made no such showing, instead ignoring this statutory limitation.

In addition, in enacting the EGRRCPA in 2018, Congress codified its judgment as to the proper balance of costs and benefits of reporting by institutions that make only a certain number of loans. Providing "tailored regulatory relief," that amendment relieved *some* smaller institutions from *some* HMDA reporting obligations. Pub. L. No. 115-174, § 104(a)(2) (enacting 12 U.S.C. § 2803(i)(1)–(3)). Moreover, Congress included a safeguard: Any institution that failed examination under the Community Reinvestment Act (CRA) would *not* be able to take advantage of the partial exemption. And to evaluate the effect of these amendments on achieving the purposes of HMDA, Congress directed the Comptroller General to evaluate the impact of these amendments *no earlier* than May 2020. *Id.* §104(b). (That evaluation has not yet occurred.)

The 2020 Rule overrules this careful statutory balance by adopting a blanket exemption for an overlapping, but not coextensive, set of institutions, without any analogous safeguards and without awaiting the Comptroller's review of the impact of Congress's chosen method of reducing burden.[2] Curiously, the CFPB recognized the potential conflict between its setting of thresholds

---

[2] As noted above, the CFPB estimates that 1,630 of the 1,700 closed-end reporters and 378 of the 401 open-end reporters newly exempted under the 2020 Rule were partially exempt under EGRRCPA. *See* 2020 Final Rule, 85 Fed. Reg. at 28393, 28399.

and congressional intent under the EGRRCPA, but only in declining to raise the open-end threshold to 500 permanently. 2020 Rule, 85 Fed. Reg. at 28379. There, CFPB explained:

> Doing so would provide a complete exclusion from reporting all open-end data for institutions below the threshold of 500, even though Congress opted to provide only a partial exemption at the threshold of 500, and would extend that complete exclusion to institutions that Congress did not include in even the partial exemption.

*Id.* But a similar logic applies to the rule that the CFPB did adopt. First, Congress opted to provide no exemption at all for non-depository institutions, and the 2020 Rule provides a complete exclusion to non-depository institutions with less than 200 open-end loans—institutions that Congress did not include in even the partial exemption. Second, Congress opted to provide only a *partial* exemption as the appropriate remedy for regulatory burden, and the CFPB determined that a different remedy—complete exemption—was appropriate. Finally, whereas Congress used the CRA exam as a safeguard to revoke any partial exemption, the CFPB provided no safeguard to revoke *any* exemption. The CFPB did not address these inconsistencies between its rule and the statute. But the reason it provided for rejecting a 500 open-end loan threshold should be applied to the 2020 loan threshold as well. Congress made a cost-benefit determination: Certain institutions should have their reporting obligations reduced, but not eliminated. It is not the CFPB's place to reject Congress's balancing and substitute its own.

The CFPB's rule exceeds the authority granted by section 305(a), and it should be vacated. At a minimum, the court should remand and require the Bureau to explain its interpretation of the limits of its Section 305(a) power—the approach taken by the D.C. Circuit in *Consumers Union of U.S., Inc. v. Federal Reserve Board*, 938 F.2d 266, 273 (D.C. Cir. 1991). There, the Federal Reserve Board suggested that it could utilize its then-parallel exception authority under the Truth in Lending Act "to override statutory provisions that would otherwise apply to *all* lenders." *Id.* (discussing 15 U.S.C. § 1604(a) (1996)). Because the court was troubled by the "seriousness of

interpreting a statutory provision that is asserted to give the Board authority to override the clear language of other provisions," it remanded to the Board to provide its interpretation of how this authority should be limited. *Id.* The CFPB has not explained its reading of section 305(a), and its attempt to exempt large swaths of the market from clear statutory coverage in conflict with more specific statutory provisions is exactly the kind of abusive exercise that worried the court in *Consumers Union*. *See also U.S. Info. Agency, Voice of Am. v. FLRA*, 960 F.2d 165, 169–70 (D.C. Cir. 1992) (remanding to agency where it failed to provide reasoned interpretation of statutory exception).

### C.  The CFPB cannot rely on its general rulemaking authority to promulgate broad exemptions.

Finally, the CFPB also cites its general rulemaking authority, section 1022(b)(1) of the Dodd-Frank Act, 12 U.S.C. § 5512(b)(1). That provision, however, does not confer authority to issue exemptions. Rather, a different subsection of that provision, 12 U.S.C. § 5512(b)(3), addresses the CFPB's authority to issue exemptions. And that more specific provision requires the CFPB to consider three factors before "exempt[ing] any class of covered persons, service providers, or consumer financial products or services": the total assets of the class, the volume of transactions in which the class engages, and "existing provisions of law which are applicable to the consumer financial product or service and the extent to which such provisions provide consumers with adequate protections." *Id.* The CFPB plainly did not consider the third factor here. These specific limitations on CFPB authority cannot be evaded by relying on the more general provision in the very same statutory section, as "it is well established that an agency may not

circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority." *Air All. Houston*, 906 F.3d at 1061.

In any event, even absent a specific exemption provision, general rulemaking authority would authorize the agency to make only *de minimis* exemptions, not the very substantial exemptions adopted in the 2020 Rule. "[T]he authority to create [] exceptions does not extend to 'a situation where the regulatory function does provide benefits, in the sense of furthering regulatory objectives, but the agency concludes that the acknowledged benefits are exceeded by the costs.'" *Public Citizen v. FTC*, 869 F.2d 1541, 1557 (D.C. Cir. 1989) (quoting *Ala. Power Co. v. Costle*, 636 F.2d 323, 360–61 (D.C. Cir. 1979)). "That is, they must cover only situations 'where the burdens of regulation yield a gain of trivial or no value,' for otherwise the exemption reflects impermissible 'second-guess[ing][of] Congress's calculations,' as opposed to avoidance of 'absurd or futile results.'" *Shays v. FEC*, 414 F.3d 76, 114 (D.C. Cir. 2005) (quoting *Env't Def. Fund, Inc. v. EPA*, 82 F.3d 451, 466 (D.C. Cir. 1996), and *Pub. Citizen*, 869 F.2d at 1557 (internal marks omitted)). The substantial exemptions created by the 2020 HMDA Rule do not fall into this *de minimis* category.

## CONCLUSION

Because the CFPB relied on erroneous data and overstated the benefits of the 2020 HMDA Rule, failed to adequately consider the harms to consumers and the public the Rule would cause, and acted beyond its statutory authority, Plaintiffs' motion for summary judgment should be granted. The Court should declare unlawful and set aside the 2020 HMDA Rule.

Dated: December 11, 2020          Respectfully submitted,

                                         /s/ Adam R. Pulver
                                         Adam R. Pulver (D.C. Bar No. 1090475)
                                         Michael T. Kirkpatrick (D.C. Bar No. 486293)
                                         Allison M. Zieve (D.C. Bar No. 42486)

Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*