# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL COMMUNITY REINVESTMENT COALITION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 20-2074 (BAH)

## DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendant Consumer Financial Protection Bureau respectfully cross-moves for summary judgment on all claims raised in Plaintiffs' complaint for the reasons set forth in the accompanying memorandum of points and authorities.

Dated: April 2, 2021

Respectfully submitted,

MARY McLEOD
*General Counsel*
JOHN R. COLEMAN
*Deputy General Counsel*
LAURA M. HUSSAIN
*Assistant General Counsel*
CHRISTOPHER DEAL
*Senior Counsel*

/s/ Joseph Frisone
JOSEPH FRISONE (Va. Bar No. 90728)
*Counsel*
Consumer Financial Protection Bureau

1700 G Street, NW
Legal Division
Washington, D.C. 20552
Telephone: (202) 435-9287
Fax: (202) 435-7024
Joseph.Frisone@cfpb.gov

*Counsel for Defendant Consumer*
*Financial Protection Bureau*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

NATIONAL COMMUNITY REINVESTMENT
COALITION, et al.,

              Plaintiffs,

      v.

CONSUMER FINANCIAL PROTECTION
BUREAU,

              Defendant.
_____

Civil Action No. 20-2074 (BAH)

## COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ............................................................................................. 1

BACKGROUND ............................................................................................... 3

   I.     HMDA and Regulation C ...................................................................... 3

   II.    The Dodd-Frank Act ............................................................................ 4

   III.   The 2015 Rule ..................................................................................... 5

   IV.   The Economic Growth, Regulatory Relief, and Consumer Protection Act ................... 9

   V.    The 2020 Rule ................................................................................... 10

   VI.   Correction Notice .............................................................................. 14

STANDARD OF REVIEW ............................................................................... 15

ARGUMENT .................................................................................................. 17

   I.     The Bureau's correction of clerical errors in the preamble to the 2020 Rule does not affect the Bureau's analysis of the Rule's benefits and costs ......................................... 17

   II.    The Bureau's consideration of the 2020 Rule's benefits and costs was reasonable. .... 21

      A.    The Bureau reasonably considered the relevant factors in assessing the benefits and costs to covered persons that would result from increasing the HMDA reporting thresholds ......................................................................................... 23

         i.    The Bureau's methodology for considering cost savings to institutions was reasonable ......................................................................... 23

         ii.   The Bureau adequately addressed the issues Plaintiffs raise regarding costs savings to institutions ....................................................................... 25

      B.    The Bureau reasonably considered the benefits and costs to consumers from increasing the HMDA reporting thresholds. ............................................... 34

         i.    The Bureau adequately considered the nonquantifiable costs to consumers that would result from the loss of HMDA data ............................................ 35

         ii.   The Bureau adequately considered the geographic distribution of newly excluded entities, including the impact of the data loss on smaller institutions and on rural areas. ...................................................................... 38

   III.   The Bureau acted within the scope of its authority under HMDA in issuing the 2020 Rule ......................................................................................... 43

A.     HMDA's text does not unambiguously foreclose the Bureau's interpretation. ........ 46

B.     The Bureau's interpretation of its rulemaking authority under HMDA is
       reasonable ............................................................................................................ 49

C.     Congress's decision to provide additional regulatory relief through the 2018
       EGRRCPA supports the reasonableness of the Bureau's interpretation of its statutory
       authorities. ........................................................................................................... 53

CONCLUSION .......................................................................................................................... 55

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Agape Church, Inc. v. FCC,*
  738 F.3d 397 (D.C. Cir. 2013) ................................................................................ 44

*Am. Biosci., Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2001) ............................................................................ 15

*Am. Council of Blind v. Mnuchin,*
  977 F.3d 1 (D.C. Cir. 2020) .................................................................................. 36

*Am. Waterways Operators v. Wheeler,*
  2020 WL 7024195 (D.D.C. 2020)........................................................................ 18

*Am. Wild Horse Pres. Campaign v. Perdue,*
  873 F.3d 914 (D.C. Cir. 2017) .............................................................................. 19

*Amgen, Inc. v. Smith,*
  357 F.3d 103 (D.C. Cir. 2004) .............................................................................. 47

*Ass'n of Pri. Sector Colls. & Univs. v. Duncan,*
  681 F.3d 427 (D.C. Cir. 2012) .............................................................................. 25

*Canadian Ass'n of Petroleum Producers v. FERC,*
  254 F.3d 289 (D.C. Cir. 2001) .............................................................................. 25

*Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) ......................................................................... 16, 44, 46, 53

*Cigar Ass'n of Am. v. FDA,*
  480 F. Supp. 3d 256 (D.D.C. 2019) ...................................................................... 36

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) ............................................................................................. 19

*City of Arlington, Tex. v. FCC,*
  569 U.S. 290 (2013)....................................................................................... 16, 44

*Commc'n of the United Church of Christ v. FCC,*
  707 F.2d 1413 (D.C. Cir. 1983) ............................................................................ 15

*Commodity Futures Trading Comm'n v. Schor,*
  478 U.S. 833 (1986) ............................................................................................. 49

*\*Ctr. for Auto Safety v. Peck,*
  751 F.2d 1336 (D.C. Cir. 1985) .............................................................. 22, 31, 39

*Ctr. for Sustainable Econ. v. Jewell,*
  779 F.3d 588 (D.C. Cir. 2015) ................................................................. 40, 41

*Cuozzo Speed Techs., LLC v. Lee,*
  136 S. Ct. 2131 (2016) ................................................................................... 16

*Douglas Timber Operators, Inc. v. Salazar,*
  774 F. Supp. 2d 245 (D.D.C. 2011) ............................................................ 19

*EarthLink, Inc. v. FCC,*
  462 F.3d 1 (D.C. Cir. 2006) ........................................................................ 15

*FBME Bank Ltd. v. Mnuchin,*
  249 F. Supp. 3d 215 (D.D.C. 2017) ............................................................ 25

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ................................................................................. 42, 43

*Good Fortune Shipping SA v. Comm'r of IRS,*
  897 F.3d 256 (D.C. Cir. 2018) .................................................................... 49

*Hermes Consol., LLC v. EPA,*
  787 F.3d 568 (D.C. Cir. 2015) .................................................................... 21

*Household Credit Servs., Inc. v. Pfennig,*
  541 U.S. 232 (2004) ...................................................................................... 52

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.,*
  448 U.S. 607 (1980) ...................................................................................... 31

*\*Inv. Co. Inst. v. Commodity Futures Trading Comm'n,*
  720 F.3d 370 (D.C. Cir. 2013) ......................................................... 22, 23, 42

*Judulang v. Holder,*
  565 U.S. 42 (2011) ........................................................................................ 44

*MCI Telecomms. Corp. v. AT&T,*
  512 U.S. 218 (1994) ...................................................................................... 47

*Md. People's Counsel v. FERC,*
  761 F.2d 768 (D.C. Cir. 1985) .................................................................... 36

*Melcher v. FCC,*
  134 F.3d 1143 (D.C. Cir. 1998) .................................................................. 39

*Michigan v. EPA,*
  576 U.S 743 ............................................................................................. 30, 31

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................................... 15

*Mourning v. Family Publ'ns Serv., Inc.*,
  411 U.S. 356 (1973) ............................................................................................. 44

*N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*,
  677 F.3d 596 (4th Cir. 2012) ............................................................................... 20

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007) ............................................................................................. 20

*Nat'l Ass'n of Home Builders v. EPA*,
  682 F.3d 1032 (D.C. Cir. 2012) ..................................................................... 22, 42

*Nat'l Cable & Telecomms. Ass'n v. FCC*,
  567 F.3d 659 (D.C. Cir. 2009) ....................................................................... 46, 49

*Nat'l Shooting Sports Found., Inc. v. Jones*,
  716 F.3d 200 (D.C. Cir. 2013) ....................................................................... 15, 43

*Nat'l Wildlife Fed'n v. EPA*,
  286 F.3d 554 (D.C. Cir. 2002) ............................................................................. 28

*New Lifecare Hosps. of Chester Cty. LLC v. Azar*,
  417 F. Supp. 3d 31 (D.D.C. 2019) ....................................................................... 26

*Nicopure Labs, LLC v. FDA*,
  266 F. Supp. 3d 360 (D.D.C. 2017) ................................................................ 37, 39

*NRDC v. Herrington*,
  768 F.2d 1355 (D.C. Cir. 1985) ........................................................................... 36

*Off. of Commc'n of the United Church of Christ v. FCC*,
  707 F.2d 1413 (D.C. Cir. 1983) ........................................................................... 15

*Olivares v. TSA*,
  819 F.3d 454 (D.C. Cir. 2016) ............................................................................. 31

*Pub. Citizen, Inc. v. FAA*,
  988 F.2d 186 (D.C. Cir. 1993) ............................................................................. 25

*Ramaprakash v. FAA*
  346 F.3d 1121 (D.C. Cir. 2003) ........................................................................... 15

*Reytblatt v. Nuclear Regul. Comm'n*,
  105 F.3d 715 ........................................................................................................ 25

*Sector Colls. & Univs. v. Duncan*,
   681 F.3d 427 (D.C. Cir. 2012) ............................................................... 25

*Texas Mun. Power Agency v. EPA*,
   89 F.3d 858 (D.C. Cir. 1996) ........................................................... 27, 28

*WJG Tel. Co., Inc. v. FCC*,
   675 F.2d 386 (D.C. Cir. 1982) ......................................................... 16, 22

**Statutes**

5 U.S.C. § 706 .................................................................................................. 20

5 U.S.C. § 706(2)(A) ........................................................................................ 15

5 U.S.C. § 706(2)(C) ........................................................................................ 15

12 U.S.C. § 2801 .............................................................................................. 52

12 U.S.C. § 2801(b) ..................................................................................... 3, 50

12 U.S.C. § 2802(2) ........................................................................................... 6

12 U.S.C. § 2803 ............................................................................................... 4

12 U.S.C. § 2803(b) ........................................................................................... 5

12 U.S.C. § 2803(g) ......................................................................................... 50

12 U.S.C. § 2803(i)(1) ...................................................................................... 50

12 U.S.C. § 2803(i)(2) ...................................................................................... 50

12 U.S.C. § 2803(i)(3) ...................................................................................... 10

*12 U.S.C. § 2804(a) .................................................................................. passim*

12 U.S.C.§ 2808(a) .......................................................................................... 31

12 U.S.C. § 5481(5) ........................................................................................... 5

12 U.S.C. § 5481(6) ........................................................................................... 5

12 U.S.C. § 5481(12)(K) .................................................................................... 5

12 U.S.C. § 5481(14) ......................................................................................... 5

12 U.S.C. § 5481(15)(A)(i) ................................................................................ 5

12 U.S.C. § 5491(a) ............................................................................................................ 4

12 U.S.C. § 5511(a) ............................................................................................................ 4

12 U.S.C. § 5512(b)(2)(A) ...................................................................................... 17, 36, 38

12 U.S.C. § 5512(b)(2)(A)(ii) ............................................................................................ 40

12 U.S.C. § 5581 ................................................................................................................ 5

15 U.S.C. § 1604(a) .......................................................................................................... 44

Dodd-Frank Wall Street Reform and Consumer Protection Act,
   Pub L. No. 111-203, § 1094(3) ..................................................................................... 5

*Economic Growth, Regulatory Relief, and Consumer Protection Act,
   Pub. L. No. 115-174, § 104, 132 Stat. 1296 (2018) ........................................... *passim*

Federal Deposit Insurance Corporation Improvement Act of 1992,
   Pub. L. No. 102–242, § 224, 105 Stat 2236 (1991) ................................................... 48

Home Mortgage Disclosure Act of 1975,
   Pub. L. No. 94-200, § 302, 89 Stat. 1124 (1975) .................................................. 3, 48

**Regulations**

12 C.F.R. § 1003.1 ............................................................................................................ 4

12 C.F.R. § 1003.1(b)(1) .................................................................................................... 3

12 C.F.R. § 1003.2(g) ...................................................................................................... 31

12 C.F.R. § 1003.3(c) ...................................................................................................... 48

12 C.F.R. § 1003.3(c)(11) ................................................................................................ 48

12 C.F.R. § 1003.3(c)(12) ................................................................................................ 48

Home Mortgage Disclosure, Final Rule,
   54 Fed. Reg. 51356 (Dec. 15, 1989) ........................................................................... 3

Home Mortgage Disclosure (Regulation C) Adjustment to Asset-Size Exemption Threshold,
   Final Rule,
   84 Fed. Reg. 69993 (Dec. 20, 2019) ......................................................................... 32

*Home Mortgage Disclosure (Regulation C), Final Rule,
   80 Fed. Reg. 66128 (Oct. 28, 2015) ............................................................... *passim*

Home Mortgage Disclosure (Regulation C), Final Rule,
    82 Fed. Reg. 43088 (Sept. 13, 2017)............................................................................. 9

Home Mortgage Disclosure (Regulation C), Final Rule,
    84 Fed. Reg. 57946 (Oct. 29, 2019) ............................................................................. 9

*Home Mortgage Disclosure (Regulation C), Final Rule
    85 Fed. Reg. 28364 (May 12, 2020) ................................................................... *passim*

Home Mortgage Disclosure (Regulation C);
    Correction of Supplementary Information, Final Rule,
    85 Fed. Reg. 69119 (Nov. 2, 2020)....................................................... 14, 17, 19, 21

Home Mortgage Disclosure (Regulation C), Proposed Rule,
    84 Fed. Reg. 20972 (May 13, 2019) ........................................................................... 10

Partial Exemptions From the Requirements of the Home Mortgage Disclosure Act Under the
    Economic Growth, Regulatory Relief, and Consumer Protection Act (Regulation C),
    Interpretive and Procedural Rule,
    83 Fed. Reg. 45325 (Sept. 7, 2018)........................................................................... 10

**Other Authorities**

Black's Law Dictionary (11th ed. 2019)........................................................................... 46

Merriam-Webster, *Merriam-Webster.com Dictionary*, https://www.merriam-
    webster.com/dictionary/exception (last visited Mar. 30, 2021) ................................ 46

**INTRODUCTION**

The Home Mortgage Disclosure Act (HMDA), as implemented, generally requires certain financial institutions to collect, report, and disclose data about mortgage lending. In May 2020, seeking to appropriately balance transparency in the mortgage market, regulatory burden, and access to credit, the Consumer Financial Protection Bureau exercised its rulemaking authority under HMDA to increase the thresholds that determine which financial institutions are required to report HMDA data (2020 Rule). Specifically, the Bureau excluded certain financial institutions from HMDA's reporting requirements if they did not make at least 100 closed-end loans in each of the two preceding years or extend at least 200 open-end lines of credit in each of the two preceding years.

The Bureau originally established reporting thresholds in 2015 (2015 Rule), but after hearing from smaller financial institutions that they were still facing significant burdens in complying with some of HMDA's reporting requirements, the Bureau reassessed whether the 2015 Rule had appropriately balanced burden on financial institutions and the amount of HMDA data necessary to serve HMDA's purposes. As a part of that reassessment, the Bureau considered the benefits and costs on both financial institutions and consumers under several possible reporting thresholds. The Bureau also considered that in 2018, Congress passed the Economic Growth, Regulatory Relief, and Consumer Protection Act to provide additional relief to smaller depository institutions by partially exempting them from some of HMDA's reporting requirements. Ultimately, the Bureau concluded that under the new thresholds it could maintain an estimated 98% of data on closed-end loans and 95% of data on open-end lines of credit, relative to the data available under the 2015 Rule's thresholds, while reducing burden on

1

thousands of small financial institutions by excluding them from HMDA's reporting requirements.

Plaintiffs challenge the 2020 Rule under the Administrative Procedure Act arguing that (1) the Bureau's consideration of the Rule's benefits and costs was arbitrary and capricious, and (2) the Bureau exceeded its statutory authority under HMDA in increasing the reporting thresholds to the current levels. The Court should reject both claims.

Contrary to Plaintiffs' claims, the Bureau's consideration of benefits and costs was not arbitrary and capricious. The administrative record details the Bureau's methodology for considering the cost savings for newly excluded financial institutions, the potential benefits to consumers from institutions passing those cost savings on to consumers, and the costs to consumers resulting from the limited reduction in publicly available HMDA data. The Bureau explained the assumptions it made, described the factors it considered (as well as the factors it was not persuaded by), and, where the Bureau could not quantify certain factors, it explained why it could not and offered a qualitative assessment instead. Plaintiffs may have weighed certain factors differently and arrived at a different conclusion, but that is not enough to find the Bureau's consideration of benefits and costs arbitrary or capricious.

Plaintiffs' claim regarding the scope of the Bureau's exception authority under HMDA is equally unavailing. HMDA grants the Bureau broad authority to prescribe "regulations as may be necessary to carry out the purposes of [HMDA]," and provides the Bureau with explicit authority to create "exceptions for any class of transactions, as in the judgment of the Bureau are necessary and proper to effectuate the purposes of [HMDA], and prevent circumvention or evasion thereof, or to facilitate compliance therewith." 12 U.S.C. § 2804(a). The Bureau appropriately exercised this authority when it first established reporting thresholds in 2015, and, again, when it revised

those thresholds in 2020. The Bureau reasonably interpreted the broad grant of authority to "except[] . . . any class of transactions" from HMDA as permitting it to except transactions made by institutions whose prior lending activity fell below certain thresholds. Plaintiffs cannot show that the Bureau's interpretation of its rulemaking authority was foreclosed by Congress, or that the Bureau acted unreasonably in exercising this authority.

## BACKGROUND

### I.  HMDA and Regulation C

Congress passed the Home Mortgage Disclosure Act (HMDA) in 1975, finding that "depository institutions have sometimes contributed to the decline of certain geographic areas by their failure pursuant to their chartering responsibilities to provide adequate home financing to qualified applicants on reasonable terms and conditions." Pub. L. No. 94-200, § 302, 89 Stat. 1124 (1975). HMDA is thus a disclosure statute intended to (1) "help determine whether financial institutions are serving the housing needs of their communities;" (2) "assist public officials in distributing public-sector investment so as to attract private investment to areas where it is needed;" and (3) "assist in identifying possible discriminatory lending patterns and enforcing antidiscrimination statutes." 12 C.F.R. § 1003.1(b)(1).[1]

To effectuate these purposes, HMDA, as implemented, requires certain depository institutions and for-profit non-depository institutions to collect, report, and disclose data about originations and purchases of mortgage loans, as well as mortgage loan applications that do not

---

[1] The regulatory articulation of the purposes of HMDA is based on the statute's original articulation of its purposes, *see* 12 U.S.C. § 2801(b), as well as subsequent amendments. *See* Home Mortgage Disclosure, 54 Fed. Reg. 51356, 51357 (Dec. 15, 1989).

result in originations (for example, applications that are denied or withdrawn). *See* 12 U.S.C. § 2803; *see generally* 12 C.F.R. pt. 1003.

As described below, the Board of Governors of the Federal Reserve System initially implemented HMDA through its "Regulation C," but that authority has since been transferred to the Bureau. Thus, the Bureau now has the authority to "prescribe such regulations as may be necessary to carry out the purposes of [HMDA]." *Id*. § 2804(a). This rulemaking authority is particularly broad and includes explicit authority to promulgate "such classifications, differentiations, or other provisions, and [to] provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Bureau are necessary and proper to effectuate the purposes of [HMDA], and prevent circumvention or evasion thereof, or to facilitate compliance therewith." *Id*.

## II.    The Dodd-Frank Act

In 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) which, among other things, created the Bureau and gave it primary authority to "regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws." *Id*. § 5491(a). Congress directed the Bureau to use this authority to ensure that "consumers have access to markets for consumer financial products and services" and that those markets are "fair, transparent, and competitive." *Id*. § 5511(a). To that end, when the Bureau prescribes rules under Federal consumer financial law, it must generally "consider" (1) "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting

from such rule;"[2] and must specifically "consider" (2) "the impact of proposed rules on [smaller depository institutions and credit unions], and the impact on consumers in rural areas." *Id*. § 5512(b)(2)(A).

The Dodd-Frank Act, which defines "Federal consumer financial laws" to include HMDA, 12 U.S.C. § 5481(12), (14), transferred to the Bureau the Federal Reserve Board's consumer financial protection functions, including the Board's HMDA rulemaking authority. *Id*. §§ 5581, 5481(12)(K); § 2804(a). The Act further amended HMDA, including by expanding the scope of information relating to mortgage applications and loans that must be reported to include an additional 13 data points, such as age, total points and fees, property value, and others. *See* Pub L. No. 111-203, § 1094(3); 12 U.S.C. § 2803(b). The Dodd-Frank Act also authorized the Bureau to require by rule the reporting of additional information. *Id*.

III.    **The 2015 Rule**

In 2015, the Bureau amended Regulation C to implement the Dodd-Frank Act's amendments to HMDA and to make certain other changes. 80 Fed. Reg. 66128 (Oct. 28, 2015) (Admin. Record (AR) 151) (2015 Rule). The 2015 Rule implemented the Dodd-Frank Act's mandate that institutions report 13 new data points and also specified, through the use of discretionary authority granted to the Bureau by the Dodd-Frank Act, an additional 14 data points that institutions must report. The 2015 Rule also required for the first time that certain

---

[2] The Dodd-Frank Act defines a "covered person" as an entity that provides "a consumer financial product or service," such as a mortgage loan secured by an individual's residence. *See* 12 U.S.C. § 5481(5), (6), (15)(A)(i).

financial institutions report data on certain open-end lines of credit (e.g., home equity lines of credit). *Id*. at 66158.[3]

Of particular relevance here, the 2015 Rule also established uniform loan-volume minimum thresholds for purposes of determining which depository and non-depository institutions are required to report HMDA data. Specifically, the 2015 Rule required an otherwise covered financial institution to report HMDA data only if it "originated at least 25 closed-end mortgage loans or at least 100 open-end lines of credit in each of the two preceding calendar years." *Id*. at 66128.[4] The Bureau found that establishing uniform loan-volume thresholds for both depository and non-depository institutions would "facilitate compliance with HMDA's requirements." *Id*. at 66150.

In determining the appropriate thresholds, the Bureau was guided by the principle that "Regulation C's institutional coverage criteria should balance the burden on financial institutions with the value of the data reported. [Financial] institutions that are currently reporting should not bear the burden of reporting under Regulation C if their data are of limited value in the HMDA data set. At the same time, Regulation C's institutional coverage criteria should not impair HMDA's ability to achieve its purposes." *Id*. at 66147.

As required by the Dodd-Frank Act, the Bureau adopted the 2015 Rule only after considering the potential benefits and costs. In its analysis, the Bureau considered (1) compliance

---

[3] In particular, the Bureau interpreted "mortgage loan," which HMDA defines as a loan that is "secured by residential real property or a home improvement loan," 12 U.S.C. § 2802(2), to include "dwelling-secured, consumer-purpose open-end lines of credit." 80 Fed. Reg. at 66160.
[4] The 2015 Rule also "includes a separate test to ensure that covered institutions that meet only the 25 closed-end mortgage loan threshold are not required to report their open-end lending, and that covered institutions that meet only the 100 open-end line of credit threshold are not required to report their closed-end lending." 80 Fed. Reg. at 66128.

costs at the per-institution level and aggregate market level and (2) the resulting reduction in

HMDA data both nationally and locally. *See id*. at 66261-62. For closed-end reporting, the

Bureau estimated that at a 25-loan threshold, depository institutions most likely to be exempt

would save approximately $2,500 annually in ongoing compliance costs and $3,000 in one-time

compliance costs each. *Id*. at 66277. At the aggregate market level this translated into annual cost

savings of $3,500,000 and a one-time cost savings of $4,200,000. *Id*. Looking at the reduction in

HMDA data, the Bureau found that 22% of closed-end depository institution reporters would be

exempt under the threshold. *Id*. at 66279. However, these 22% of reporters accounted for less

than 1% of HMDA data previously reported by depository institutions.[5] In other words, the

Bureau found that it could relieve burden on 22% of closed-end depository institution reporters

while maintaining more than 99% of previously available closed-end HMDA data from

depository institutions. *Id*. Recognizing the relevance of the geographic distribution of the data

reduction, the Bureau also assessed the impact of this data loss at the census tract level. *See id*.

At the 25 closed-end loan threshold, only 46 of 73,841 total census tracts would lose 20% or

more of previously reportable HMDA data. *Id*. And only 23 of 21,882 low-to-moderate income

tracts would lose a similar amount of HMDA data. *Id*.

The Bureau acknowledged in the 2015 Rule that given data limitations it was unable to

quantify the direct economic impact of this data loss on consumers, stating that quantifying this

impact "would require measuring the impact of increased transparency on financial institution

behavior, the need for public and private investment, the housing needs of communities, the

number of lenders potentially engaging in discriminatory or predatory behavior, and the number

---

[5] These estimates reflect reduction in reporting only by depository institutions because the 2015
Rule expanded closed-end reporting by non-depository institutions. *See* 80 Fed. Reg. at 66280.

of consumers currently being unfairly disadvantaged and the level of quantifiable damage from such disadvantage." *Id*. at 66262. And the Bureau was "unaware of data that would enable reliable quantitative estimates of all of these effects." *Id*. Nor did commenters provide or point to any existing data that would have allowed the Bureau to conduct this quantitative analysis. *Id*. at 66266. Instead, the Bureau conducted a qualitative assessment that focused on the amount of HMDA data that would remain available and an assessment of whether this reduction of data would have a "significant" or "material negative impact" on the usefulness of the data to achieve HMDA's purposes. *Id*. at 66262.

The Bureau concluded that a threshold of 25 closed-end mortgage loans meaningfully "reduce[d] burden on small depository institutions while preserving important data about communities and improving visibility into the lending practices of nondepository institutions." *Id.* at 66280. The Bureau also reasoned that while "higher closed-end mortgage loan-volume thresholds . . . might not significantly impact the value of HMDA data for analysis at the national level," they would "have a material negative impact on the availability of data about patterns and trends at the local level." *Id.* at 66147.

Similarly, with respect to open-end lines of credit, the Bureau believed that it struck the right balance setting a 100-loan threshold. *Id*. at 66149-50. Acknowledging the data limitations given that open-end reporting was previously not required, the Bureau estimated that under the 100-loan threshold the Bureau would relieve burden on approximately 3,400 depository institutions while still requiring reporting for 88% of all open-end lines of credit. *Id*. at 66281-82.[6]

_____

[6] These estimates reflected reporting only by depository institutions because, at the time, the

The 25 closed-end loan reporting threshold went into effect on January 1, 2017 for depository institutions and on January 1, 2018 for non-depository institutions. *Id*. at 66128, 66308-09. The 100 open-end loan threshold was scheduled to go into effect on January 1, 2018; however, after receiving feedback expressing concerns that the Bureau set the open-end threshold too low at 100, the Bureau temporarily increased the threshold to 500 open-end lines of credit before it could go into effect, so that the Bureau could better determine an appropriate permanent threshold.  That temporary increase remains in effect through January 1, 2022. *See* Home Mortgage Disclosure (Regulation C), 82 Fed. Reg. 43088 (Sept. 13, 2017) (AR 412) (setting temporary threshold until January 1, 2020); Home Mortgage Disclosure (Regulation C), 84 Fed. Reg. 57946 (Oct. 29, 2019) (AR 556) (extending temporary threshold until January 1, 2022).

## IV.    The Economic Growth, Regulatory Relief, and Consumer Protection Act

In 2018, Congress passed the Economic Growth, Regulatory Relief, and Consumer Protection Act (EGRRCPA) to further reduce burden on HMDA reporters by providing for partial exemptions to HMDA's reporting requirements for certain insured depository institutions and insured credit unions. Pub. L. No. 115-174, § 104, 132 Stat. 1296 (2018). In particular, the EGRRCPA amended HMDA by providing that insured depository institutions and insured credit unions that originated fewer than 500 closed-end mortgage loans in each of the two preceding calendar years did not have to report any of the 14 data points added in the 2015 Rule pursuant to the Bureau's discretionary authority and only had to report one of the 13 new data points (specifically, age) required by the Dodd-Frank Act and implemented through the 2015 Rule. *Id*.

---

Bureau "belie[ved] that most nondepository institutions do not originate [covered] open-end lines of credit." 80 Fed. Reg. at 66281.

The EGRRCPA likewise exempted insured depository institutions and insured credit unions that originated fewer than 500 open-end lines of credit in each of the two preceding calendar years from reporting nearly all of the 2015 Rule's new data points.[7] *Id.*  On August 31, 2018, the Bureau issued an interpretive and procedural rule to implement and clarify the partial exemptions established by the EGRRCPA. Partial Exemptions From the Requirements of the Home Mortgage Disclosure Act Under the Economic Growth, Regulatory Relief, and Consumer Protection Act (Regulation C), 83 Fed. Reg. 45325 (Sept. 7, 2018) (AR 474).

## V.    The 2020 Rule

On May 13, 2019, the Bureau issued a notice of proposed rulemaking to amend, as relevant here, Regulation C's reporting thresholds. Home Mortgage Disclosure (Regulation C), 84 Fed. Reg. 20972 (May 13, 2019) (AR 483). The Bureau explained that since issuing the 2015 Rule, it "ha[d] heard concerns that lower-volume institutions continue[d] to experience significant burden at the 25 closed-end coverage threshold." *Id.* at 20976. Similarly, the Bureau received information that "caused the Bureau to question its assumption[s]" and cost estimates with respect to smaller institutions reporting open-end lines of credit. *Id.* at 20981. Thus, the Bureau sought comments on whether the closed-end threshold should be increased from 25 to 50 or 100 and whether the open-end threshold should be increased from 100 to 200 (at the expiration of the temporary open-end threshold). *Id.* at 20972.

---

[7] The EGRRCPA further provided that a depository institution would not be eligible for partial exemptions if it "received a rating of 'needs to improve record of meeting community credit needs' during each of its 2 most recent examinations or a rating of 'substantial noncompliance in meeting community credit needs' on its most recent examination under . . . the Community Reinvestment Act of 1977." Pub. L. No. 115-174, § 104; 12 U.S.C. § 2803(i)(3).

On May 12, 2020, the Bureau issued the final rule that is the subject of this litigation, increasing the closed-end reporting threshold from 25 to 100 and the open-end threshold from 100 to 200. Home Mortgage Disclosure (Regulation C), 85 Fed. Reg. 28364 (May 12, 2020) (AR 615) (2020 Rule). Just as it did with the 2015 Rule, the Bureau made its decisions about the appropriate thresholds for the 2020 Rule after considering the cost savings to newly excluded financial institutions as well as the degree to which the marginal loss of data would impede the achievement of HMDA's purposes. *See id.* at 28389-92. In doing so, the Bureau took into account developments since issuance of the 2015 Rule, including the passage of the EGRRCPA. *Id*.

With respect to the closed-end loan threshold, the Bureau estimated that by increasing the reporting threshold to 100, the annual savings in ongoing costs for newly excluded financial institutions that were not eligible for a partial exemption under the EGRRCPA would be approximately $4,500 for a representative low-complexity institution and approximately $44,700 for a representative moderately complex institution.[8] *Id*. at 28394. For newly excluded institutions that were eligible for a partial exemption under the EGRRCPA, the Bureau estimated that a representative low-complexity institution would save approximately $2,200 annually and a representative moderately complex institution would save $32,800 annually. *Id*. Looking at

---

[8] In order to "consider costs in a practical and meaningful way," given that "costs vary by institution due to many factors, such as size, operational structure, and product complexity," the Bureau "adopted an approach that focused on three representative tiers of financial institutions." 85 Fed. Reg. at 28389.  Tier 1 denoted those institutions with the highest levels of complexity, originating the most mortgages; tier 2 denoted those institutions of moderate complexity; and tier 3 denoted the least complex institutions, who originated the fewest mortgages. *Id*. The 2020 Rule's increased thresholds affected only tier 2 and tier 3 institutions.

aggregate cost savings across the market, the Bureau estimated that newly excluded institutions would save in total $6.4 million annually under the 100 closed-end threshold. *Id*. at 28396.

Turning to the reduction in HMDA data, the Bureau estimated that increasing the closed-end loan threshold to 100 would exclude 1,700 financial institutions (both depository and non-depository) that were required to report under the 25-loan threshold. *Id*. at 28394. These 1,700 institutions, however, accounted for only approximately 2% of the closed-end mortgage loans reported by institutions that met the 25-loan threshold. *Id*. at 28392, 28394. In other words, the Bureau estimated that over 98% of HMDA data reported under the 25-loan threshold would still be available after increasing the threshold to 100 while reducing burden for 1,700 institutions. As it did for the 2015 Rule, the Bureau then assessed how this reduction in data would impact local areas in particular. Under the 100 closed-end loan threshold, the Bureau estimated, relative to the 25-loan threshold, that 73,400 (or 98%) of the approximately 74,600 total census tracts would still retain more than 80 percent of reportable HMDA data—the same benchmark used in the 2015 Rule. *Id*. at 28373. Similarly, the Bureau estimated that approximately 97% of low-to-moderate income tracts would retain more than 80% of reportable HMDA data and 95% of rural tracts would retain the same. *Id*. Like in the 2015 Rule, the Bureau was unable to quantify the economic impact of the reduction in available HMDA data to consumers. *Id*. at 28392. Instead, the Bureau again focused on a qualitative assessment. *Id*.

The Bureau acknowledged in the 2020 Rule that it was departing from its assessment in the 2015 Rule that a closed-end loan threshold above 25 would mean a loss of HMDA data at the "local level that would substantially impede the public's and public officials' ability to understand access to credit in their communities." *Id*. at 28368. The Bureau explained that, based on feedback it had received since the 2015 Rule took effect, it was concerned that financial

institutions were "experienc[ing] significant burden with the threshold set at 25." *Id*.

Accordingly, the Bureau reassessed the appropriate balance between the estimated burden and

the benefits of increased HMDA reporting in the 2020 Rule, taking into account developments

since the 2015 Rule such as the new EGRRCPA partial exemptions. The Bureau ultimately

concluded that "increasing the closed-end threshold to 100 will provide meaningful burden relief

for lower-volume depository institutions while maintaining reporting sufficient to achieve

HMDA's purposes." *Id*. at 28374.

      With respect to open-end lines of credit, the Bureau estimated that by increasing the

reporting threshold to 200, the annual ongoing cost savings for newly excluded financial

institutions that were not eligible for a partial exemption under the EGRRCPA would be

approximately $8,800 for a representative low-complexity institution and $44,700 for a

moderately complex institution. *Id*. at 28380. For newly excluded institutions that were eligible

for a partial exemption under the EGRRCPA, the Bureau estimated that a representative low-

complexity institution would save approximately $4,300 annually and a moderately complex

institution would save approximately $21,900 annually. *Id*. In addition, the Bureau estimated that

the majority of newly excluded institutions would save approximately $3,000 in one-time costs.

*Id*. In the aggregate, then, the Bureau estimated that, "increasing the threshold from 100 to 200

open-end lines of credit [would] result in savings in the operational costs associated with open-

end lines of credit of about $3.7 million per year starting in 2022," when the temporary increase

to 500 expires, as well as one-time costs savings of $23.9 million. *Id*. at 28400-01.

      Looking at the data loss, the Bureau estimated that by increasing the threshold to 200, the

2020 Rule would exempt 401 financial institutions while reducing data on open-end lines of

credit by less than 5% as compared to the 100-loan threshold. *Id*. at 28399. The Bureau thus

concluded that increasing the permanent open-end threshold to 200 would provide meaningful burden relief for smaller institutions while still providing significant market coverage of open-end lending. *Id*. at 28378.

## VI.    Correction Notice

On November 2, 2020, following Plaintiffs' complaint in this action, the Bureau published a Correction Notice in the *Federal Register* regarding several "clerical errors" in the 2020 Rule "regarding the estimated cost savings in annual ongoing costs from various possible closed-end coverage thresholds as compared to the then-current coverage threshold of 25 closed-end mortgage loans." Home Mortgage Disclosure (Regulation C); Correction of Supplementary Information, 85 Fed. Reg. 69119 (Nov. 2, 2020) (AR 659).[9] In the 2020 Rule, and specifically in the section detailing the benefits and costs of the Rule, the Bureau correctly reported its estimate that financial institutions would save in the aggregate $6.4 million in annual ongoing costs under the new 100 closed-end loan threshold. 85 Fed. Reg. at 28396. The Bureau found that those financial institutions that were eligible for partial exemptions under EGRRCPA would save $5.9 million in annual ongoing costs, while those institutions that were not eligible would save $0.5 million. *Id*. However, elsewhere in the Rule, the Bureau inadvertently stated the wrong number—summarizing the aggregate cost savings as $11.2 million. *See id*. at 28374, 28383. The Correction Notice states, in relevant part, that the correct aggregate cost savings estimate for financial institutions under the 100 closed-end loan threshold is $6.4 million and replaces the $11.2 million estimate with the correct estimate. 85 Fed. Reg. at 69119.

---

[9] This is the same Correction Notice as the one listed on the Certified List of Contents as being issued on October 20, 2020. *See* ECF 13-2 at 1. The Correction Notice was not published in the *Federal Register* until November 2—after the Bureau filed the Certified List of Contents; thus, the Certified List of Contents lists the date on which the Bureau published the rule on its website.

## STANDARD OF REVIEW

Under the Administrative Procedure Act (APA), the court may set aside a rule if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). "When a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal" and the "entire case on review is a question of law." *Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotations omitted).

A court's "review under the APA is highly deferential." *Ramaprakash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003). This is particularly true when a court reviews an agency's consideration of benefits and costs. *See Off. of Commc'n of the United Church of Christ v. FCC*, 707 F.2d 1413, 1440 (D.C. Cir. 1983) ("Such cost-benefit analyses epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency."). A court generally may not "substitute its judgment for that of the agency" and instead must uphold the agency's action so long as it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Moreover, where agencies are making "predictive judgments about areas that are within the agency's field of discretion and expertise[, they] are entitled to *particularly deferential* review." *EarthLink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006) (emphasis in original). An agency has "wide discretion in making line-drawing decisions," and it "is not required to identify the optimal threshold with pinpoint precision[; i]t is only required to identify the standard and explain its relationship to the underlying regulatory concerns." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (internal quotations and citations omitted); *see*

*also WJG Tel. Co., Inc. v. FCC*, 675 F.2d 386, 389 (D.C. Cir. 1982) ("When a line has to be

drawn, [an agency] is authorized to make a rational legislative-type judgment," and if the "figure

selected by the agency reflects its informed discretion, and is neither patently unreasonable nor a

dictate of unbridled whim, then the agency's decision adequately satisfies the [APA].") (internal

quotations and citations omitted).

Further, when evaluating a claim that a regulation exceeds an agency's statutory

authority, courts must apply the framework set forth in *Chevron, USA, Inc. v. Natural Resources

Defense Council, Inc.*, 467 U.S. 837, 842-44 (1984). *See City of Arlington, Tex. v. FCC*, 569 U.S.

290, 296-97, 300 (2013) (answering in the affirmative "whether a court must defer under

*Chevron* to an agency's interpretation of a statutory ambiguity that concerns the scope of the

agency's statutory authority"); *see also Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142

(2016) ("We interpret Congress' grant of rulemaking authority in light of our decision in

*Chevron*.").  Under that framework, a court first asks "whether Congress has directly spoken to

the precise question at issue." *Chevron*, 467 U.S. at 842. If it has, the court "must give effect to

the unambiguously expressed intent of Congress." *Id.* at 842-43. But if "the statute is silent or

ambiguous with respect to the specific issue, the question for the court is whether the agency's

answer is based on a permissible construction of the statute." *Id.* at 843. In making this

assessment, a court asks only whether the agency's construction represents "a reasonable policy

choice for the agency to make"; it "may not substitute its own construction of a statutory

provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844-45.

16

**ARGUMENT**

**I.      The Bureau's correction of clerical errors in the preamble to the 2020 Rule does not affect the Bureau's analysis of the Rule's benefits and costs.**

Contrary to Plaintiffs' assertion, *see* Pls. Br. at 21, the Bureau did not rely on a "massive error" in justifying the 2020 Rule, and the Bureau's *Federal Register* notice correcting clerical errors in some of the Bureau's cost estimates (Correction Notice) does not suggest otherwise.

Section 1022 of the Dodd-Frank Act requires that the Bureau "consider … the potential benefits and costs" of its rules "to consumers and covered persons" (hereinafter, "1022(b) Analysis"). 12 U.S.C. § 5512(b)(2)(A). As part of the Bureau's 1022(b) Analysis of the 2020 Rule, the Bureau estimated that by setting the reporting threshold at 100 closed-end loans, newly excluded financial institutions would save in the aggregate approximately $6.4 million annually in operational costs. 85 Fed. Reg. at 28396. Following Plaintiffs' Complaint in this action, however, the Bureau realized that it had entered the wrong aggregate cost savings number—$11.2 million—in the Section-by-Section analysis of the preamble of the 2020 Rule. *See* 85 Fed. Reg. at 28374, 28383. As a result, the Bureau issued a notice in the *Federal Register* to correct and conform "several clerical errors regarding the estimated cost savings in annual ongoing costs" to "the cost estimates provided [in the 1022(b) Analysis]."  Home Mortgage Disclosure (Regulation C); Correction of Supplementary Information, 85 Fed. Reg. 69119, 69119 (November 2, 2020). In doing so, the Bureau confirmed that the $6.4 million cost estimate in the 1022(b) Analysis was the correct cost estimate—that is, the estimate on which the Bureau based its impact analysis.

The 2020 Rule itself demonstrates that the Bureau relied on the $6.4 million estimate in the 1022(b) Analysis and not the $11.2 million estimate noted in the Section-by-Section analysis. The Bureau repeatedly emphasized that the 1022(b) Analysis contained the most detailed and

comprehensive analysis of the Bureau's cost estimates. *See*, *e.g.*, 85 Fed. Reg. at 28371, 28374 n.68, 28381, 28383 n.137, 28384 n.141. In fact, the 1022(b) Analysis explains how the Bureau derived the $6.4 million estimate:

> [T]he Bureau estimates that the total savings in the annual ongoing costs from HMDA reporting by excluded firms that are already partially exempt for closed-end mortgage loans under the [Economic Growth Regulatory Relief, and Consumer Protection Act] will be about *$5.9 million*. The Bureau also estimates that the total savings in the annual ongoing costs from HMDA reporting by fully excluded firms that are not eligible for a partial exemption under the EGRRCPA will be about *$0.5 million*. Together the annual savings in the operational costs of firms newly excluded under the threshold of 100 closed-end loans will be about *$6.4 million*.

85 Fed. Reg. at 28396 (emphasis added). While the Section-by-Section analysis included the cost estimate summaries, it was in the 1022(b) Analysis where the Bureau "show[ed] its work." *Am. Waterways Operators v. Wheeler*, --- F. Supp. 3d ---, 2020 WL 7024195, at *12 (D.D.C. 2020).

Plaintiffs counter that "although the Correction Notice notes that the 2020 Rule describes the section 1022(b) analysis as more 'comprehensive' than the Section-by-Section analysis . . . it is clear in context that the word was used to indicate that the section 1022(b) analysis addressed all aspects of the Rule and gave more detail about the figures." Pls. Br. at 23. But that just confirms that the 1022(b) Analysis contained the correct cost estimates. The repeated emphasis that the 1022(b) Analysis is more comprehensive and the fact that the Bureau showed its work in the 1022(b) Analysis demonstrate that the number on which the Bureau relied was the $6.4 million estimate.

Regardless, because the 2020 Rule's Section-by-Section analysis included inaccurate figures, the Bureau issued a correction. Plaintiffs seize on the Correction Notice to claim that the Bureau is "now say[ing]" that "the correct number for savings . . . is actually $6.4 million," Pls. Br. at 22, implying that the Bureau did not previously use this number. However, as just

discussed, the Bureau stated the correct $6.4 million cost estimate in the 2020 Rule, *see* 85 Fed. Reg. at 28396, and the Rule's 1022(b) Analysis shows that the Bureau relied on that estimate. Plaintiffs further claim that in the Correction Notice the Bureau "did not disclaim that it had relied on the incorrect $11.2 million figure" in the 2020 Rule. Pls. Br. at 23 (alterations omitted). But that's exactly what the Bureau did. The Correction Notice explicitly identifies the changes as corrections to "clerical errors" and *not* a revision to the cost estimate on which it relied. *See* 85 Fed. Reg. at 69119.[10]

American Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017), on which Plaintiffs rely, is inapposite. There, the United States Forest Service amended a decades-old map that defined the scope of wild horse territory. *Id*. at 918. To justify its decision to revise its long-standing position, the Service claimed it was merely correcting an "administrative error" from some twenty years earlier. The D.C. Circuit rejected the notion that the Service could change the legal status of more than 23,000 acres of land simply by labeling it an "administrative error," finding the earlier map had been "reconfirmed repeatedly by two decades of agency practice and official pronouncements." *Id*. at 924.

Here, by contrast, the Bureau is not amending the reporting thresholds from the 2015 Rule by calling the previous thresholds an administrative error. In other words, and contrary to Plaintiffs' contention, the Bureau is not claiming some "oops" as a substitute for the requirement that the Bureau engage in reasoned decision-making. Instead, the Bureau promptly conformed

---

[10] To be sure, simply calling something a clerical error does not necessarily mean that it is one. However, in APA challenges, agency decisions are "entitled to a 'presumption of regularity,'" *Douglas Timber Operators, Inc. v. Salazar*, 774 F. Supp. 2d 245, 250 (D.D.C. 2011) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)), and Plaintiffs have not pointed to anything that would suggest that the Bureau is mischaracterizing this correction.

incorrect figures in the Section-by-Section Analysis of the 2020 Rule to the correct figures in the 1022(b) Analysis upon which the Bureau's decision actually relied. The Bureau's now-corrected clerical error is, at most, a harmless error, which "could have had no effect on the underlying agency action being challenged." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007); *see also* 5 U.S.C. § 706 (instructing in a review of agency action that "due account shall be taken of the rule of prejudicial error").

For a similar reason, Plaintiffs' reliance on *N.C. Wildlife Federation v. N.C. Department of Transportation*, 677 F.3d 596 (4th Cir. 2012) is misplaced. Pls. Br. at 22. Plaintiffs argue that a "*post hoc*, mid-litigation 'correction' cannot save" the Bureau from its admission that a serious flaw undermined its analysis. *Id*. However, in *N.C. Wildlife Federation*, the North Carolina Department of Transportation and the Federal Highway Administration admitted that there was a substantive error in the way they designed their baseline analysis to determine whether to approve a new toll road. 677 F.3d at 602. The agencies further admitted that, as a result, the "administrative record mischaracterize[d]" their baseline analysis. *Id*. at 604. The court also found that the agencies were aware of the error during the administrative process and, despite comments during the open comment period specifically highlighting the error, chose not to acknowledge the error until they were in litigation. *Id*. at 603. The court ultimately disagreed with the agencies that their admission of error during the litigation cured any missteps, holding that agency action must be based on "the administrative record, not subsequent litigation rationalizations." *Id*. at 604.

Here, the Correction Notice does not state that the Bureau made a substantive error in its consideration of the 2020 Rule's benefits and costs, but instead corrected a clerical error in the figures reported in the Bureau's Section-by-Section analysis. Nor is the Bureau relying on

information not in the record to justify the 2020 Rule; rather the Bureau is relying on its detailed consideration of the Rule's benefits and costs contained in the 2020 Rule itself, as confirmed by the Bureau's published Correction Notice. And while the Bureau did issue the correction during litigation, it did so through a notice published in the *Federal Register, see* 85 Fed. Reg. 69119, which the Bureau included in the administrative record. *See* ECF 13-2 at 1 (Certified List of Contents of the Administrative Record).

In any event, Plaintiffs concede that the Court can "uphold the 2020 Rule if it can 'conclude with sufficient certainty that the agency would have made the same decision absent its errors.'" Pls. Br. at 22 (quoting *Hermes Consol., LLC v. EPA*, 787 F.3d 568, 579 (D.C. Cir. 2015)). And there can be no question based on the 2020 Rule itself and the Correction Notice that the Bureau would have made the same decision on the thresholds absent its clerical errors.

Thus, the Bureau's correction of several inaccurate numbers in the Section-by-Section Analysis to align them with the correct numbers found in the Bureau's 1022(b) Analysis is not a basis to set aside the 2020 Rule.

## II.     The Bureau's consideration of the 2020 Rule's benefits and costs was reasonable.

In determining whether to increase HMDA's reporting thresholds, the Bureau considered the 2020 Rule's benefits and costs, in accordance with Section 1022(b) of the Dodd-Frank Act. The Bureau detailed its methodology, explained the assumptions it made, described the factors it considered (as well as the factors it was not persuaded by), and, where it could not quantify certain factors, explained why and provided a qualitative assessment instead. Plaintiffs nevertheless challenge the Bureau's consideration of benefits and costs as arbitrary and capricious.

Courts review an agency's "cost-benefit analysis deferentially," and in challenging the Bureau's consideration of the 2020 Rule's benefits and costs, Plaintiffs' "burden to show error is high." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012). Thus, when a court reviews a challenge to an agency's cost-benefit analysis, its "role is to determine whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Inv. Co. Inst. v. Commodity Futures Trading Comm'n,* 720 F.3d 370, 377 (D.C. Cir. 2013) (citing *Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985)).

Here, as required by Section 1022(b), the Bureau considered both the benefits and costs to consumers and covered persons that would result from raising the HMDA reporting thresholds. In particular, the Bureau estimated the compliance burdens imposed under the 2015 Rule's reporting thresholds as well as the cost savings that smaller institutions would realize if the thresholds were increased. The Bureau analyzed the impact that increasing the thresholds would have on the amount of publicly available HMDA data, both nationally and locally. The Bureau considered the effect this reduction in HMDA data would have on the ability to achieve HMDA's purposes. The Bureau also considered that Congress, through the EGRRCPA, reduced the amount of data required to be reported for certain institutions and had thus affected the compliance burden for those institutions. The Bureau ultimately concluded that setting the closed-end reporting threshold at 100 and the open-end reporting threshold at 200 would meaningfully reduce burden on smaller lending institutions while maintaining sufficient publicly available HMDA data. This is precisely the sort of "rational legislative-type judgment" that Congress has entrusted to the Bureau's discretion. *WJG Tel. Co., Inc. v. FCC*, 675 F.2d 386, 389 (D.C. Cir. 1982).

A.    **The Bureau reasonably considered the relevant factors in assessing the benefits and costs to covered persons that would result from increasing the HMDA reporting thresholds.**

As required by Section 1022(b), the Bureau considered both the benefits and costs to "covered persons"—i.e., mortgage lenders—that would result from raising the HMDA reporting thresholds. The Bureau did not identify any significant costs to lenders, *see* 85 Fed. Reg. at 28397, and therefore most of its analysis addressed the ways lenders would benefit from higher thresholds, which consisted chiefly of reduced compliance costs for those that would no longer have to report HMDA data. Plaintiffs challenge the Bureau's analysis, but their challenge falls far short of showing that the Bureau's decision was not "based on a consideration of the relevant factors" or was a "clear error of judgment." *Inv. Co. Inst.,* 720 F.3d at 377.

i.    **The Bureau's methodology for considering cost savings to institutions was reasonable.**

To consider compliance costs incurred by HMDA reporters that would be avoided under the new thresholds, the Bureau relied on the same framework it used in the 2015 Rule. 85 Fed. Reg. at 28390 ("For the impact analysis in [the 2020 Rule], the Bureau is utilizing the cost estimates provided in the 2015 HMDA Rule. . . with some updates."). That is, the Bureau first "estimate[d] the current cost of reporting for financial institutions"; then "evaluated the one-time costs and ongoing operational costs that financial institutions would incur in response to the final rule"; and finally, "aggregate[ed] up to the market-level the institution-level cost estimates from the first two stages." 80 Fed. Reg. at 66261; *see also* 85 Fed. Reg. at 28389-91.

With respect to the institution-level costs, because "costs vary by institution due to many factors, such as size, operational structure, and product complexity . . . the Bureau adopted an approach that focused on three representative tiers of financial institutions." 85 Fed. Reg. at 28389, 28394. Most relevant here, tier 3 denotes a financial institution with the lowest level of

complexity. For closed-end mortgage loans, the representative tier 3 financial institution has 50 loan/application records per year. *Id*. In other words, if required to report, a typical closed-end tier 3 institution would report data on about 50 mortgage loans or applications each year. For open-end lines of credit, the representative tier 3 financial institution has 150 loan/application records per year. *Id*. at 28391.

Following an extensive study of the HMDA compliance processes and costs, including engaging directly with HMDA reporters, the Bureau classified the operational activities that financial institutions use for HMDA data collection and reporting into 18 discrete compliance "tasks." *Id.* at 28389. These tasks include: transferring data to the HMDA Management System, researching and reporting questions, geocoding, training, internal and external audits, and preparation for and assistance with regulators' HMDA compliance examinations. *Id*. at 28389 n.162. The Bureau further "identified seven key dimensions of compliance operations that were significant drivers of compliance costs, including the reporting system used, the degree of system integration, the degree of system automation, the compliance program, and the tools for geocoding, performing completeness checks, and editing." *Id*.

The Bureau then calculated the cost for each of the 18 compliance tasks for a representative institution in each of the three tiers. *Id*. at 28390; 80 Fed. Reg. at 66271-73 (charts listing compliance costs for each task). For the 2020 Rule specifically, the Bureau adjusted the cost estimates to account for: (1) "operational improvements that have been implemented by the Bureau regarding HMDA reporting since the issuance of the 2015 HMDA Rule" and (2) whether "financial institutions [are] eligible for partial exemptions under the EGRRCPA." 85 Fed. Reg. at 28390.

Notably, the Bureau solicited input on its methodology for estimating compliance costs; and, after "consider[ing] these comments," the Bureau "conclude[d] . . . that they do not undermine the Bureau's approach or cost parameters." *Id*. For example, the Bureau considered whether the list of 18 compliance tasks should be modified to include others and whether the cost values should be adjusted to account for the fact that excluded institutions will still need to collect the same information for other reporting requirements. *Id*. at 28390-91.

As noted above, under this framework, the Bureau estimated newly excluded institutions' cost savings at both the per-institution and aggregate market level and concluded that raising the reporting threshold for both closed-end loans and open-end lines of credit would provide these institutions meaningful burden relief. *See id*. at 28374, 28378.

> ### ii. The Bureau adequately addressed the issues Plaintiffs raise regarding costs savings to institutions

Nevertheless, Plaintiffs claim that the Bureau failed to adequately address "three major points" raised in public comments regarding the Bureau's compliance cost estimates and thus did not engage in "reasoned decision-making" in issuing the 2020 Rule. Pls. Br. at 24. While the "failure to respond meaningfully to [objections raised by commenters] renders its decision . . . arbitrary and capricious," *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001), an agency's "obligation to respond . . . is not particularly demanding," *Ass'n of Pri. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427 (D.C. Cir. 2012) (internal quotations omitted). Ultimately, an agency "must only address significant comments in a reasoned manner . . . that allows a court to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did." *FBME Bank Ltd. v. Mnuchin*, 249 F. Supp. 3d 215, 222 (D.D.C. 2017) (citing *Reytblatt v. Nuclear Regul. Comm'n*, 105 F.3d 715, 722 (D.C. Cir. 1997) and *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993)) (internal quotations omitted). Here, the

administrative record shows that the Bureau adequately considered and meaningfully responded to all three issues that Plaintiffs highlight.[11]

1. Contrary to Plaintiffs' claim, the Bureau adequately considered that "the newly-excluded institutions will still be required to maintain most HMDA data to comply with other statutory and regulatory requirements." Pls. Br. at 24-25, 28. Plaintiffs claim that the Bureau merely acknowledged this point without "stat[ing] that it took the point into account in estimating cost savings . . . or how it adjusted its projections of savings to account for it." Pls. Br. at 25. Plaintiffs, however, focus too narrowly on one sentence in the 1022(b) Analysis, without considering the entire administrative record, including the description of the Bureau's methodology, which was more fully detailed in the 2015 Rule and incorporated by reference. *See New Lifecare Hosps. of Chester Cty. LLC v. Azar*, 417 F. Supp. 3d 31, 44 (D.D.C. 2019) (rejecting petitioner's assertion that the agency addressed petitioner's comment only in a "terse three sentence response," because the agency had incorporated its reasoning from earlier related rulemakings that were part of the administrative record).

As stated in the 2020 Rule, the Bureau relied on the same framework for calculating its compliance cost estimates as it did in the 2015 Rule. *See* 85 Fed. Reg. at 28390. In the 2015 Rule, the Bureau explicitly stated that "[o]ne important consideration during the Bureau's rulemaking process that informs this discussion of benefits, costs, and impacts was alignment of data fields to *existing regulations* or industry data standards." 80 Fed. Reg. at 66287 (emphasis

---

[11] In their brief, Plaintiffs address separately the Bureau's analysis of the revised closed-end reporting threshold and the revised open-end reporting threshold. *See* Pls. Br. at 24, 27. However, the arguments for both are largely the same, focusing on the same three issues. (There is one exception, which the Bureau addresses in footnote 13.) Therefore, the Bureau addresses both sets of arguments together.

added). To do this, "the Bureau analyzed each data point . . . to determine whether analogous data existed." *Id.*; *see also id.* at 66287-93 (considering the cost of each HMDA data point, including whether the data point is aligned with another regulation). Thus, in the 2015 HMDA Rule, the Bureau's compliance cost estimates reflected that some of the new data points were already required by other existing statutes and regulations, and as a result the estimates were slightly lower because of this. By using the same structure and estimates (adjusted to account for things like inflation), the Bureau's cost saving estimates in the 2020 Rule reflect how some data points are required by other existing statutes and regulations. *See* 85 Fed. Reg. at 28390 ("For the impact analysis in this final rule, the Bureau is utilizing the cost estimates provided in the 2015 Rule . . . with some updates.").

In any event, even if the Bureau had failed to respond to the issue that Plaintiffs highlight, it would not undermine the Bureau's consideration of benefits and costs. *See Texas Mun. Power Agency v. EPA*, 89 F.3d 858, 876 (D.C. Cir. 1996) ("[T]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors."). As discussed above, the Bureau followed a reasonable process to estimate compliance costs for HMDA reporting that included "classif[ying] the operational activities that financial institutions use for HMDA data collection and reporting into 18 discrete compliance 'tasks.'" 85 Fed. Reg. at 28389. The Bureau then estimated the cost for each compliance task for each of the three representative tiers of financial institutions. *See id.* at 28389-90; *see also* 80 Fed. Reg. at 66271-73. While some of these compliance tasks may overlap with tasks that covered financial institutions are performing pursuant to other statutory or regulatory requirements, the majority of the tasks are HMDA-specific. *See* 85 Fed. Reg. at 28389

n.162[12]; 80 Fed. Reg. at 66269. The administrative record thus shows that the Bureau based its estimates on a "consideration of the relevant factors." *Texas Mun. Power Agency*, 89 F.3d at 876.

2. Plaintiffs next argue that the Bureau did not adequately address that "1,630 of the 1,700 lenders that are newly exempt from reporting closed-end mortgage data under the 2020 HMDA Rule already qualify for partial reporting exemptions under the 2018 EGRRCPA." Pls. Br. at 25-26. Plaintiffs wrongly claim that the Bureau "gave no indication how or that it took this point into account when analyzing the benefits of the Rule." *Id*. at 26.

In fact, the Bureau explicitly stated in the 1022(b) Analysis that it was "making updates to align the partially exempt data points (and data fields used to report these data points) with the cost impact analyses discussed in the impact analyses for the 2015 HMDA Rule." 85 Fed. Reg. at 28390. The Bureau also made clear that the appropriate baseline analysis for determining the impact of the reporting threshold increase is a "post-EGRRCPA world in which eligible financial institutions under the EGRRCPA are already partially exempt from the reporting of certain data points." *Id*. at 28389. As a result, the Bureau repeatedly identified the number of covered financial institutions that were eligible for partial exemptions. *See, e.g.*, *id*. at 28393 ("The Bureau further estimates that about 1,630 of the 1,700 newly excluded closed-end reporters that will be excluded under the threshold of 100 closed-end mortgage loans are eligible for a partial exemption for closed-end mortgage loans under the EGRRCPA."); *id*. at 28399 ("About 378 of

---

[12] During the rulemaking process for both the 2015 and 2020 Rules, the Bureau solicited comments regarding its methodology for calculating cost estimates, and "[n]o commenter identified any additional data sources that would have improved the Bureau's estimates." 80 Fed. Reg. at 66266; *see also* 85 Fed. Reg. at 28390-91. Nor do Plaintiffs provide any data undermining the Bureau's analysis. Plaintiffs have thus not shown that the Bureau's analysis of compliance costs estimates resulted in a "cost figure" that is not within a "broad zone of reasonable estimate." *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 563 (D.C. Cir. 2002).

those 401 financial institutions [that would no longer have to report open-end lines of credit] are eligible for the partial exemption for open-end lines of credit under the EGRRCPA, and about 23 of them are not eligible for the partial exemption.").

Moreover, throughout the Bureau's 1022(b) Analysis, the Bureau provided specific cost estimates accounting for the EGRRCPA. *See*, *e.g.*, *id.* at 28394 ("On the other hand, the Bureau estimates that if a financial institution is eligible for a partial exemption on its closed-end mortgage loans under the EGRRCPA, the annual savings in the ongoing costs from the partial exemption alone would be approximately $2,300 for a representative low-complexity tier 3 institution."); *id.* at 28396 ("[T]he Bureau estimates that the total savings in the annual ongoing costs from HMDA reporting by excluded firms that are already partially exempt for closed-end mortgage loans under the EGRRCPA will be about $5.9 million."); *id.* at 28400 ("[T]he Bureau estimates that by increasing the threshold to 200 open-end lines of credit starting in 2022, the excluded financial institutions that are already partially exempt under the EGRRCPA will receive an aggregate reduction in operational cost associated with open-end lines of credit of about $3.0 million per year starting in 2022.").

In short, the administrative record shows that the Bureau adequately accounted for the impact of the EGRRCPA in estimating the compliance costs and resulting savings to institutions that would be exempted by an increase in HMDA's reporting thresholds.

3. Finally, Plaintiffs argue that the Bureau's "reliance on aggregate figures, completely divorced from context, obscures that the per institution costs, even as estimated by the CFPB, are not significant." Pls. Br. at 26. Plaintiffs further claim that the Bureau "did not consider how the $6.4 million in estimated savings would be spread across the 1,700 affected institutions, which is obviously a relevant factor." *Id.* Plaintiffs' argument fails for three reasons.

First, contrary to Plaintiffs' suggestion, the Bureau *did* consider the per-institution costs. Indeed, Plaintiffs have the Bureau's methodology backwards. The Bureau did not estimate the aggregate cost savings in the market and then refuse to apply those savings at the per-institution level; rather, the Bureau first estimated per-institution costs for different representative institutions and then aggregated those figures to calculate the cost savings across the market. *See* 85 Fed. Reg. at 28391 ("The *next step* of the Bureau's consideration of the reduction of costs for covered persons involved aggregating the institution-level estimates.") (emphasis added).

Second, there was nothing wrong with how the Bureau evaluated per-institution costs. As the Supreme Court recently stated, "[i]t will be up to the Agency to decide (as always, within the limits of reasonable interpretation) how to account for cost." *Michigan v. EPA*, 576 U.S. 743, 759 (2015). Here, as discussed above, in order to "consider costs in a practical and meaningful way," given that "costs vary by institution due to many factors, such as size, operational structure, and product complexity," the Bureau "adopted an approach that focused on three representative tiers of financial institutions." 85 Fed. Reg. at 28389. The Bureau then produced a series of compliance cost estimates for each representative tier. *See id*. at 28390. For example, the Bureau estimated that a low-complexity institution that is newly excluded by the closed-end threshold change will save approximately $2,200 a year (if partially exempt under the EGRRCPA) or $4,500 a year (if not partially exempt). *See id*. at 28394.[13]

_____

[13] Relately, with respect to the Bureau's consideration of the benefits and costs in increasing the open-end reporting threshold, Plaintiffs argue that the increase in the estimate of open-end reporters is not a sufficient basis to increase the reporting threshold because the number of open-end reporters has no bearing on the per-institution cost. Pls. Br. at 27. However, as explained above, the Bureau focused on both the per-institution cost and the aggregate market cost in assessing the impact of the 2020 Rule. S*ee* 85 Fed. Reg. at 28391. Moreover, the Bureau did not rely on just the increase in the number of open-end reporters. The Bureau also found that it may

Third, the Bureau reasonably concluded that the estimated per-institution cost savings would provide meaningful relief to newly excluded institutions. While Plaintiffs maintain that these tier 3 institution cost savings are not significant in relation to the total asset size of any depository institution subject to HMDA, Pls. Br. at 26, the Bureau was entitled to conclude otherwise. *See Peck*, 751 F. 2d at 1348 ("[T]he requirement that a 'significant' risk be identified is not a mathematical straitjacket. It is the Agency's responsibility to determine, in the first instance, what it considers to be 'significant.'") (quoting *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 655 (1980)). And, as the D.C. Circuit has previously held, "where facts alone do not provide the answer"—in this case what constitutes significant or meaningful cost savings—the agency "should so state and go on to identify the considerations it found persuasive." *Olivares v. TSA*, 819 F.3d 454, 466 (D.C. Cir. 2016). Here, the Bureau conducted a reasonable analysis of the costs that covered financial institutions incur in complying with HMDA's reporting requirements, found that small institutions would face significant burdens under the 2015 Rule loan threshold, and concluded that the per-institution cost savings "provide meaningful burden relief." 85 Fed. Reg. at 28374.

Further, Plaintiffs' argument based on the asset size is unpersuasive. As an initial matter, the asset size requirement does not apply to non-depository institutions. *See* 12 U.S.C. § 2808(a); 12 C.F.R. § 1003.2(g). And while a depository institution must have had $47 million in assets as

---

have understated the burden that open-end reporting would impose on smaller institutions as evidence suggested that, contrary to its assumption in the 2015 Rule, there may not be the cost sharing between an institution's "line of business that conducts open-end lending and the line of business that conducts closed-end lending." *Id*. at 28378. As noted above, the Bureau applied the same methodology used in the 2015 Rule in assessing the costs and benefits of the 2020 Rule but incorporated this new finding regarding costs as well as the new EGRRCPA partial exemptions. The determination that the Bureau reached based on this analysis was reasonable. *See Michigan*, 576 U.S. at 759.

of December 31, 2019 to be covered by HMDA's reporting requirements in 2020, *see* Home Mortgage Disclosure (Regulation C) Adjustment to Asset-Size Exemption Threshold, 84 Fed. Reg. 69993 (Dec. 20, 2019), total asset size does not necessarily relate to the size of that institution's mortgage origination business or compliance operations, on which the Bureau appropriately focused in assessing the impact of the revised loan thresholds. Specifically, the Bureau found that under the 2020 Rule's 100 closed-end loan threshold, approximately 1,620 of the 1,700 newly excluded institutions are similar to the Bureau's representative tier 3, low-complexity institution. 85 Fed. Reg. at 28396. Thus, regardless of their asset size, these institutions generally have few HMDA-compliance staff, do not have automated systems, and are making fewer than one mortgage loan a day each year. *See id*. at 28369 ("A number of small financial institutions stated that they have only a few employees who work in mortgage lending and that these employees spend a considerable amount of time on HMDA compliance."); 28390 (chart detailing complexity of a representative institution's compliance operations for the three tiers); 28389, 28394 (the representative tier 3 institution has 50 mortgage loan/application records per year). Thus, the meaningfulness of the Bureau's estimated costs savings cannot be measured solely by reference to a depository institution's overall asset size. Rather, the Bureau reasonably focused on the complexity of institutions' HMDA-compliance operations in assessing the estimated cost savings and overall impact of the Rule.

Plaintiffs also suggest that there is an "inconsistency between the [Bureau's] 2015 [Rule] statement that a $1,900 annual compliance cost is 'relatively small' and [the Bureau's] 2020 [Rule] statement that avoiding a $2,200 annual compliance cost would produce 'meaningful savings.'" Pls. Br. at 27. They argue that that inconsistency renders the Bureau's later judgment arbitrary and capricious. *Id*. But Plaintiffs take the Bureau's earlier "relatively small" remark out

of context. In 2015, in addressing whether smaller institutions above the reporting threshold would be competitively disadvantaged because they could not absorb the added compliance cost as well as larger institutions, the Bureau estimated that the additional compliance cost would be "relatively small" when viewed on a per origination basis. *See* 80 Fed. Reg. at 66267. As such, the Bureau concluded that it would be unlikely that the 2015 Rule would competitively disadvantage small institutions above the threshold. *Id*. The Bureau did not say that the ongoing compliance cost savings to the smaller *excluded* institutions was small or not meaningful. In fact, the ongoing cost saving estimates for the newly exempt tier 3 closed-end reporting depository institutions are roughly the same in the 2015 and 2020 Rules. In 2015, the Bureau concluded that tier 3 depository institutions excluded by the 25 closed-end loan threshold would save approximately $2,500 in ongoing compliance costs. 80 Fed. Reg. at 66277. In 2020, the Bureau concluded that tier 3 depository institutions excluded by the 100 closed-end loan threshold would save approximately $2,200 a year (if partially exempt under the EGRRCPA) or approximately $4,500 a year (if not partially exempt). 85 Fed. Reg. at 28394. Therefore, contrary to Plaintiffs' assertion, there is no inconsistency between the Bureau's treatment of the meaningfulness of the ongoing compliance cost savings for exempted institutions in the 2015 and 2020 Rules.

In any event, to the extent there is any tension between its conclusions in the 2015 and 2020 Rules regarding the significance of cost savings, the Bureau is permitted to change its position, as discussed further in section II.B.ii. Here, Plaintiffs ignore that in passing the EGRRCPA, Congress believed that further burden relief from HMDA reporting requirements was warranted for smaller-volume institutions, and thus provided for partial exemptions to HMDA's reporting requirements for certain insured depository institutions and insured credit unions. Pub. L. No. 115-174, § 104, 132 Stat. 1296 (2018). Therefore, it was reasonable for the

Bureau to have reassessed in light of the EGRRCPA, as well as additional feedback from industry received since the 2015 Rule, that something that was deemed relatively small in 2015 could in fact be meaningful.

In sum, the administrative record shows that the Bureau reasonably estimated the cost savings that would accrue to covered persons stemming from the 2020 Rule and made a reasoned policy judgment concerning the meaningfulness of those cost savings to covered persons and to the market as a whole. Plaintiffs in all likelihood would have reached a different policy conclusion, but that does not change the fact that the Bureau considered (1) that newly exempt financial institutions will still need to collect data required under HMDA for other statutory or regulatory requirements, (2) the impact of the EGRRCPA on financial institutions' compliance costs for HMDA reporting, and (3) the per-institution cost savings, and reached a reasonable judgment. Plaintiffs have thus failed to show that the Bureau's consideration of the benefits to covered persons from the 2020 Rule's revised reporting thresholds was arbitrary or capricious.

> **B.    The Bureau reasonably considered the benefits and costs to consumers from increasing the HMDA reporting thresholds.**

The Bureau also reasonably considered the benefits and costs to consumers that would result from raising the HMDA reporting thresholds. As to benefits, the Bureau considered that newly excluded institutions could "pass-through" their cost savings to consumers, which could lower mortgage costs as well as positively "affect credit access." 85 Fed. Reg. at 28397. Conversely, the Bureau analyzed the cost that the reduction in HMDA data would have on consumers—namely that there would be less HMDA data to serve HMDA's purposes. *Id*. To do this, the Bureau first estimated the reduction in HMDA data, both by number of institutions and number of loans and applications, nationally and locally. *See*, *e.g.*, *id*. at 28372-73. Then, acknowledging the lack of available data to reliably estimate the direct economic impact that this

reduction in HMDA data would have on consumers, the Bureau relied on a qualitative

assessment, as it had done in the 2015 Rule. *Id*. at 28392.

Plaintiffs claim that this analysis was deficient in two ways: First, the Bureau "refus[ed]

to even consider 'nonquantifiable' harms that would result from the loss of [HMDA data]," and

second, it "fail[ed] to consider and address the disproportionate impacts of data loss" on certain

communities. Pls. Br. at 30. The administrative record contradicts both claims.

> ### i.  The Bureau adequately considered the nonquantifiable costs to consumers that would result from the loss of HMDA data.

To consider the costs to consumers from the 2020 HMDA Rule, the Bureau analyzed and

calculated the reduction in HMDA data at the national and census tract level, as well as for

specific markets. *See*, *e.g.*, 85 Fed. Reg. at 28371-74. The Bureau then considered the impact that

this data loss would have on consumers. *See id*. at 28397 (impact for increasing closed-end

threshold) and 28402 (impact for increasing open-end threshold).  However, as the Bureau

explained, it was "unable to readily quantify the loss of some of the HMDA benefits to

consumers with precision, both because the Bureau does not have the data to quantify all HMDA

benefits and because the Bureau is not able to assess completely how this final rule will reduce

those benefits." *Id*. at 28392. The Bureau elaborated: "quantifying and monetizing benefits of

HMDA to consumers would require identifying all possible uses of HMDA data, establishing

causal links to the resulting public benefits, and then quantifying the magnitude of these benefits.

For instance, quantification would require measuring the impact of increased transparency on

financial institution behavior, the need for public and private investment, the housing needs of

communities, the number of financial institutions potentially engaging in discriminatory or

predatory behavior, and the number of consumers currently being unfairly disadvantaged and the

level of quantifiable damage from such disadvantage." *Id*.  The Bureau used a similar qualitative

approach to assess the impact on consumers in the 2015 Rule. *See* 80 Fed. Reg. at 66262.

Plaintiffs claim that because the Bureau recognized that the available data did not allow it

to readily quantify the direct impact the reduction in HMDA data would have on consumers, the

Bureau improperly dismissed this impact "without further inquiry." Pls. Br. at 32 (citing *Md.*

*People's Counsel v. FERC*, 761 F.2d 768, 776 (D.C. Cir. 1985)). But the Bureau did not use its

inability to conduct a quantitative analysis as an excuse not to consider the impact of the loss of

HMDA data on consumers. As the Bureau expressly stated in the 2020 Rule, "[i]n light of these

data limitations, [the Bureau] provides a qualitative (not quantitative) consideration of the . . .

potential loss of HMDA benefits to consumers." 85 Fed. Reg. at 28392. And so, in the Bureau's

1022(b) Analysis addressing the "Potential Benefits and Costs to Consumers and Covered

Persons," the Bureau discussed—qualitatively—the impact that increasing the reporting

thresholds would have on consumers. *Id*. at 28392, 28397, 28402.

*NRDC v. Herrington*, 768 F.2d 1355 (D.C. Cir. 1985), on which Plaintiffs rely, is

inapposite. There, the D.C. Circuit found that under a distinct statutory scheme, "Congress . . .

mandated quantitative analysis of the factors relevant to economic justification to the greatest

extent practicable." *Id*. at 1400 (internal quotations omitted). There is no such requirement in the

Dodd-Frank Act. *See* 12 U.S.C. § 5512(b)(2)(A). The Dodd-Frank requires only that the Bureau

*consider* benefits and costs, and as the D.C. Circuit has held, absent a statutory requirement,

agencies are not required to consider costs quantitatively. *See Am. Council of Blind v. Mnuchin*,

977 F.3d 1, 8 (D.C. Cir. 2020) ("And our caselaw rejects the notion that the only acceptable

agency analyses are quantitative."). The Bureau's qualitative assessment was thus sufficient. *See*

*Cigar Ass'n of Am. v. FDA*, 480 F. Supp. 3d 256, 276 (D.D.C. 2019) (finding it sufficient for

APA purposes that an agency provided "detail on the benefits of the rule and the reasons why quantification was not possible") (citing *Nicopure Labs, LLC v. FDA*, 266 F. Supp. 3d 360, 406 (D.D.C. 2017)).

Plaintiffs also claim that the Bureau failed to acknowledge its earlier conclusions in the 2015 Rule "that the benefit of enhanced transparency [created by the 2015 Rule] will be substantial" and that as a "sunshine rule . . . most of the benefits . . . on consumers will be realized indirectly." Pls. Br. at 32. This, they argue, violates the APA because the Bureau did not adequately explain its "about-face" in the 2020 Rule. *Id*. But there simply is no "about-face." In the 2020 Rule, the Bureau recognized that HMDA is a sunshine statute that provides benefits to consumers indirectly through transparency and, just as it did in the 2015 Rule, qualitatively assessed the impact the marginal change in HMDA data reporting would have on consumers. *Compare* 80 Fed. Reg. at 66262 *with* 85 Fed. Reg. at 28392.

Plaintiffs also ignore the full scope of the 2015 Rule, which—contrary to Plaintiffs' suggestion—the Bureau did not "repeal." Pls. Br. at 31. The 2015 Rule did more than set reporting thresholds; it also required for the first time that certain institutions report data on open-end lines of credit, implemented the 13 data points mandated by the Dodd-Frank Act and added 14 new discretionary data points, and expanded reporting under some existing data points—thus substantially increasing the amount of publicly available HMDA data. *See generally* 80 Fed. Reg. at 66128. The 2020 Rule, by contrast, amended only the reporting thresholds, keeping in place the additional reporting requirements adopted by the 2015 Rule. The 2020 Rule therefore did not take a position on or reverse the Bureau's previous conclusion that the benefit of enhanced transparency from the 2015 Rule would be substantial. As such, there was no "about-face" to explain.

ii.     **The Bureau adequately considered the geographic distribution of newly excluded entities, including the impact of the data loss on smaller institutions and on rural areas.**

As mentioned above, in considering the costs imposed on consumers by increasing the reporting thresholds, the Bureau considered the amount of data loss at both the national and census tract level, consistent with its obligations under the Dodd-Frank Act. *See* 12 U.S.C. § 5512(b)(2)(A) (requiring the Bureau to consider, among other things, "the impact on consumers in rural areas").

Specifically, the Bureau considered that "any loan-volume threshold will affect individual markets differently, depending on the extent to which smaller creditors service individual markets and the market share of those creditors" and thus "examine[d] the potential effect on available data at the census tract level."[14] 85 Fed. Reg. at 28383. Relative to the 2015 closed-end threshold, the Bureau found that under the new threshold approximately 73,400 census tracts out of approximately 74,600 total census tracts in which HMDA data are currently reported would retain more than 80 percent of reportable HMDA data. *Id*. at 28373. In other words, over 98 percent of census tracts would retain at least 80 percent of HMDA data reported under the 2015 threshold. Similarly, the Bureau estimated that approximately 97 percent of low-to-moderate income (LMI) census tracts and 95 percent of rural census tracts would retain such data. *Id*. Finally, the Bureau considered the impact of the threshold increase on specific types of loan products, such as loans for multifamily housing and manufactured housing, and estimated that under the new thresholds the public would still have access to data on approximately 87

---

[14] Census tracts are defined as "small, relatively permanent statistical subdivisions of a county or equivalent entity." United States Census Bureau, Glossary (last visited Apr. 2, 2021), *available at*:
https://www.census.gov/programs-surveys/geography/about/glossary.html#par_textimage_13.

percent of previously-reported multifamily loan applications and originations and 96 percent of previously-reported loans and applications related to manufactured housing. *Id*. Considering the impact this data loss would have on the public—nationally, locally, and for specific loan products—as well as the burden reduction for newly exempt financial institutions in eliminated compliance costs, the Bureau concluded that the 2020 Rule's closed-end threshold struck a reasonable "balance." *Id*. at 28374.

Nevertheless, Plaintiffs argue that the Bureau's analysis of the impact of the increased reporting thresholds, particularly on smaller geographic areas, was insufficient. First, Plaintiffs argue that the Bureau's assignment of significance to the amount of data loss was unreasonable. *See* Pls. Br. at 34, 35, 38. But while Plaintiffs would have assigned a different significance to the amount of reduced HMDA data, that alone does not render the Bureau's assessment unreasonable. *See Nicopure Labs, LLC v. FDA*, 266 F. Supp. 3d 360, 407 (D.D.C. 2017) ("While plaintiffs would surely have assessed the various costs and benefits in a different manner, the Court does not have the power to take up the agency's analysis de novo.").

Moreover, because determining whether something is "'significant' . . . is not a mathematical straightjacket," it is the "Agency's responsibility to determine, in the first instance, what it considers to be [ ] significant." *Peck*, 751 F. 2d at 1348. And, "where facts alone do not provide the answer," as is the case here regarding how much HMDA data is sufficient to meet HMDA's purposes, the Bureau is "obliged to make policy judgments." *Melcher v. FCC*, 134 F.3d 1143, 1152 (D.C. Cir. 1998). In such cases, courts "require only that the agency . . . state [that it is making a policy judgment] and go on to identify the considerations it found persuasive." *Id*. at 1152. That is what the Bureau did here. The Bureau considered the relevant factors, both quantitatively and qualitatively, and made a policy judgment at that time that

increasing the reporting thresholds would provide meaningful burden reduction for lower-volume financial institutions while maintaining sufficient reporting to achieve HMDA's purposes. *See* 85 Fed. Reg. at 28383 (closed-end); 28378 (open-end).

Plaintiffs next argue that the Bureau did not "meaningfully grapple with comments on the impacts in [rural and LMI] tracts," particularly because the Dodd-Frank Act requires that the Bureau "consider the impact of its rules 'on consumers in rural areas.'" Pls. Br. at 36-37 (citing 12 U.S.C. § 5512(b)(2)(A)(ii)). However, the Bureau specifically addressed the impact the reduction in data from the 2020 Rule would have on rural and LMI tracts. Given the available data, the Bureau quantitatively assessed how many such tracts would retain a meaningful amount of HMDA data. *See* 85 Fed. Reg. at 28383. And, as explained in Section II.B.i, the Bureau qualitatively considered the impact that this loss of HMDA data would have on consumers. *See id*. at 28397, 28402. Indeed, the Bureau dedicated a specific section of its 1022(b) Analysis to the impact of the rule on consumers in rural areas. *See id*. at 28403. Moreover, in considering the appropriate reporting threshold, the Bureau rejected closed-end loan thresholds above 100 as "suggested by industry commenters [because they] could have a material negative impact on the availability of data about patterns and trends at the local level [including in rural tracts] and could affect the availability of data necessary to achieve HMDA's purposes." *Id*. at 28373. Thus, the Bureau's discussion of the disproportionate impact in rural and LMI tracts was not limited to the two sentences Plaintiffs cite. *See* Pls. Br. at 37 (stating that the Bureau's "sole discussion" was two sentences). That the Plaintiffs ignore much of the Bureau's analysis and regard the remainder as insufficient is not a sufficient basis to find it arbitrary and capricious. *See Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 612 (D.C. Cir. 2015) ("[T]he final decision as to how

much analysis is necessary in view of the available data must be the agency's, subject to judicial review only for obviously incorrect results or methodology.").

Lastly, Plaintiffs highlight that in 2015 the Bureau concluded that a loss of 20% or more of reportable HMDA data in 385 census tracts would substantially impede the public's and public officials' ability to understand access to credit in their communities, Pl. Br. at 36 (citing 80 Fed. Reg. at 66147-48), and argue that it is inconsistent with the Bureau's adoption of the 2020 Rule because the Bureau acknowledged that the 2020 Rule would result in a loss of data for 1,200 census tracts. Plaintiffs argue that the Bureau "neither acknowledged nor explained this reversal," rendering the 2020 Rule arbitrary and capricious. *Id*. While it is true that the Bureau changed its policy judgment, doing so was not arbitrary and capricious. In 2015, the Bureau made a policy judgment that a threshold of 25 closed-end loans appropriately balanced the burdens on financial institutions in complying with HMDA with the impact of the resulting loss of HMDA data. In 2019, in "light of the concerns expressed by industry stakeholders regarding the considerable burden associated with reporting the new data points on closed-end mortgage loans required by the 2015 HMDA Rule," the Bureau "proposed to increase the closed-end threshold for institutions to ensure that it appropriately balance[d] the benefits of the HMDA data reported by lower-volume institutions in furthering HMDA's purposes with the burden on such institutions associated with reporting closed-end data." 85 Fed. Reg. at 28368-69. Then, in 2020, based on its consideration of the significant compliance costs and available HMDA data, the Bureau re-assessed its previous policy judgment and concluded that the threshold should be set at 100 closed-end loans. *See id*. at 28370.

An agency is permitted to change its policy. In doing so, the agency must first acknowledge that it is changing its policy; then, the agency must show that the new policy is

permissible under the statute, that there are good reasons for it, and that the agency believes it to be better. *See FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009). "The APA imposes no heightened obligation on agencies to explain 'why the original reasons for adopting the displaced rule or policy are no longer dispositive.'" *Inv. Co. Inst,* 720 F.3d at 376 (quoting *Fox*, 556 U.S. at 514).

Here, the Bureau "clears this low bar." *See id*. at 377. First, the Bureau acknowledged the change in policy. The nature of the rulemaking is an acknowledgement that the Bureau was changing its policy from 2015 with respect to the reporting thresholds for closed-end loans and open-end lines of credit. *See Nat'l Ass'n of Home Builders*, 682 F.3d at 1037 (EPA's rulemaking amending a previous rulemaking showed there was "no doubt that the EPA knew it was changing its position"). And, the Bureau was explicit that it was revisiting the balance it struck in the 2015 Rule.  *See* 85 Fed. Reg. at 28364 ("With the benefit of this additional information about the 2015 HMDA Rule, and the new data to supplement the Bureau's analyses, the Bureau is now in a better position to assess both the benefits and burdens of the reporting required under the 2015 HMDA Rule.").

Next, as evidenced by its consideration of the benefits and costs of the 2020 Rule, the Bureau concluded at that time that there were good reasons for the new policy and that the new policy is better than the previous one. As previously explained, the Bureau received feedback from covered financial institutions regarding significant compliance burdens. *See* 85 Fed. Reg. at 28370-71. Further, in passing the EGRRCPA, Congress recognized the need for additional burden relief following the 2015 Rule. *See generally* Pub. L. No. 115-174, § 104. Accordingly, the Bureau reassessed the appropriate balance between the burden and the benefits of increased HMDA reporting in the 2020 Rule. After considering the reduction in burden for newly excluded

financial institutions as well as the impact of the marginal loss of HMDA data, the Bureau concluded that a 100-loan closed-end threshold "would provide meaningful burden relief for lower-volume . . .  institutions while maintaining reporting sufficient to achieve HMDA's purposes." 85 Fed. Reg. at 28370. As the Supreme Court has made clear, it is sufficient that the Bureau concluded, at the time it adopted the new rule, that this was the better drawn line. *See Fox*, 556 U.S. at 515 (an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better"); *see also Nat'l Shooting Sports Found., Inc.*, 716 F.3d at 214–15 (stating that an agency "has wide discretion in making line-drawing decisions" and that it "is not required to identify the optimal threshold with pinpoint precision[; i]t is only required to identify the standard and explain its relationship to the underlying regulatory concerns").

Finally, as explained more fully in Section III, the revised thresholds are permissible under HMDA.

### III.   The Bureau acted within the scope of its authority under HMDA in issuing the 2020 Rule.

Congress vested the Bureau with broad authority to "prescribe such regulations as may be necessary to carry out the purposes of [HMDA]." 12 U.S.C. § 2804(a). Congress further provided that these "regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as *in the judgment of the Bureau* are necessary and proper to effectuate the purposes of [HMDA], and prevent circumvention or evasion thereof, or to facilitate compliance therewith." *Id.* (emphasis added). Two years before Congress enacted HMDA, the Supreme Court interpreted a similar provision as providing a "broad grant of rulemaking authority" that reflected Congress's judgment that it should "rely on" the agency, which could bring to bear "the expert's familiarity with industry conditions which members of [Congress] cannot be expected to possess."

*Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 372-73 (1973) (discussing the Truth in Lending Act's grant of rulemaking authority, which is nearly identical to HMDA's) (quotations omitted).[15]

The Bureau acted within the scope of this authority when it first established reporting thresholds for certain financial institutions in 2015. And, contrary to Plaintiffs' arguments, it did so again in amending those thresholds in the 2020 Rule. When evaluating whether a regulation is within the scope of an agency's statutory authority, courts apply the familiar framework set forth in *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-44 (1984). *See City of Arlington, Tex. v. FCC*, 569 U.S. 290, 296-97, 300 (2013). The first question is "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842-43. If the court determines that Congress has indeed spoken to the precise question, then the court "must give effect to the unambiguously expressed intent of Congress." *Id*. at 843, n.9. But if the "statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843.[16]

---

[15] In 1973, the Truth in Lending Act (TILA) provided that the Federal Reserve Board "shall prescribe regulations to carry out the purposes of [TILA]" and that these "regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of [TILA], to prevent circumvention or evasion thereof, or to facilitate compliance therewith." *See Mourning*, 411 U.S. 362-63 (citing 15 U.S.C. § 1604(a)).

[16] "The analysis of disputed agency action under *Chevron* Step Two and arbitrary and capricious review is often 'the same, because under *Chevron* step two, [the court asks] whether an agency interpretation is arbitrary or capricious in substance.'" *Agape Church, Inc. v. FCC*, 738 F.3d 397, 410 (D.C. Cir. 2013) (quoting *Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011))

Here, Congress delegated broad authority to the Bureau to establish "exceptions for any class of transactions" that, "in the judgment of the Bureau," are "necessary and proper to," among other things, "facilitate compliance with [HMDA]." 12 U.S.C. § 2804(a). The Bureau interpreted this provision as authorizing the Bureau to provide an exception for the classes of transactions made by institutions whose prior loan activity fell below certain thresholds. The excepted classes of transactions make up less than 2% of closed-end transactions and less than 5% of open-end transactions that were previously reportable under the 2015 Rule. *See* 85 Fed. Reg. at 28394, 28399. The Bureau concluded that excepting these classes of transactions and maintaining uniform thresholds for both depository and non-depository institutions "provides sufficient information on . . . lending to serve HMDA's purposes" and that this uniformity "maintains the simplicity of [the HMDA] reporting regime, thereby facilitating compliance." 85 Fed. Reg. at 28371, 28381.

Plaintiffs, however, claim that the Bureau exceeded its authority under HMDA, arguing: (1) that the 2020 Rule is contrary to HMDA's text because the Rule excludes too many institutions to constitute an "exception," and the Bureau's exception authority is limited to "class[es] of transactions," not "class[es] of institutions"; and (2) that the 2020 Rule is contrary to Congress's will as evidenced by the EGRRCPA. Pls. Br. at 40-43.[17] Neither argument shows that, at *Chevron* Step 1, Congress "unambiguously foreclose[d] the [Bureau's] interpretation,"

---

[17] Plaintiffs also argue that the Bureau cannot justify the 2020 Rule as an exercise of its general rulemaking or exception authority in the Dodd-Frank Act. Pls. Br. at 44-45. However, in amending Regulation C's reporting thresholds, the Bureau relied solely on its authority under HMDA. As such, the Bureau does not address Plaintiffs' argument regarding the Bureau's rulemaking and exception authority under the Dodd-Frank Act.

*Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 663 (D.C. Cir. 2009), or that, at Step 2, the Bureau's interpretation was unreasonable, *Chevron*, 467 U.S. at 843.

### A.    HMDA's text does not unambiguously foreclose the Bureau's interpretation.

Contrary to Plaintiffs' argument, the Bureau's interpretation of its rulemaking authority as permitting it to exclude a small percentage of transactions from being reported under HMDA based on an institution's loan volume is not unambiguously foreclosed under HMDA's broad grant of exception authority. First, Plaintiffs argue that the 2020 Rule excludes too many institutions from HMDA's reporting requirements, and thus the Rule is "inconsistent with the normal meaning of the term 'exception.'" Pls. Br. at 40.[18] But while the Rule does relieve regulatory burdens for many institutions, it excepts less than 2% of closed-end transactions and less than 5% of open-end transactions that were previously required to be reported under the 2015 Rule. *See* 85 Fed. Reg. at 28394, 28399.  An exception for such a small percentage of transactions is wholly consistent with Congress's authorization of "exception[s]" for classes of transactions. Black's Law Dictionary defines "exception" as "[s]omething that is excluded from a rule's operation."  Black's Law Dictionary (11th ed. 2019).  Similarly, Merriam-Webster's Dictionary defines "exception" simply as "a case to which a rule does not apply." *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/exception (last visited Mar. 30, 2021). That is precisely what the 2020 Rule does: it "exclude[s] from [its] operation,"

---

[18] Plaintiffs overstate the percentage of institutions no longer required to report under the 2020 Rule, relative to the 2015 Rule. The Bureau estimated that under 2020 Rule thresholds the number of closed-end reporters would decrease, relative to the 2015 Rule, from approximately 4,860 to 3,160. 85 Fed. Reg. at 28394. That is a decrease of 35%, not 47% as Plaintiffs claim. *See* Pls. Br. at 40.

i.e., HMDA reporting, transactions made by those institutions that do not meet certain loan volume thresholds.[19]

Plaintiffs nevertheless argue that the 2020 Rule somehow ran afoul of some undefined limit to "exception," relying on *Amgen, Inc. v. Smith*, 357 F.3d 103 (D.C. Cir. 2004), a case that does not even address the word "exception." In *Amgen*, the D.C. Circuit found that the phrase "other adjustments" would not permit the Secretary of Health and Human Services to establish a payment scheme under the Medicare Act that would result in the "total elimination or severe restructuring of the statutory scheme." 357 F.3d at 117 (finding that the Secretary of HHS did not exceed its statutory authority). But the 2020 Rule does not result in a total elimination or severe restructuring of HMDA's reporting scheme. The Bureau estimates that more than half of the institutions required to report under the 2015 Rule will still be required to report under the 2020 Rule, and, more importantly, over 98% of closed-end data and over 95% of data on open-end lines of credit will still be reported. *See* 85 Fed. Reg. at 28394, 28399. Put simply, this "exception" does not swallow the rule.

Second, Plaintiffs argue that HMDA permits the Bureau to make exceptions for a "class of transactions" and not exceptions for a "class of institutions." Pls. Br. at 40-41 (quoting 12 U.S.C. § 2804(a)). Again, however, Plaintiffs do not point to any statutory definition of "class of transactions" or explain why a "class of transactions" cannot be interpreted by the Bureau as

---

[19] For this reason, Plaintiffs' reliance on *MCI Telecommunications Corp. v. AT&T*, 512 U.S. 218 (1994) is misplaced. Relying on legal and common dictionaries, the Supreme Court held the word "modify" had "a connotation of increment or limitation," thereby preventing the Federal Communications Commission from enacting a regulatory scheme it viewed as a "fundamental revision of the statute." *Id.* at 225, 231. Ignoring that the Court in *MCI* was interpreting a different word, the 2020 Rule's modest impact of the amount of publicly available HMDA data, relative to the 2015 Rule's thresholds, is not a "fundamental revision" of HMDA's reporting regime.

being based on a characteristic of the institution making the transaction. Here, the Bureau

excluded transactions, i.e., mortgage loans or applications, from being reported if they were

made by institutions whose prior loan activity was below certain loan volume thresholds. Indeed,

in Regulation C, the Bureau provides a list of "Excluded *transactions*." *See* 12 C.F.R.

§ 1003.3(c) (emphasis added). That list includes transactions made by institutions that fall below

the closed-end threshold or threshold for open-end lines of credit. *Id*. § 1003.3(c)(11)-(12).

Plaintiffs instead point to another provision of HMDA, 12 U.S.C. § 2808(a), to try to

show that Congress has unambiguously foreclosed the Bureau's interpretation. Pls. Br. at 42.

Section 2808(a) provides that the Bureau may exempt non-depository institutions if it shows they

are "comparable within their respective industries to [depository] institutions" with $10 million

or less in assets. Because the exemption authority for non-depository institutions in section

2808(a) specifically uses the word "institutions," Plaintiffs argue that the Bureau's broader

exemption authority in section 2804(a) for "class[es] of transactions" cannot be based on

institutions. Plaintiffs ignore, however, that the non-depository exception authority in section

2808(a) was added in 1991, 16 years after the HMDA's broader exception authority for

"class[es] of transactions" in section 2804(a) was enacted. *Compare* Pub. L. No. 102–242, § 224,

105 Stat 2236 (1991) *with* Pub. L. No. 94-200, § 309, 89 Stat. 1124 (1975). Plaintiffs do not

explain how adding the word "institutions" in one section affected the definition of "class[es] of

transactions" in another section. Nor do Plaintiffs explain how in expanding the Federal Reserve

Board's (and subsequently, the Bureau's) exception authority to include non-depository

institutions in section 2808(a) in 1991, Congress implicitly limited the broader exception

authority in section 2804. Section 2808(a) simply does not have the effect that Plaintiffs ascribe

to it.

Notably, in amending HMDA after the Bureau's 2015 Rule, in which the Bureau first excepted transactions based on an institution's loan volume, Congress followed the same loan volume framework in providing partial exemptions to HMDA's reporting requirements. *See* Pub. L. No. 115-174, § 104.  In particular, Congress provided that insured depository institutions and insured credit unions that originated fewer than 500 closed-end or open-end mortgage loans in each of the two preceding calendar years did not have to report certain of the required data points. *Id*. Congress did not disturb the Bureau's regulatory exceptions for transactions by institutions below the closed-end loan threshold or threshold for open-end lines of credit. And Congress's adoption of the loan volume framework is "persuasive evidence" that Congress did not unambiguously foreclose the Bureau's interpretation. *Cf. Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986) ("[C]ongressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.") (internal quotations omitted).

Thus, Plaintiffs have not shown that HMDA's text provides a basis for finding that Congress has unambiguously foreclosed the Bureau's interpretation. *Nat'l Cable & Telecomms. Ass'n*, 567 F.3d at 663.

**B.     The Bureau's interpretation of its rulemaking authority under HMDA is reasonable.**

The Bureau reasonably interpreted section 2804(a) to authorize an exception for the small percentage of transactions made by institutions whose prior loan activity fell below certain thresholds. The Bureau's interpretation fits with the statutory language and is consistent with HMDA's purposes. *See Good Fortune Shipping SA v. Comm'r of IRS*, 897 F.3d 256, 261 (D.C. Cir. 2018) ("Whether an agency's construction is reasonable depends, in part, on the

49

construction's fit with the statutory language, as well as its conformity to statutory purposes.") (internal quotations omitted).

First, as discussed above, Section 2804(a) broadly authorizes the Bureau to make exceptions for "*any* class of transactions" that the Bureau judges to be necessary and proper to serve HMDA's purposes, prevent circumvention of HMDA, or to facilitate compliance with HMDA. In 2015, and again in 2020, the Bureau interpreted this provision as authorizing exceptions for the small percentage of transactions that are made by institutions that originated relatively few loans in each of the two preceding years. Additionally, the Bureau's interpretation is consistent with the text of other provisions of HMDA that provide exceptions or exemptions to reporting requirements for transactions made by certain lenders. For instance, 12 U.S.C. § 2803(g) provides an "exception[]" applicable to "mortgage loans" made by subsidiaries of certain entities. And, in 2018—after the Bureau had provided an exception for transactions based on the institution's prior loan volume in the 2015 Rule—Congress added 12 U.S.C. § 2803(*i*)(1), (2), which provided "exemptions" "with respect to closed-end mortgage loans" and "with respect to open-end lines of credit" that are based on the institution's prior loan volume and are designed to relieve regulatory burden. *See* Pub. L. No. 115-174, § 104.

Second, the Bureau's interpretation is consistent with HMDA's purposes. HMDA is a disclosure statute designed to provide the public and public officials with information about mortgage lending. *See* 12 U.S.C. § 2801(b). As explained above, the Bureau sought to draw a line that would balance the burden imposed on smaller financial institutions while maintaining sufficient publicly available HMDA data that would serve HMDA's purposes. *See* 80 Fed. Reg. 66147. The Bureau believed that it arrived at the appropriate balance in the 2020 Rule, finding that the 2020 Rule's thresholds provide sufficient information on mortgage lending to serve

HMDA's purposes, while appropriately reducing costs that smaller institutions would incur under the thresholds from the 2015 Rule. *See* 85 Fed. Reg. at 28371, 28378. Indeed, under the 2020 Rule's thresholds, the Bureau estimates that over 98% of closed-end data and over 95% of data on open-end lines of credit, relative to the 2015 Rule's thresholds, will still be reported. *See* 85 Fed. Reg. at 28394, 28399. By maintaining such a large volume of data, the Bureau's interpretation is consistent with HMDA's purposes of providing the public and public officials with information about mortgage lending.

Plaintiffs nevertheless argue that the Bureau does not "discuss how increasing the coverage thresholds effectuates the 'purposes' of HMDA, prevents circumvention or evasion, or facilitates compliance, as would be necessary to validly invoke" section 2804(a). Pls. Br. at 39. Similarly, Plaintiffs argue that the Bureau's interpretation is not consistent with HMDA's text because "[a]llowing the [Bureau] to issue such broad exceptions under section [2804(a)] would also require an unreasonable interpretation of the phrase 'necessary and proper to effectuate the purposes of' the HMDA." Pls. Br. at 41.[20] But as Plaintiffs acknowledge, HMDA requires that the Bureau conclude that its exceptions are necessary and proper to effectuate the purposes of HMDA *or*, as relevant here, to facilitate compliance therewith. 12 U.S.C. § 2804(a). Thus, it is sufficient for the Bureau to have concluded that its exceptions are necessary and proper to facilitate compliance with HMDA's reporting requirements.

---

[20] Plaintiffs similarly argue that the Bureau "refused to analyze the impact of the [2020] Rule on the 'purposes' of HMDA, on the ground that any impact on those purposes were not quantifiable," and thus "failed to demonstrate that it considered a statutory factor," rendering the 2020 Rule "arbitrary and capricious." Pls. Br. at 39-40. However, as discussed in Section II.B.i, the Bureau did not refuse to consider any unquantifiable harms to HMDA's purposes resulting from the 2020 Rule; rather, the Bureau acknowledged why it could not quantify the economic impact from the reduction in HMDA data and provided a qualitative assessment instead. *Id*. at 28392.

The Bureau explained throughout the 2020 Rule, as it had in the 2015 Rule, that by exempting lower-volume financial institutions, the threshold facilitated compliance with HMDA by reducing the often substantial—and sometimes prohibitive—burden on institutions with lower volumes of lending. *See*, *e.g.*, 85 Fed. Reg. at 28367-68 (noting that in 2015, the Bureau "found that the [reporting thresholds] . . . . facilitate compliance with HMDA."); *Id*. at 28384 ("A threshold of 100 closed-end mortgage loans also facilitates compliance with HMDA by reducing burden on smaller institutions.").

The Bureau also explained that the 2020 Rule's uniform "threshold of 100 closed-end mortgage loans" for both depository and non-depository institutions "maintains the simplicity of [the HMDA] reporting regime, thereby facilitating compliance." *Id*. at 28371, 28381; *see also id*. at 28385 ("Additionally, the increase in the permanent threshold . . . to 200 open-end lines of credit will promote consistency, and thereby facilitate compliance, by subjecting nondepository institutions to the same threshold that applies to the depository institutions that make up the majority of the open-end line of credit market."). As the Supreme Court has previously recognized, establishing "a clear, easy to apply (and easy to enforce) rule" facilitates compliance with a statutory scheme. *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 245 (2004) (finding a Federal Reserve Board rule implementing TILA effectuated the purposes of TILA, prevented circumvention or evasion thereof, and facilitated compliance therewith).

In addition to considering how the revised reporting thresholds facilitated compliance, the Bureau also considered how the thresholds would impact consumers' access to credit—one of the factors that motivated Congress to enact HMDA. *See* 12 U.S.C. § 2801 ("Congress finds that some depository institutions have sometimes contributed to the decline of certain geographic areas by their failure . . . to provide adequate home financing to qualified applicants on

reasonable terms and conditions."). Industry commenters reported that institutions limit their lending, or exit the market altogether, in order to avoid the burdens of HMDA reporting. *See id*. at 28369 (noting a comment from a national trade association stating that a "significant number of small financial institutions limit or no longer offer specific mortgage products" in order to avoid HMDA reporting, "which ultimately leaves customers with fewer lending options"); *id*. at 28369 ("Most of these commenters discussed the burden of collecting and reporting HMDA data and . . . stated that the cost of complying with regulations has affected their ability to serve their communities."). It was the Bureau's judgment that "[a]voiding the imposition of such costs for these affected institutions may also enable smaller institutions to focus on lending activities and serving their communities." *Id.* at 28374.

In sum, because the Bureau reasonably exercised its rulemaking authority under HMDA to except transactions made by institutions whose prior loan activity fell below certain thresholds, *Chevron* bars the courts from "disturb[ing] it." *Chevron*, 467 U.S. at 845.

**C.     Congress's decision to provide additional regulatory relief through the 2018 EGRRCPA supports the reasonableness of the Bureau's interpretation of its statutory authorities.**

Congress's decision to provide regulatory relief to certain low-volume institutions from the burdens imposed by the new data reporting requirements of the 2015 Rule supports, rather than undercuts, the additional regulatory relief that the Bureau provided through the 2020 Rule. First, the EGRRCPA plainly demonstrates Congress's judgment that there was need for additional regulatory relief for certain institutions, especially smaller institutions, following the 2015 Rule. Second, as noted above, the EGRRCPA utilized the same loan-volume threshold approach in determining exemptions as used by the Bureau in both the 2015 and 2020 Rules, thus supporting the Bureau's interpretation of its statutory exception authority and its conclusion

that reducing reporting requirements and thus costs for certain small-volume institutions (even at the cost of some HMDA data) is consistent with the purposes of HMDA.

Plaintiffs make no attempt to show that the EGRRCPA amended or in any way limited the Bureau's pre-existing authority to create or alter loan-volume thresholds. Nor could they. Had Congress wanted to limit the Bureau's exception authority, it could have amended Section 2804(a) while it was amending HMDA, but it did not. Contrary to Plaintiffs' assertions, Congress through the EGRRCPA did not "codif[y] its judgment as to the proper balance of costs and benefits of reporting by institutions," Pl. Br. at 42, but rather created a statutorily-imposed *floor* of certain regulatory relief that exceeded the relief provided by the exceptions to reporting adopted by the 2015 Rule, without setting any corresponding *ceiling*.

Relatedly, Congress's decision to provide for only partial exemptions and not to apply those exemptions to non-depository institutions does not undercut the 2020 Rule's complete exclusion from reporting requirements for transactions by institutions, including non-depositories, reporting fewer than 100 closed-end loans or 200 open-end lines of credit. *See* Pls. Br. at 43. Congress did not disturb the 2015 Rule's exceptions based on loan volume and the Rule's application of those exceptions to non-depositories. In setting partial exemptions for insured depository institutions and insured credit unions, Congress could have rejected the Bureau's complete exceptions for transactions by the same institutions (as well as non-depositories) reporting fewer than 25 closed-end or 100 open-end lines of credit. But Congress did not. Contrary to Plaintiffs' assertion, the EGRRCPA does not show that the Bureau's interpretation of Section 2804(a) is unreasonable.

In short, nothing in the EGRRCPA suggests that Congress intended to preclude raising HMDA's reporting thresholds should the Bureau determine, through the exercise of its pre-

existing authorities, that doing so was warranted. The Bureau determined, based on information it had gathered since 2015, including after the passage of the EGRRCPA, and following its consideration and balancing of benefits and costs to both consumers and covered persons, that excepting additional loans made by the smallest loan volume reporting institutions was appropriate under HMDA.  *See* 85 Fed. Reg. 28378. The Bureau's 2020 Rule is therefore not arbitrary and capricious in violation of the APA.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to the Bureau on all of Plaintiffs' claims and deny Plaintiffs' motion for summary judgment.

Dated: April 2, 2021

Respectfully submitted,

MARY McLEOD
*General Counsel*
JOHN R. COLEMAN
*Deputy General Counsel*
LAURA M. HUSSAIN
*Assistant General Counsel*
CHRISTOPHER DEAL
*Senior Counsel*

/s/ Joseph Frisone
JOSEPH FRISONE (Va. Bar No. 90728)
*Counsel*
Consumer Financial Protection Bureau
1700 G Street, NW
Legal Division
Washington, D.C. 20552
Telephone: (202) 435-9287
Fax: (202) 435-7024
Joseph.Frisone@cfpb.gov

*Counsel for Defendant Consumer*
*Financial Protection Bureau*